**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| SIGNAL NATIONAL LLC, *et al.*,[1] | § § § | Case No. 26-90190 (ELM) |
| Debtors. | § § § | (Joint Administration Requested) |

**DECLARATION OF MARK SHAPIRO IN SUPPORT OF DEBTORS'
EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Mark Shapiro declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. Since May 2024, I have been the independent Chief Operating Officer ("COO") of 777 Partners LLC ("777 Partners") and 600 Partners LLC ("600 Partners"), the parent holding companies for the broader company enterprises described in this Declaration. I am the authorized signatory for Signal National LLC ("Signal National") and each of the other above-captioned affiliated debtors and debtors in possession (each, a "Debtor" and collectively, with 777 Partners and 600 Partners, the "Debtors" or the "Company").

2. I am over the age of 18, and I am authorized to submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash*

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/SignalNational. The Debtors' address for service in these chapter 11 cases is 3500 Maple Ave, Suite 420, Dallas, TX 75219.

4923-3496-1092

*Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion"), filed contemporaneously herewith.[2]

3.      I am a Senior Managing Director of GlassRatner Advisory & Capital Group LLC ("GlassRatner"), where I have been employed since 2016.[3] Prior to that time, I managed Challenger Advisors LLC, a Dallas-based turnaround financial advisory firm, and before that served as chief financial officer for a number of public companies, including Big Lots Inc. and Central Parking Corp, as well as private equity-owned portfolio businesses.  I received my Bachelor of Science degree in accounting from The Ohio State University and began my career with Ernst & Young in New York.  I am a Certified Public Accountant (inactive).

4.      I have over thirty years' of experience as a turnaround advisor and corporate financial executive and have advised debtors, secured lenders, trade creditors, and equity holders in both out-of-court and in-court proceedings.  As a turnaround consultant, I have experience in a number of disciplines needed to help improve a company's performance including assessing a company's financial performance, comparing operating results to industry norms, providing financial forecasts, providing cash management assistance, developing and executing business strategy and plans, analyzing markets, recreating a company's prior year financial statements, assessing business valuations, determining cost reduction opportunities, among others.  I have extensive experience in United States Bankruptcy Courts, including the U.S. Bankruptcy Court for the Northern District of Texas.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement, as applicable.

[3] B. Riley Financial purchased GlassRatner in or around July 2018, which then for a time did business as B. Riley Advisory Services.  In June 2025, GlassRatner was sold out of B. Riley and once again became its own stand-alone entity.

2

5.      In my capacity as Interim COO, I am familiar with the Debtors' daily operations, their books and records, and their business and financial affairs.  Since being retained by the Debtors, I have worked closely with management, legal counsel, and other advisors to evaluate the Debtors' strategic alternatives, liquidity needs, and financing options.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisors that report to me in the ordinary course of my responsibilities.

6.      Pursuant to the DIP Motion, the Debtors seek authority to, among other things: (a) enter into a senior secured loan facility in an aggregate principal amount of up to $24,952,000 (the "DIP Facility" or "DIP Credit Facility") with the DIP Lenders, comprised of $6,238,000 in New Money Loans and up to $18,714,000 of Roll-Up Loans, with up to $2,300,000 available on an interim basis (comprised of approximately $575,000 in New Money Loans and up to $1,725,000.00 in Roll-Up Loans); (b) use cash collateral of the DIP Lenders under the terms of the DIP Orders; and (c) grant adequate protection to the Pre-Petition Lenders.

7.      Based on the Debtors' financial condition and the circumstances described in the DIP Motion, the Debtors were unable to obtain unsecured credit.  The DIP Motion therefore seeks authority to grant the DIP Lenders superpriority administrative expense claims and liens on encumbered and unencumbered assets, as necessary to induce the DIP Lenders to provide the DIP Facility.  Except with respect to each DIP Lender (in its capacity as a Pre-Petition Lender), the DIP Motion and DIP Orders expressly do not attempt to prime any other party; the DIP Lenders have consented to priming themselves.

8.      It is my opinion, based on my experience, that the proposed DIP Credit Facility is the product of arm's-length, good-faith negotiations conducted over the course of several months.

3

4923-3496-1092

The Debtor's independent director has approved the proposed transaction, and each of the Debtors and the DIP Lenders was represented by separate, independent legal and financial advisors throughout the negotiation process. Accordingly, the DIP Credit Facility represents the best—and only—postpetition financing available to the Debtors given the circumstances of these chapter 11 cases, and entering into the DIP Credit Facility is in the best interests of the Debtors, their estates, and all parties in interest.

9.      References to the Bankruptcy Code (as defined in the Motion), the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**The Debtors' Immediate Need for DIP Financing**

10.     The Debtors' business history, capital structure, and circumstances leading to these chapter 11 cases are described in greater detail in my First Day Declaration, which is incorporated herein by reference.

11.     Prior to the Petition Date, and as set forth in the First Day Declaration, the Debtors experienced severe liquidity constraints that left them unable to fund ongoing operations and the costs associated with preparing for and commencing these chapter 11 cases.  Those constraints resulted from a combination of market, business, regulatory, and creditor-related developments that materially reduced the Company's access to external capital.

12.     In the wake of these developments, 777 Partners and 600 Partners hired GlassRatner in May 2024 to provide independent financial leadership and advisory services, including day-to-day operational control and managerial services.  For more than two years, under GlassRatner's stewardship, the Debtors have been winding down their historical operations in an

4

effort to maximize value for creditors while managing substantial, overlapping litigation exposure. Throughout this period, certain of the Debtors' prepetition senior secured lenders and their affiliates—several of whom are also participating in the proposed DIP financing—continued to provide liquidity, including protective advances requested by GlassRatner to fund working-capital needs and permit the Company to continue operating while GlassRatner stabilized the business, addressed creditor issues, and restructured, sold, or wound down businesses that the Company could no longer support.

13.    Without additional financing, including the Pre-Petition Advances, the Debtors would have been unable to maintain payroll, satisfy critical operating obligations, pay rent and insurance, honor customer commitments, or fund the professional expenses necessary to implement a restructuring process.

14.    The DIP Credit Facility is critical to preserving value, maintaining operations and relationships with employees, vendors, customers, and counterparties, administering these chapter 11 cases, and effectuating the restructuring and sale transactions contemplated by the Debtors.  I therefore believe that the DIP Credit Facility is in the best interests of the Debtors, their estates, and all stakeholders

15.    Absent access to the DIP Credit Facility and cash collateral, the Debtors would face immediate and irreparable harm.  The Debtors do not have any sources of readily available credit in these chapter 11 cases other than the proposed DIP Credit Facility.  The Debtors would likely be unable to continue operations, resulting in a significant loss of estate value and materially diminished recoveries for creditors and other stakeholders.  The DIP Credit Facility therefore provides critically needed liquidity that will enable the Debtors to preserve going-concern value while pursuing an orderly wind-down process.

4923-3496-1092

16.     The Debtors have prepared a detailed Approved Budget demonstrating their liquidity needs during the interim period.  The interim draw of approximately $2,300,000, comprising $575,000 in New Money Loans and $1,725,000 in Roll-Up Loans, is specifically tailored to cover the Debtors' projected operating expenses, professional fees, and administrative costs during the period between the interim and final hearings (approximately the month of August 2026).

17.     The Debtors' projected cash position is insufficient to sustain operations through the period required to schedule and conduct a final hearing on the DIP Motion.  Without immediate access to interim financing and Cash Collateral, the Debtors would be unable to fund payroll, satisfy critical vendor obligations, and pay the professional fees necessary to administer these chapter 11 cases, which would result in immediate and irreparable harm to the estates and their stakeholders. Interim approval is therefore necessary to bridge the Debtors' liquidity needs until the Court can conduct a final hearing.

### Debtors' Efforts to Obtain Financing

18.     Since being retained, GlassRatner has provided financial advisory services which include exploring financing options to address the Debtors' liquidity constraints.  To that end, GlassRatner contacted twenty-five (25) financing sources for a potential DIP loan.  As of today, none of those parties are willing to provide financing to the Debtors.  The parties contacted were unwilling to extend unsecured credit, take a junior lien on any assets, were unwilling to engage in a priming fight with the Prepetition Lenders, or otherwise did not believe making this kind of DIP loan was a good fit.

19.     The DIP Lenders are prepetition senior, secured lenders with first-priority security interests on substantially all of the Debtors' assets, and their Pre-Petition Indebtedness far exceeds

4923-3496-1092

the expected value of the Debtors' assets.  Obtaining postpetition financing from any other source was unrealistic as it would either have required the DIP Lenders to consent to priming liens—which they would not do—or obtain financing on an effectively unsecured basis.  GlassRatner was unable to identify any party interested in or willing to provide postpetition funding to the Debtors on an unsecured or junior-lien basis and no other stakeholder or third party has presented an alternate debtor in possession financing proposal.  Based on my experience with the Debtors over the last two-plus years and the existence of the Pre-Petition Indebtedness, I do not believe that there is any other viable third-party postpetition financing source available to the Debtors.  That said, between the time of the interim hearing on the DIP Motion and the final hearing, I plan to work with the Debtors, their independent manager, and third parties to further market the DIP Credit Facility to ensure that the Debtors will incur postpetition financing on the best possible terms.

20.     With no other source of capital, the DIP Lenders agreed to fund the DIP Facility to allow the Debtors to pursue the sale and restructuring transactions contemplated in these cases.  As a consequence, and given time and liquidity constraints, I believe that the DIP Facility was the best financing alternative available under the circumstances.  That said, between the time of the interim and final hearings on the Motion, GlassRatner will continue to "shop the DIP" to ensure that the Debtors ultimately seek final approval of the best and most favorable financing terms available.

**Roll-Up Structure**

21.     To finance these chapter 11 cases, the DIP Lenders have agreed to provide the Debtors with the DIP Facility in the principal amount of up to $24,952,000, comprised of $6,238,000 in New Money Loans and up to $18,714,000 in Roll-Up Loans.  Of the DIP Roll-Up Loans, the Debtors seek to roll up $1,725,000.00 on an interim basis, representing a portion of the

7

4923-3496-1092

Prepetition Advances made by the Pre-Petition Lenders constituting bridge financing that allowed the Debtors to prepare for these chapter 11 cases, retain and compensate their professionals, and operate the business in the interim.

22.     The Roll-Up Loans were a material and required component of the DIP Credit Facility, the DIP Lenders' willingness to provide the New Pre-Petition Advances, and I do not believe the DIP Lenders would be willing to provide the DIP Credit Facility without the roll up component.   The Debtors agreed to the roll-up structure only after extensive arm's-length negotiations and only because the DIP Lenders were the sole viable source of financing available to fund operations, support the chapter 11 process, permit use of cash collateral, and facilitate the restructuring transactions contemplated by the Debtors.

23.     In my experience, roll up loans are not an uncommon occurrence in chapter 11 cases, particularly where, as here, the Debtors are unable to locate a new, third-party lender willing to finance the chapter 11 process.  Although the ratios of new money loans to roll up loans vary from case to case, the roll up ratio of New Money Loans ($6,238,000) to Roll Up Loans ($18,714,000) in this case is 3:1.  Based on my experience, this 3:1 ratio of New Money Loans to Roll Up Loans is within the range of roll ups approved by this Court, as well as other courts, both within this District and outside of this District. Indeed, an aggregate ratio of 3:1 roll up to new money loans was recently approved in *In re CareMax, Inc.*, No. 24-80093 (MVL) (Bankr. N.D. Tex. Jan. 24, 2025) (authorizing DIP facility in an aggregate principal amount of $122 million, including $30.5 million of new-money DIP term loans and a $91.5 million roll up (3:1 roll-up)); and courts in this District also approved an interim roll up of a "prepetition DIP" in *In re Buca Texas Restaurants, L.P.*, No. 24-80058 (SGJ) (Bankr. N.D. Tex. Aug. 7, 2024) [Docket No. 77] and

8

4923-3496-1092

*In re Studio Movie Grill Holdings, LLC*, Case No. 20-32633 (SGJ) (Bankr. N.D. Tex. Oct. 27, 2020) [Docket No. 52].

24. In my business judgment, the roll-up is reasonable under the circumstances, necessary to secure the DIP financing, and in the best interests of the Debtors' estates and stakeholders.

**Fairness and Reasonableness of the DIP Credit Facility**

25. I believe the terms of the DIP Credit Facility are fair and reasonable under the circumstances, are generally in line with market trends, and are the product of good faith, arm's-length negotiations. The terms of the DIP Credit Facility, including the interest rate, fees, milestones, collateral package, and roll-up provisions, were extensively negotiated by the Debtors and the DIP Lenders with the assistance of experienced restructuring professionals and counsel. Such terms were an integral part of the overall terms of the DIP Credit Facility, the DIP Orders, and the restructuring transactions contemplated in these cases.

26. The DIP Credit Facility bears interest at 11.5% per annum. It includes customary fees and expenses and contains milestones designed to ensure that the Debtors proceed promptly toward a sale or restructuring. The specific terms of the DIP Credit Facility, including events of default, reporting requirements, and financial covenants, are set forth in detail in the DIP Credit Agreement attached to the Motion.

27. I believe that the proposed DIP Liens on encumbered and unencumbered assets are common features of postpetition financing facilities and were a necessary feature here to provide security for the proposed financing

28. Given the Debtors' financial condition, the limited availability of financing sources, the timing and risks associated with these chapter 11 cases, and the absence of competing

9

4923-3496-1092

proposals, I believe that the economic terms of the DIP Credit Facility are fair, reasonable, and appropriate under the circumstances. I also believe that the terms of the DIP Credit Facility are in accordance with current market terms.

29. The DIP Credit Facility provides the Debtors with sufficient liquidity to operate their businesses, preserve value, conduct a sale and restructuring process, and maximize recoveries for stakeholders.

30. I also believe that the milestones contained in the DIP Credit Facility, although tight, are achievable and appropriately designed to facilitate a prompt and value-maximizing chapter 11 process.

31. After considering all available alternatives and consulting with the Debtors' advisors, I concluded that entering into the DIP Credit Facility, including the fees and rates to be paid, constitutes a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and all stakeholders.

**Use of Cash Collateral**

32. In addition to the DIP Credit Facility, the Debtors require continued use of Cash Collateral, which is essential to the continued operation of the Debtors' businesses and smooth entry into these chapter 11 cases.

33. The projections in the Approved Budget rely on the assumption that the Debtors will continue to access cash generated through ordinary course transactions, and the Debtors would require further postpetition financing if they were unable to access Cash Collateral.

34. Accordingly, I believe that access to Cash Collateral, on an interim basis, is critical to supplement the proceeds of the DIP Credit Facility and provide the required liquidity for the Debtors to maintain ordinary course operations and administer these chapter 11 cases.

4923-3496-1092

35.    To protect the interests of the Pre-Petition Lenders, the DIP Orders provide adequate protection in the form of replacement liens and superpriority administrative expense claims. The Debtors' use of Cash Collateral and the granting of DIP Liens could otherwise result in a diminution in the value of the Pre-Petition Lenders' collateral. I believe these adequate protection provisions are sufficient to protect the Pre-Petition Lenders against any such diminution. Notably, the DIP Lenders (in their capacity as such as well as their capacity as Pre-Petition Lenders) agreed to forego the payment of reasonable and documented professional fees and expenses during the course of these bankruptcy cases, an element of adequate protection to which they would ordinarily be entitled.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: August 9, 2026

*/s/ Mark Shapiro*
Mark Shapiro
Interim Chief Operating Officer

11

4923-3496-1092