**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| SIGNAL NATIONAL LLC, *et al.*,[1] | § § | Case No. 26-90190 (ELM) |
| Debtors. | § § § | (Joint Administration Requested) |

**DECLARATION OF MARK SHAPIRO IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Mark Shapiro, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am over the age of 18, and I am authorized to submit this declaration (this "Declaration") on behalf of the debtors and debtors in possession in the above captioned chapter 11 cases (the "Chapter 11 Cases").  I submit this Declaration in support of the Debtors' chapter 11 petitions and the relief sought in the first-day pleadings filed contemporaneously herewith (collectively, the "First Day Motions").

2.      Since May 2024, I have been the independent Chief Operating Officer ("COO") of 777 Partners LLC ("777 Partners") and 600 Partners LLC ("600 Partners"), the parent holding companies for the broader company enterprises described in this Declaration.  I am the authorized signatory for Signal National LLC ("Signal National") and each of the other above-captioned affiliated debtors and debtors in possession (each, a "Debtor" and collectively, with 777 Partners and 600 Partners, the "Debtors" or the "Company").

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/SignalNational.  The Debtors' principal offices are located at 3500 Maple Avenue, Suite 420, Dallas, Texas 75219.

3.      I am a Senior Managing Director of GlassRatner Advisory & Capital Group LLC ("GlassRatner"), where I have been employed since 2016.[2] Prior to that time, I managed Challenger Advisors LLC, a Dallas-based turnaround financial advisory firm, and before that served as chief financial officer for a number of public companies, including Big Lots Inc. and Central Parking Corp, as well as private equity-owned portfolio businesses.  I received my Bachelor of Science degree in accounting from The Ohio State University and began my career with Ernst & Young in New York.  I am a Certified Public Accountant (inactive).

4.      I have over thirty years' experience as a turnaround advisor and corporate financial executive and have advised debtors, secured lenders, trade creditors, and equity holders in both out-of-court and in-court proceedings.  As a turnaround consultant, I have experience in a number of disciplines needed to help improve a company's performance including assessing a company's financial performance, comparing operating results to industry norms, providing financial forecasts, providing cash management assistance, developing and executing business strategy and plans, analyzing markets, recreating a company's prior year financial statements, assessing business valuations, determining cost reduction opportunities, among others.  I have extensive experience in United States Bankruptcy Courts, including the U.S. Bankruptcy Court for the Northern District of Texas.  My prior engagements Debtor-side engagements in bankruptcy cases include:

- Buddy Mac Holdings LLC. (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);
- Bela Flor Nurseries, Inc. (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division);

---

[2] B. Riley Financial purchased GlassRatner in or around July 2018, which then for a time did business as B. Riley Advisory Services.  In June 2025, GlassRatner was sold out of B. Riley and once again became its own stand-alone entity.

4911-5404-5636

- Eye Care Leaders Portfolio Holdings LLC (financial advisor to the Debtors; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Kalera Inc. (chief restructuring officer; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Christian Care Centers Inc. (chief restructuring officer and liquidating trustee; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Limetree Bay Services, LLC (chief restructuring officer; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Fresh Acquisitions, LLC (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Loves Furniture, Inc. (financial advisor to the Debtors; United States Bankruptcy Court for the Eastern District of Michigan);

- PBS Brand Co., LLC/Punch Bowl Social (chief restructuring officer; United States Bankruptcy Court for the District of Delaware);

- GGI Holdings LLC/Gold's Gym (financial advisor to the Debtors and liquidating trustee; United States Bankruptcy Court for the Northern District of Texas, Dallas division);

- Eagle Pipe LLC (financial advisor to the Debtors; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Pine Creek Medical Center LLC (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Lockwood Holdings LLC (chief restructuring officer; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Uplift Rx LLC/Alliance Health (financial advisor to the Debtors and liquidating trustee; United States Bankruptcy Court for the Southern District of Texas, Houston Division)

5.      In my capacity as COO, I have been managing the Debtors' daily operations since May 2024 and am familiar with their books and records and their business and financial affairs. I have been directly involved in over 30 sales and other dispositions of assets and/or business units involving the Debtors and / or their affiliates and I have spent extensive time overseeing and developing a path for maximizing the value of the Debtors' remaining businesses and assets.

6.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information, my discussions with

4911-5404-5636

the Debtors' employees and professional advisors, or my opinions based upon experience, knowledge and information concerning the Debtors' operations and financial affairs.  In preparing this Declaration, I have drawn upon my day-to-day involvement in managing the Debtors' operations since May 2024, my oversight of the retention of the Debtors' restructuring counsel and other professional advisors, and my review of the forensic accounting analysis conducted with respect to the Debtors' financial records.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7.       On August 9, 2026, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court.  The Debtors are, and intend to continue, in possession of their assets and managing their respective businesses as debtors in possession. As explained further below, the filing of these Chapter 11 Cases was accelerated as a result of a recent involuntary bankruptcy petition filed against certain of the Debtors and the petitioning creditors' unwillingness to cooperate with a voluntary filing process.

**Preliminary Statement**

8.       These Chapter 11 Cases do not mark the beginning of the Debtors' restructuring efforts.  Since May 2024, independent restructuring professionals have managed the Company through an extensive wind-down, conducted without a chapter 11 filing at the Debtor level (although, as described below, certain subsidiaries were placed into insolvency or administration proceedings in other jurisdictions), that has materially reduced the Company's operating footprint and headcount, disposed of or transitioned numerous businesses and investments, reduced or resolved significant secured indebtedness, and preserved assets that require additional time to monetize.

4911-5404-5636

9.      Historically, 777 Partners and 600 Partners operated as diversified investment holding companies with businesses and investments across structured finance and private credit, insurance and reinsurance, financial technology, litigation finance, aviation, professional sports, media and entertainment, and sustainability.  Those businesses were conducted through numerous operating subsidiaries, special-purpose entities and portfolio holding companies. Brickell Insurance Holdings LLC ("Brickell"), a non-Debtor affiliate, historically served as the principal holding company platform for the Company's insurance and reinsurance investments.

10.     The Company's present financial condition is attributable to several intersecting causes.  In 2022, the Company faced a combination of macroeconomic and business-specific pressures, including sharply higher interest rates and financing costs, continued disruption in aviation and professional sports businesses following the COVID-19 pandemic, and emerging disputes and mismanagement concerning the ownership, eligibility, valuation, and allocation of collateral supporting certain asset-backed credit facilities.  Those pressures intensified during 2023 and early 2024 as regulatory developments negatively affected the Company's reinsurance business, and creditor disputes, and counterparty concerns increased, along with additional adverse publicity, all of which constrained liquidity and access to external capital.

11.     By the spring of 2024, those issues had developed into a broader liquidity, governance, and creditor-management problem.  As a result, the Debtors' former principals, Joshua Wander ("Wander") and Steven Pasko ("Pasko"), voluntarily resigned and were replaced by independent restructuring management in May 2024.  Since that time, the Debtors have pursued sales, negotiated transitions, foreign insolvency processes, consensual surrenders, and monitored and where appropriate addressed the exercise of secured-creditor remedies across the Company's

portfolio, all while maintaining the personnel and infrastructure necessary to preserve and administer remaining assets.

12. Certain of the Debtors' largest secured creditors have supported that process with additional liquidity. Those creditors include AAV2024 LLC ("AAV2024"), Advantage Capital Holdings LLC ("ACH"), Dacian Master Fund LP ("Dacian"), Haymarket Insurance Company ("Haymarket"), and National Founders LP ("National Founders"), all of whom are participating in the bridge and proposed debtor in possession financing for these cases. Their continued funding has allowed the Debtors to avoid a disorderly and value-destructive shutdown while restructuring professionals worked through a portfolio of assets that included long-duration receivables, foreign investments, litigation claims, and other assets that cannot be responsibly liquidated on a single timetable.

13. The Debtors had been planning for an eventual, coordinated chapter 11 process on a measured timeline. However, on July 16, 2026, Vida Longevity Fund LP, Vida Insurance Credit Opportunity Fund II, LP, and Vida Insurance Credit Opportunity Fund III, LP (collectively, "Vida") filed an involuntary chapter 7 petition ("Involuntary Petition") against 777 Partners in the U.S. Bankruptcy Court for the Southern District of Florida. The Involuntary Petition, and the petitioning creditors' unwillingness to work toward a consensual filing, forced the Debtors to commence these Chapter 11 Cases now to maximize the value of their remaining assets and to provide an orderly forum for administering creditor claims.

14. A number of the Debtors' businesses remain going concerns. Among other things, some of these businesses own special-purpose vehicles that hold structured-receivables assets that self-liquidate over time. Fully monetizing those assets for creditors will take years and will need

4911-5404-5636

the involvement of people who understand how these esoteric portfolios are structured, serviced, and realized.

15. The Debtors' objective in chapter 11 is straightforward: preserve remaining value, complete sales and other monetizations that should occur during the bankruptcy, establish an orderly process to resolve creditor claims and litigation, and transfer longer-duration assets and causes of action to a liquidating trust that can realize value over time. In my judgment, that process offers materially greater value than a chapter 7 liquidation conducted by a trustee who would have to recreate more than two years of institutional knowledge and liquidate complex or long-duration assets in the short term, before their value can be realized.

## **Background and Operations**

### **A. Overview of 777 Partners, 600 Partners, and Brickell**

16. 777 Partners was formed as a Delaware limited liability company in 2015 by Wander and Pasko. Its original business was underwriting and financing the purchase of structured-settlement portfolios and other non-traditional receivables, including medical-lien receivables, structured-settlement payment streams, and annuity-backed receivables. Beginning around 2018, and accelerating from 2021, 777 Partners expanded well beyond that base into consumer and commercial finance, insurance distribution, aviation and airlines, media and entertainment, and ownership interests in professional sports clubs and leagues across the United States, Europe, South America, Australia, and the Caribbean.

17. Pasko formed 600 Partners as a Delaware limited liability company in 2017 as an affiliated investment holding company. Its portfolio overlapped with a number of 777 Partners' business lines, including structured settlements, aviation, media and entertainment, and professional sports.

4911-5404-5636

18. Brickell operated as a related, but separate, non-Debtor holding company for insurance and reinsurance investments. Its historical insurance-related investments included Sutton National Group, Merit Life Insurance Company, and 777 Re, a Bermuda reinsurer. Although 777 Partners, 600 Partners, and Brickell were distinct holding company platforms, the broader enterprise was managed by Pasko and Wander.

**B. Historical Business Verticals**

19. The Company's operations were organized into several verticals that can be described generally as follows:

| Vertical | Business |
| --- | --- |
| Private Credit / Structured Finance | Acquisition, financing, servicing, and monetization of structured settlement payment streams, medical receivables, lottery receivables, and other specialty-finance assets. |
| Insurance / Reinsurance | Insurance distribution, insurance-company investments, reinsurance, and related asset-management activities. |
| Financial Technology | Consumer and specialty finance, servicing, and technology-enabled lending businesses. |
| Litigation Finance | Funding and management of litigation-related receivables and claims. |
| Aviation | Airline technology, airline investments, aircraft leasing, and related aviation assets. |
| Sports | Ownership and financing of interests in professional football and basketball clubs, leagues, and sports-related businesses. |
| Media & Entertainment | Film-completion guarantees, production and post-production services, media-rights and related entertainment investments. |
| Sustainability | Investments in businesses focused on sustainable products and related commercial opportunities. |

20. The structured-finance and private-credit businesses were among the Company's earliest and most significant operations. They generally used special-purpose entities to originate, purchase, finance, and service structured settlement payment streams, lottery receivables, medical and healthcare provider receivables, and insurance commission receivables. These portfolios were financed through asset-backed lending facilities and securitization vehicles, with borrowing bases tied to the value of eligible receivables. The assets self-liquidate as the underlying payment

4911-5404-5636

streams are collected over a period of years.  This vertical comprises a significant amount of the Debtors' remaining going-concern value.

21. Through Debtor F3EA Holdings LLC ("F3EA Holdings") and its subsidiaries, including Debtors F3EA Capital LLC, F3EA Servicing LLC, Employee Funding of America, LLC, and Tactical Marketing Partners LLC, the Company originated and serviced consumer and commercial finance receivables, including consumer installment loans and related lending products marketed through a network of merchant and lead-generation channels.

22. Through Debtors Lex Capital Holdings LLC ("Lex Capital") and Scout Law Group Holdings LLC ("Scout Law"), the Company held interests in the litigation-finance and legal-services vertical, which originated and acquired litigation-related receivables and funded claims through platforms operated under the JusticeFunds business.

23. Through Debtors Phoenicia LLC ("Phoenicia") and Daedalus I LLC ("Daedalus"), the Company held its aviation investments, comprising both aviation-technology platforms and airline investments, including a minority interest in Flair Airlines in Canada and the start-up Australian carrier Bonza.

24. Through Debtors Lumiere Financing LLC ("Lumiere Financing") and Lumiere Acquisitions Company LLC ("Lumiere Acquisitions"), the Company held its interest in the Film Finances business, a film completion-guarantee and production-services enterprise.

25. Through Debtor Thresher Acquisition LLC ("Thresher"), the Company held interests in entities related to an insurance-distribution and technology platform that marketed and administered life and annuity insurance products.

4911-5404-5636

**C.      Corporate Structure and Debtor Group**

26.      The Debtors are part of a corporate structure comprising hundreds of direct and indirect subsidiaries, special-purpose entities, and holding companies organized under the laws of numerous U.S. and foreign jurisdictions.  At its peak in 2023, the 777 Partners and 600 Partners enterprise had invested more than $10 billion in assets and was a major employer worldwide through its network of holding and portfolio companies.  The corporate structure was complex, as was the scope of the wind-down that followed.[3]

27.      777 Partners is owned by Wander and Pasko through JARM Capital LLC and MTCP LLC, which hold interests in SuttonPark Acquisition LLC, the direct parent of 777 Partners.  600 Partners is owned by Pasko through MTCP LLC and SPA II LLC.  A listing of the Debtors and their ultimate parent (777 Partners or 600 Partners) is attached as **Exhibit A** ("Organizational Chart").

28.      Chapter 11 has long been part of the Debtors' wind-down plan, and the Company had been preparing to file for several months.  Because the Involuntary Petition accelerated the timing, the Company is filing bankruptcy in two waves.  The Debtors commencing these Chapter 11 Cases in this first wave (the "First-Wave Debtors") are the parent holding companies and the affiliated entities whose assets, operations, or role in the DIP and wind-down structure require that they be in chapter 11 now.  Several additional affiliates (the "Subsequent Debtors") require more time to prepare their filings and are expected to file their own chapter 11 petitions within approximately 60 days.

---

[3] The original May 2024 unabridged 777 organizational chart reflecting the Debtors and affiliated entities (when GlassRatner was first engaged) spanned more than 500 legal entities and 60 pages.

4911-5404-5636

29.     The First-Wave Debtors comprise 777 Partners, 600 Partners, and their direct and indirect subsidiaries listed on **Exhibit A**. In summary:

a.     *Administrative and DIP-borrower entities.* Signal National was formed as a Texas limited liability company in February 2026 to consolidate certain administrative functions for the Debtors, including payroll and employee benefits, and to facilitate the final stage of the restructuring from Texas, where GlassRatner and the Debtors' restructuring professionals have been directing much of the day-to-day restructuring work.  777 Asset Management LLC likewise supports the enterprise's asset-management functions.  These entities are filing to preserve the centralized administrative and cash-management operations on which the wind-down depends.

b.     *Parent holding companies.* 777 Partners and 600 Partners are the two parent holding companies. They are the primary obligors or guarantors under the principal prepetition facilities described in Section III and the borrowers under the DIP Credit Facility, and their estates are the focal point of the litigation and claims to be administered in these cases.

c.     *Structured-finance and receivables entities.* Debtors SuttonPark Capital LLC and SuttonPark Servicing LLC (structured-settlement purchasing and servicing), Singer Asset Finance Company, LLC, Sphinx Funding LLC, the Signal receivables entities (Signal Servicing LLC, Signal National LLC, Signal AHF Medical Receivables HoldCo LLC, Signal MLH Medical Receivables HoldCo LLC, Signal LF Portfolio Holdco LLC), and related holding and funding entities hold or service the self-liquidating receivables that constitute most of the Debtors' remaining going-concern value. They are filing to protect that value and to enable an orderly, centralized monetization under a chapter 11 plan.

d.     *Consumer/commercial finance and litigation-finance entities.* F3EA Holdings LLC, F3EA Capital LLC, F3EA Servicing LLC, Employee Funding of America, LLC,

4911-5404-5636

Tactical Marketing Partners LLC, and Lex Capital Holdings LLC hold residual assets, contracts, or claims from the consumer-finance and litigation-finance verticals that are best administered within these estates.

e.      *Other holding and asset entities.* Daedalus I LLC, Ironman Capital LLC, Lumiere Acquisitions Company LLC, Lumiere Financing LLC, Phoenicia LLC, Thresher Acquisition LLC, and certain other holding entities are filing because they hold residual equity, contract rights, or claims, or because their inclusion is necessary to administer intercompany obligations and preserve the integrity of the cash-management and DIP structure.

**D.      Current Operations and Employees**

30.      As of the Petition Date, the Debtors have approximately 15 employees consisting of 14 full-time employees and one (1) part-time employee.  Twelve (12) employees are salaried; three (3) are hourly.  The employees fill the functioning roles of in-house legal, accounting, treasury, finance, human resources, and portfolio servicing.  The employees fulfill their functional roles on behalf of all Debtors and are critical to the ongoing operations and preservation of value of the Debtors' estates.  All employees work remotely.

31.      As a result of the two-year wind-down and the sale of most of the Company's operating assets, the current workforce is far smaller than at its historical peak.  It is concentrated in finance, legal, and functions that support the continued servicing and management of the remaining receivables, regulatory and financial reporting, the wind-down of remaining assets, and the prosecution and defense of litigation.  The employees are employed by 777 Partners, and payroll is processed through Signal National.

32.      The Debtors historically maintained principal offices in Miami, Florida at various locations.  However, for the past two years, the majority of the workforce became predominantly

4911-5404-5636

remote and the Company's day-to-day operations and major business decisions have been directed from GlassRatner's offices at 3500 Maple Avenue, Suite 420, Dallas, Texas 75219, which is the Debtors' notice address in these cases.

### Prepetition Capital Structure

33.     As of the Petition Date, the Debtors have at least $2,705,233,601.28 in prepetition funded-debt obligations. The principal facilities are summarized in the table below and described in the subsections that follow.[4]

| Loan | Outstanding Principal | Secured by Debtors' Assets |
|---|---|---|
| DIP Credit Facility | $8,632,000.00 | Yes |
| ACAP Holdco Facility | $891,235,612.59 | Yes |
| ACAP Unsecured Facility | $25,037,805.82 | No |
| Leadenhall Master Facility | N/A | No |
| EFOA Loan | $76,379,331.00 | Yes |
| SPS Secured Rated Loan | $56,654,579.70 | Yes |
| Vida Margin Loan | $26,000,000.00 | No |
| ING Capital Facility | $28,000,000.00 | Yes |
| 777 Revolver | $14,000,000.00 | Yes |
| Thresher Seller Note | $19,342,782.41 | No |
| 777 Condo Loan | $4,620,000.00 | Yes |
| Knightsbridge (National Founders) Facility | $1,187,113,090.59 | Yes |

### A.     Senior Secured DIP Credit Facility

34.     The Debtors and certain non-Debtors entered into a Super-priority Debtor-in-Possession Credit Agreement, dated as of June 9, 2026 (as amended to date and as may be further amended from time to time, the "DIP Credit Agreement") and related DIP Loan Documents pursuant to which ACM Delegate LLC ("ACM"), in its capacity as administrative agent, and

---

[4] This summary describes only the major debt obligations of the Debtors; it does not include the debt obligations of non-Debtor affiliates, nor does it include every debt obligation on which a Debtor is a guarantor. Amounts are estimated and still subject to reconciliation. Any such estimates should not be construed as an admission of the Debtors' balance of any amount owed.

4911-5404-5636

AAV2024, ACH, Dacian, Haymarket, and National Founders (collectively the "DIP Lenders"), in their capacity as DIP Lenders, agreed to provide a new credit facility (the "DIP Credit Facility"), including prepetition new money advances of up to $8,632,000.00 to fund the Debtors' working capital needs and prepare these chapter cases, as well as additional post-petition funding of up to $6,238,000.00for the costs of administering these cases.

35.     The borrowings under the DIP Credit Facility are secured by substantially all of the Debtors' assets including: (i) senior first priority liens on the Debtors' assets which are not subject to valid, perfected, and non-avoidable liens (including proceeds or property recovered in connection with pursuit of chapter 5 causes of action), and (ii) junior liens on all assets of the Debtors subject only to valid, properly perfected, and nonavoidable liens that existed on the Debtors' assets as of the Petition Date.  The DIP Lenders are also receiving Priming Liens (as defined in the DIP Credit Agreement), but each DIP Lender's Priming Liens attach only to collateral in which such DIP Lender already held first priority liens in their capacity as a pre-petition lender.

36.     As of the Petition Date, the prepetition advances under the DIP Credit Facility total $8,632,000.00.

**B.     ACAP Holdco Facility[5]**

37.     Certain of the Debtors are borrowers or guarantors under the Amended and Restated Loan and Security Agreement, dated as of November 2, 2023 by and among, 600 Partners, 777 Partners, and JARM Capital LLC as borrowers and other corporate guarantors, ACM, as administrative agent and collateral agent, and AAV2024 and Haymarket, as lenders

---

[5] The ACAP Holdco facility and ACAP Unsecured Facility are among a number of obligations owed by the Debtors or their affiliates to ACAP affiliates. A complete breakdown of those facilities and amounts owed is contained in Schedule 1.3 to the DIP Credit Agreement (Exhibit B to the DIP Motion).

4911-5404-5636

(collectively, with any other lenders party thereto from time to time, the "ACAP Holdco Lenders" and the foregoing, the "ACAP Holdco Facility"). The ACAP Holdco Facility amended and restated, without constituting a novation, an existing Loan and Security Agreement, dated as of February 27, 2020 by and among 777 Partners, as borrower, and Haymarket, as lender in an original principal amount of $46,000,000.

38.     Pursuant to the ACAP Holdco Facility, the ACAP Holdco Lenders made available a secured loan facility in a maximum principal amount of up to $891,235,612.59, the proceeds of which were used for working capital for the borrowers, corporate guarantors and their various portfolio investments and acquisition of portfolio investments. Borrowings under the ACAP Holdco Facility are secured by substantially all assets of 600 Partners, 777 Partners, and the guarantors thereto.

39.     The ACAP Holdco Facility matured on November 2, 2024 and is in default. As of June 30, 2026, principal and interest owed under the ACAP Holdco Facility (which is inclusive of the 777-600 Bridge Loan, TAMI Tranche, JARM Obligations, and the MCAG Tranche as set forth on Schedule 1.3 to the DIP Credit Agreement, Exhibit B to the DIP Motion) is approximately $1,259,454,011.76.

**C.     ACAP Unsecured Facility**

40.     On or about December 12, 2024, 777 Partners, as borrower, and Advantage Capital Holdings LLC ("ACH"), as lender, entered into an Unsecured Loan Agreement (the "ACAP Unsecured Facility") pursuant to which ACH made available to 777 Partners an unsecured loan facility in a maximum principal amount of up to $25 million for the purpose of funding operational costs and professional fees. As of June 30, 2026, the principal balance owed under the ACAP

4911-5404-5636

Unsecured Facility is $25,037,805.82 (the excess principal amount over $25 million being the result of PIK interest accruing and being added to the outstanding principal balance).

**D.      Leadenhall Master Facility**

41.      777 Partners and 600 Partners are unsecured guarantors under a Loan and Security Agreement dated as of May 7, 2021 (as amended, supplemented, or otherwise modified from time to time, the "Leadenhall Facility") by and among both Debtor and non-Debtor subsidiaries,[6] as borrowers, and the lenders, Leadenhall Capital Partners LLP, as administrative agent, and Leadenhall Life Insurance Linked Investments Fund PLC, as collateral agent (collectively, "Leadenhall").  Notably, the Leadenhall Facility is an obligation of special-purpose borrower entities; 777 Partners and 600 Partners are unsecured guarantors only, not secured borrowers, and Leadenhall holds no lien on their assets—a point the Second Circuit confirmed, as described in Section IV.

42.      The Leadenhall Facility is structured through separate borrower and lender groups and provided committed financing subject to borrowing base limitations and specified sub-facility limits, which originally totaled $300 million but were increased to $350 million.  Pursuant to the Leadenhall Facility, loans were funded based upon the value of eligible receivables comprising the applicable borrowing base and were secured by senior liens on substantially all of the borrowers' assets including structured settlement receivables, lottery receivables, medical-related receivables, health-care provider loan receivables, and insurance commission receivables. Leadenhall's aggressive posture in litigation and collateral disputes described below has driven a disproportionate share of the cost, delay, and disruption in the Company's wind-down.

---

[6] The non-Debtor subsidiary borrowers under the Leadenhall Facility are SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC.  Leadenhall exercised certain rights under the Leadenhall Facility to appoint independent managers for each of the borrowers, including Insurety Agency Services in December 2024, and SPLCSS II, Signal SML 4 and Dorchester Receivables II in December 2025.

43. As described in Section IV below, Leadenhall alleges that the same collateral securing the Leadenhall Facility—reportedly more than 1,600 assets valued at approximately $185 million—was also pledged to other lenders, and that certain Debtors and their principals made material misrepresentations regarding the ownership and priority status of that collateral. Leadenhall asserts a claim of approximately $609 million under the Leadenhall Facility, including default interest, fees, and other charges. The Debtors dispute the validity and amount of Leadenhall's claims.

**E. National Founders**

44. Certain of the Company's structured-finance special-purpose vehicles are borrowers under facilities provided by National Founders LP ("National Founders"), secured by the receivables held in those vehicles. SuttonPark Capital LLC is a guarantor on certain of those facilities. In addition, both 777 Partners and 600 Partners act as guarantors under these facilities. As of June 30, 2026, the principal amount owed under the National Founders facilities is $1,187,113,090.59. SuttonPark Capital LLC has pledged all of its right title and interest in one of the non-Debtor affiliates to secure the obligations under those facilities.

**F. Other Material Secured Debt / Creditors**

45. 777 Partners is a borrower under an Amended and Restated Margin Loan Agreement dated as of July 14, 2020, with the Vida lenders, in an original principal amount of approximately $59.7 million (the "Vida Margin Loan"), secured by a pledge of collateral by non-Debtor affiliate Brickell PC Insurance Holdings LLC and guaranteed by SuttonPark Capital LLC and Signal Financial Holdings LLC. Following an alleged default, Vida obtained a judgment of $26 million against 777 Partners, SuttonPark Capital LLC, Signal Financial Holdings LLC, and Brickell PC Insurance Holdings LLC in the Supreme Court of the State of New York, County of

4911-5404-5636

New York. That judgment is the stated basis for the Involuntary Petition. As described in Section V, the Company attempted to engage with Vida toward a consensual resolution; Vida instead elected to file the Involuntary Petition.

46.     Sierra 2016, LLC ("Sierra 2016"), a special-purpose entity, is a borrower under a credit agreement dated June 17, 2016, with ING Capital LLC ("ING Capital"), as sole lender and administrative agent, secured by a first-priority lien on substantially all of Sierra 2016's assets. ING Capital asserts that Sierra 2016 owes more than $28 million. As described in Section IV, ING Capital has brought an action seeking to recover those loan proceeds on a fraud theory. The Debtors dispute ING Capital's claims.

47.     777 Partners is also a borrower under that certain Second Amended and Restated Revolving Loan and Security Agreement dated as February 17, 2022 with Dacian, one of the DIP Lenders, as the sole lender, secured by, among other things, a brokerage account owned by 777 Partners ("Dacian Revolver Facility"). The Dacian Revolver Facility is among several other obligations owed by the Debtors or their affiliates to Dacian.[7]

**Significant Events Leading to Chapter 11**

**A.    Events Precipitating the Company's Financial Distress.**

48.     The Debtors' financial distress resulted from the convergence of several developments over a period of years.

49.     Beginning in 2022, sharply rising interest rates increased the cost of financing and affected the valuation and economics of a number of rate-sensitive assets and financing structures across the Company. At the same time, the Company's aviation and professional sports investments were operating through the extended effects of the COVID-19 pandemic, which had

---

[7] A complete breakdown of those facilities and amounts owed is contained in Schedule 1.3 to the DIP Credit Agreement (Exhibit B to the DIP Motion).

4911-5404-5636

materially disrupted both industries. These pressures increased the amount of liquidity required to support certain portfolio companies and reduced the availability and attractiveness of external financing.

50. Separate from those market pressures, issues emerged by 2022 concerning the ownership, eligibility, valuation, and allocation of receivables supporting certain specialty-finance facilities. Those issues included instances in which assets were reported as collateral under more than one facility or were not available to the borrower in the manner reflected in lender reporting. The Company's later forensic work has shown that these issues predated the 2024 management transition. The existence of these collateral issues created disputes among 777-related entities and their lenders and materially complicated the Company's financing position.

51. During late 2023 and early 2024, regulatory and ratings developments affecting 777 Re created additional liquidity and business pressure. The Bermuda Monetary Authority took regulatory action with respect to 777 Re, and certain reinsurance counterparties subsequently recaptured or began recapturing business and related assets. Those developments reduced the asset base and financial flexibility of 777 Re and affected businesses that had historically depended on capital or liquidity associated with the reinsurance platform.

52. By late 2023, the combination of tightening credit, the reinsurance disruption, mounting creditor concerns, continued mismanagement, and significant adverse publicity surrounding Wander and the proposed Everton acquisition caused the Company's access to outside capital to contract sharply. Investors and creditors lost confidence in Wander. Leadenhall commenced litigation and the Company could no longer fund its expansion or, before long, its ordinary operations without lender forbearance and continued funding.

4911-5404-5636

53.     In the spring of 2024, as the Company faced escalating creditor, liquidity, and governance issues, 777 Partners and 600 Partners transitioned to independent restructuring management.  As discussed earlier, Wander and Pasko voluntarily resigned and, since May 2024, professionals from GlassRatner, including myself, have been in charge of the Debtors' day-to-day operations.

54.     In May 2024, the Company retained GlassRatner to provide independent financial and operational leadership.  Ian Ratner and Ronald Glass were appointed as independent managers and I was appointed COO to run day-to-day operations.  I replaced Mr. Glass as a manager when he resigned on September 18, 2024. Michael Thatcher of GlassRatner became Chief Financial Officer of 777 Partners and 600 Partners effective December 19, 2025.

55.     In preparation for these chapter 11 cases, GlassRatner determined it was in the best interests of the Debtors to seek new independent managers during the pendency of the Debtors' bankruptcy cases.  As a result, Ian Ratner and I resigned as managers of 777 Partners and 600 Partners and on August 6, 2026, Anna Phillips was appointed as independent manager for 777 Partners and 600 Partners.

56.     Since May 2024, neither Wander nor Pasko has had any role in managing the Company.

**B.     Material and Pending Litigation**[8]

57.     The Debtors are the subject of a number of pending civil and regulatory matters which have substantially impacted their operations, reputation, and access to capital as further described below.

---

[8] The summary in this Section of my Declaration highlights major ongoing litigation matters, and is not, nor is it intended to be, a complete list of all litigation matters to which the Debtors are parties.  All litigation matters will be set forth in each Debtor's forthcoming Statement of Financial Affairs.

4911-5404-5636

58.    ***SEC Enforcement Action.*** On October 16, 2025, the SEC filed a complaint against Wander, Pasko, 777 Partners, 600 Partners, and Damien Alfalla, the Company's former chief financial officer, alleging that the defendants misled investors about the Company's financial condition and fraudulently induced investments in the $237 million preferred-equity offering by falsely representing that the Company had, and would continue to have, net income sufficient to pay a 10% annual dividend.  The complaint further alleges that Wander and Alfalla misused a credit facility, resulting in a $300 million overdraw.  Alfalla resolved the SEC's claims by consent judgment entered December 16, 2025, and Pasko resolved the SEC's claims by consent judgment entered April 1, 2026.  Wander's motion to dismiss remains pending, and civil discovery was stayed in full on May 11, 2026, pending the criminal case.

59.    ***Criminal Prosecution of Wander.*** On October 16, 2025, the U.S. Attorney's Office for the Southern District of New York unsealed an indictment charging Wander with conspiracy to commit wire fraud, wire fraud, conspiracy to commit securities fraud, and securities fraud, arising from a scheme to defraud the Company's lenders and investors of more than $500 million, principally through the double-pledging of collateral and the digital alteration of bank statements.[9] Alfalla pleaded guilty to an information on October 14, 2025,[10] two days before the indictment was unsealed.  On June 30, 2026, prosecutors filed a superseding indictment adding allegations that Wander diverted the majority of a $20 million loan into his personal brokerage account and directed employees to fabricate bank statements to conceal the diversion, together with a witness-tampering count alleging that Wander attempted to discourage a former Company analyst from testifying.  Wander is contesting the charges, and trial is set for October 19, 2026.

---

[9] *United States v. Wander*, 25 Cr. 473 (JPO).

[10] *United States v. Alfalla*, 25 Cr. 468 (AS).

4911-5404-5636

60.    ***Leadenhall Litigation.*** On May 3, 2024, Leadenhall filed a complaint against Wander, Pasko, 777 Partners, 600 Partners, and certain Debtor and non-Debtor affiliates, among others, in the U.S. District Court for the Southern District of New York (the "SDNY Court"), asserting federal RICO claims, together with fraudulent-inducement and contract claims, and alleging that Wander and the Debtors defrauded Leadenhall by double-pledging certain collateral securing its SPE-level facilities.[11]  The Debtor-related defendants moved to dismiss the amended complaint, which motion was fully briefed as of December 19, 2024, and remains pending.  Most significantly, on March 23, 2026, the U.S. Court of Appeals for the Second Circuit vacated the preliminary injunction that had restrained the guarantors' assets, holding that the SDNY Court lacked authority to enjoin 777 Partners' and 600 Partners' assets because Leadenhall asserted no valid lien on, or equitable interest in, those assets.  777 Partners and 600 Partners intend to pursue the injunction bond to recover damages caused by the vacated injunction.

61.    ***Leadenhall Article 9 Foreclosures and the Company's Challenge.*** In May 2025, Leadenhall conducted Article 9 foreclosure auctions of the assets of three borrower entities— Signal SML 4 LLC, SPLCSS III LLC, and Dorchester Receivables II LLC.  The collateral consisted of structured-settlement and receivables portfolios whose value depends on specialized knowledge of the underlying payment streams.  Leadenhall acquired portfolios it had itself valued at more than $170 million for nominal credit bids of $1 each.  The Company contends these sales were not conducted in a commercially reasonable manner, stripped hundreds of millions of dollars of value from the estates at a fire-sale price, and were engineered to inflate Leadenhall's guaranty claims against 777 Partners and 600 Partners.  The Company challenged the sales, and on February 5, 2026, filed a verified amended complaint seeking, among other things, a declaration that the

---

[11] *See Leadenhall Capital Partners LLP v. Wander, et al.*, 24 Civ. 3453 (JGK)(BCM), ECF No. 1 (S.D.N.Y.).

4911-5404-5636

plaintiffs bear no deficiency liability because Leadenhall failed to conduct the sales in a commercially reasonable manner.[12]

62.    Following the auctions discussed above, Leadenhall asserted that certain of the foreclosed receivables had been transferred to DASIR 2 LLC and directed third-party obligors to remit collections to DASIR 2.  The Company further contends that, despite repeated requests, Leadenhall and DASIR 2 failed to provide the sale closing documents, written assignments, or other documentation sufficient to establish DASIR 2's ownership of the receivables or authority to redirect those collections.  This dispute exemplifies why the remaining receivables must be monetized by parties who understand them, and why a Court-supervised process is needed to prevent further value destruction and maintain transparency.

63.    ***Vida Litigation and the Involuntary Petition.*** As described in Section III, Vida obtained a $26 million judgment on the Vida Margin Loan.  The Company sought to engage Vida toward a consensual resolution consistent with the orderly wind-down, but Vida declined to cooperate.  On July 16, 2026, three Vida funds filed the Involuntary Petition against 777 Partners in the U.S. Bankruptcy Court for the Southern District of Florida, Case No. 26-19312-PDR.  777 Partners' deadline to respond to the Involuntary Petition is August 11, 2026.

64.    ***ING Capital Litigation.*** ING Capital initially sued 777 Partners, 600 Partners, Wander, Pasko, and others in the SDNY Court in October 2024, alleging that the Debtors defrauded ING Capital by pledging more than $28 million in assets that the borrower did not own.[13]  That action was voluntarily dismissed for lack of subject-matter jurisdiction. On January 27, 2025, ING Capital refiled a substantially similar complaint in the Circuit Court for Miami-Dade County,

---

[12] *See Signal SML 4 LLC, et al. v. Leadenhall Life Insurance Linked Investments Fund PLC*, Index No. 652929/2025.
[13] *See ING Capital LLC v. 777 Partners LLC, et al.*, 24 Civ. 7913 (JGK).

Florida.[14]  On May 20, 2026, the United States moved to intervene and stay that action pending the Wander criminal trial, and on June 1, 2026, the court granted the stay.  On June 2, 2026, ING Capital moved for reconsideration of that order as it was entered before the deadline for opposition papers to be filed. The Florda State Court held a hearing on August 6, 2026, reconsidered its ruling, and is allowing expert discovery to proceed.  No trial date has been set.

**C.       Pre-Petition Restructuring Efforts**

65.       For the last two years, the Debtors and their affiliates have pursued a wide range of voluntary transactions to reduce carrying costs, generate liquidity, transition viable businesses to new owners, and reduce secured debt, including sales, negotiated transitions, foreign insolvency processes, and consensual surrenders of collateral.  In addition, certain of the Debtors' senior secured lenders foreclosed upon collateral, exercised remedies, or otherwise reclaimed assets, and other creditors and third parties pursued remedies including foreign winding-up and administration proceedings.  A summary of these dispositions and creditor actions is attached hereto as **Exhibit B**.

66.       Throughout this period, the Debtors' ability to monetize assets was constrained by the nature of the funding available to them and, with respect to certain assets, by the preliminary injunction Leadenhall obtained restraining the guarantors' assets (since vacated, as described in Section IV.B above). The Debtors' senior secured lenders have made protective advances at GlassRatner's request to fund the wind-down on a basis sufficient to preserve going-concern operations and avoid an uncontrolled collapse, but that funding was not structured, and was not intended, to provide working capital for reinvestment in the underlying businesses.  As a result, in a number of instances, assets that could have commanded a materially higher price if marketed and sold on a fully-funded, non-distress basis were instead disposed of on a distressed timeline

---

[14] *See ING Capital LLC v. 777 Partners LLC, et al.*, Case No. 2025-1552-CA-01, Filing #215435997 (Fl. Dade Cty.)

4911-5404-5636

dictated by the availability of funding, the pendency of litigation, and, in certain instances, the constraints imposed by and the continued negative publicity resulting from the Leadenhall complaint and preliminary injunction.

67. Of the dispositions reflected in **Exhibit B**, a number were negotiated sales that the Debtors actively directed and that generated cash proceeds or a reduction of the Debtors' secured or guaranty obligations. Others were consensual, non-cash resolutions that extinguished guaranty or other contingent exposure without generating cash proceeds. Still others—including certain dispositions of collateral securing the ACAP Holdco Facility—were conducted by the Debtors' senior secured lenders as collateral agent, exercising their own remedies with respect to already-pledged collateral; the Debtors' ability to actively direct or negotiate the terms of those dispositions was limited, including during the pendency of the Leadenhall preliminary injunction described above. The Debtors have sought to distinguish, in **Exhibit B**, between dispositions the Debtors negotiated directly and those effected through the exercise of secured creditor remedies.

### D. Remaining Assets and Operations

68. After two years of dispositions and foreclosures, the Company's remaining value is concentrated in its self-liquidating structured-receivables portfolios and related servicing operations, together with residual equity interests, contract rights, litigation claims (including the Leadenhall commercial reasonableness and bond claims), and avoidance and other estate causes of action. These structured-receivables assets remain going concerns and will generate value as the underlying payment streams are collected over a period of years. Realizing that value requires continuity of knowledgeable management and servicing—precisely what the Debtors propose to preserve through these cases and the Liquidating Trust.

4911-5404-5636

69.     Absent the Involuntary Petition, the Debtors would have continued their consensual wind-down without a chapter 11 filing at the Debtor level and, on a modestly longer timeline, commenced streamlined voluntary chapter 11 cases.  The Involuntary Petition, and the Vida creditors' refusal to cooperate with a voluntary process, made it necessary to file now to preserve the value of the Debtors' remaining assets and to provide an orderly forum for administering creditor claims.  Concurrently with these cases, the Debtors intend to ask the Florida bankruptcy court to (a) convert the involuntary case to chapter 11 and (b) transfer venue of that case to this Court.  The Debtors do not intend to contest entry of an order for relief in the involuntary case.

## The Chapter 11 Strategy

### A.     DIP Financing and Creditor Support

70.     The Debtors and certain non-Debtors entered into a Superpriority Debtor-in-Possession Credit Agreement dated as of June 9, 2026 (as amended to date and as may be further amended from time to time, the "DIP Credit Agreement"), under which ACM, as administrative agent, and AAV2024 LLC, ACH, Dacian Master Fund LP, National Founders LP, and Haymarket, as lenders (collectively, the "DIP Lenders"), agreed to provide a new credit facility (the "DIP Credit Facility"), including prepetition new-money advances of up to approximately $8,632,000 to fund working capital and the preparation of these cases, and additional postpetition funding of up to $6,238,000.00 to fund the administration of these cases. The DIP obligations are secured by senior priming and junior liens on substantially all of the Debtors' assets, subject to the priorities set forth in the DIP Credit Agreement and the proposed orders.  As of the Petition Date, prepetition advances under the DIP Credit Facility total approximately $8,632,000.00.  Additional facts concerning the DIP Credit Facility are set forth in my separate declaration filed in support of the DIP Financing Motion.

4911-5404-5636

71. The DIP Lenders include the Company's senior secured prepetition lenders, who have made protective advances at GlassRatner's request to fund working capital and have agreed to continue funding through these cases. Their support—and their willingness to provide post-petition financing on the terms proposed—reflects both their economic stake in maximizing the value of the collateral and their confidence in the Debtors' management and wind-down strategy. That support gives these cases a credible path to a value-maximizing conclusion.

**B.      Remaining Asset Sales**

72. The Debtors intend to market and sell certain remaining assets during these cases where a sale will realize value more efficiently than holding the asset, and to do so through a Court-supervised process that protects against the kind of value-destructive, below-market disposition the Company experienced in the Leadenhall Article 9 auctions. Assets not sold during the cases will be transferred to the Liquidating Trust for monetization over time.

**C.      Claims Resolution**

73. These cases will establish an orderly, centralized, Court-supervised process for creditors to file and, where necessary, adjudicate claims by and against the Debtors' estates. That process is particularly important here, where several of the largest asserted claims—including the Leadenhall guaranty claim and the ING Capital claim—are disputed and bound up with the fraud allegations and collateral disputes described above. Resolving these claims in a single forum, under the Bankruptcy Code's claims procedures, will be more efficient and more equitable than continued litigation across multiple courts.

**D.      Chapter 11 Liquidating Plan**

74. For the reasons above, the Debtors firmly believe that a chapter 11 wind-down under this Court's supervision will realize materially more value for creditors than a chapter 7

4911-5404-5636

liquidation. The Debtors' remaining assets are esoteric structured-receivables portfolios whose value depends on specialized knowledge, continuity of servicing, and patient realization over time. A chapter 7 trustee—new to these businesses, without the years of institutional knowledge the current management has developed and operating under a mandate to liquidate promptly—would face a substantial risk of a forced, premature fire sale that destroys value, as the Leadenhall $1 credit bids for portfolios valued in the hundreds of millions of dollars starkly illustrate. Chapter 11, by contrast, allows the Debtors to pause the surrounding litigation, run an orderly claims process, sell assets where advantageous, and transfer the balance to a liquidating trust for realization over time, all with the support and financing of the senior secured lenders. That is the path most likely to maximize creditor recoveries.

75. As such, the Debtors intend to propose a chapter 11 plan that establishes the Liquidating Trust to hold and monetize the Debtors' remaining self-liquidating receivables and other going-concern assets for the benefit of creditors following the plan's effective date. Because these portfolios realize value as their underlying payment streams are collected over a period of years, a liquidating trust administered by a knowledgeable trustee is the structure best suited to capturing that value. A liquidating trust also provides a stable, long-term vehicle for pursuing the estates' retained litigation and avoidance claims.

### First Day Motions

76. Concurrently with their petitions, the Debtors have filed the First Day Motions, which include, among others, the following: (a) the DIP Financing Motion; (b) maintenance of the Debtors' cash management system; (c) extend the time to file schedules; (d) file a consolidated creditor matrix; (e) pay employee wages; and (f) retain Epiq as claims and noticing agent.

4911-5404-5636

77.     A description of the relief requested in, and the facts supporting each of, the First Day Motions is set forth in **Exhibit C** attached hereto and incorporated herein by reference.  I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful exit from these cases, (c) best serves the Debtors' estates and creditors' interests, and (d) should be approved on an emergency basis to avoid immediate and irreparable harm to the Debtors.

78.     I have reviewed each of the First Day Motions, including their attachments, and the facts stated in those motions are true and correct to the best of my knowledge, information, and belief.  I believe the relief requested in each is necessary to avoid immediate and irreparable harm to the Debtors' estates, to promote the efficient and economical administration of these cases and is otherwise in the best interests of the Debtors, their estates, and their creditors, particularly given the number of Debtors, the complexity of the Company's structure, and the expedited timing forced by the Involuntary Petition.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions and **Exhibit C**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: August 10, 2026

*/s/ Mark Shapiro*
Mark Shapiro
Interim COO and Authorized Signatory

4911-5404-5636

**<u>Exhibit A</u>**

## Organizational Chart

| Ultimate Parent | Debtor |
|---|---|
| SuttonPark Acquisition LLC | 777 Partners LLC |
| 777 Partners LLC | 777 Asset Management LLC |
| 777 Partners LLC | Daedalus I LLC |
| 777 Partners LLC | Employee Funding of America, LLC |
| 777 Partners LLC | F3EA Capital LLC |
| 777 Partners LLC | F3EA Holdings LLC |
| 777 Partners LLC | F3EA Servicing LLC |
| 777 Partners, LLC | Ironman Capital LLC |
| 777 Partners LLC | Phoenicia LLC |
| 777 Partners LLC | Signal AHF Medical Receivables HoldCo LLC |
| 777 Partners LLC | Signal LF Portfolio Holdco LLC |
| 777 Partners LLC | Signal MLH Medical Receivables HoldCo LLC |
| 777 Partners LLC | Signal National LLC |
| 777 Partners LLC | Signal Servicing LLC |
| 777 Partners LLC | Tactical Marketing Partners LLC |
| 777 Partners LLC | Thresher Acquisition LLC |
| SPA II LLC | 600 Partners LLC |
| 600 Partners LLC | Lex Capital Holdings LLC |
| 600 Partners LLC | Lumiere Acquisitions Company LLC |
| 600 Partners LLC | Lumiere Financing LLC |
| 600 Partners LLC | Singer Asset Finance Company, L.L.C. |
| 600 Partners LLC | SuttonPark Capital LLC |
| 600 Partners LLC | SuttonPark Servicing LLC |

4911-5404-5636

## Exhibit B

**Combined Legal Entity Status and Schedule of Dispositions**

4911-5404-5636

**Signal National LLC** *et al.*

Schedule of Asset Dispositions

| Business Unit | Group | Description | Disposition | Consideration to Estate | Date |
|---|---|---|---|---|---|
| 777 Equipment Finance | 777 | Equipment financing | Sale to third party | Cash proceeds of $3.8 million | May-24 |
| Sutton National | Brickell | Property & casualty insurance carrier | Restructured ownership into a Trust | N/A – governance action, not a disposition for consideration | Jun-24 |
| BBL | 777 | British professional basketball league | License terminated, league shut down | N/A – license terminated, not a disposition for consideration | Jul-24 |
| Bonza | 777 | Ultra-low-cost airline Australian airline | Voluntary administration & liquidation proceedings in Australia | Insolvency proceeding, no cash proceeds to estate | Jul-24 |
| Merit Life | Brickell | Provider of fixed annuity products | Sale to third party | Cash proceeds of ~$25.0 million applied to reduction of senior debt | Jul-24 |
| Speed Leasing | 777 | Consumer leases for pre-owned motorcycles | Sale to third party | Cash proceeds of $1.2 million plus full satisfaction of senior debt | Jul-24 |
| Trans Atlantic Lifetime Mortgages Limited ("TAMI") | 600 | Equity release mortgages in the UK | Consensual sale of the equity interest of TAMI to an ACAP affiliate. | Satisfaction of up to $275 million of debt, subject to valuation and future performance | Jul-24 |
| Ensurem | 777 | Insurance technology | Consensual, non-cash foreclosure | Release of guarantor obligations and obligations under Capital Maintenance Agreement | Aug-24 |
| United Star | 777 | company | Sale to third party | Cash proceeds of ~$1.5 million | Aug-24 |
| London Lions | 777 | Professional UK basketball team | UK administration proceedings | Insolvency proceeding, no cash proceeds to estate | Aug-24 |
| 42 Bruton | 777 | Public relations agency | Sold to management | Nominal cash consideration | Sep-24 |
| Green Sports Mgt | 777 | Professional sports athlete management | Sale to management | Nominal cash consideration | Oct-24 |
| 777 Asset Mgt Ltd. | 777 | Alternative investments | UK administration proceedings & liquidation | Insolvency proceeding, no cash proceeds to estate | Oct-24 |
| Insurety Capital | 777 | Medicare commission receivables | Independent director appointed | N/A – governance action, not a disposition for consideration | Dec-24 |
| Triplet Global | 600 | Owner of private aircraft | Sale to third party | Cash proceeds of $23.5 million applied to reduction of senior debt | Dec-24 |
| Film Finances Inc. | 600 | Film completion guarantees | Filed Ch 11 in Delaware; assets sold in §363 sale | Insolvency proceeding, no cash proceeds to estate | Jan-25 |
| Uown | 777 | Consumer rent-to-own business | Sale to ACAP affiliate | Satisfaction of $61.0 million of debt, plus $1.0 million of cash proceeds | Jan-25 |
| EFOA | 777 | Litigation funding | Consensual surrender of certain assets to Dacian | Satisfaction of obligations under loan agreement | Jan-25 |
| F3EA Servicing | 777 | Consumer/commercial finance | Wind-down with sale of related finance businesses | N/A – wind-down, no sale | Jan-25 |
| 777 Asset Mgt | 777 | Alternative investments | Wind-down | N/A – wind-down, no sale | Mar-25 |
| Case Strategies Group, Principled Engineering Consultants, Global Claim Advisors | 777 | Litigation finance | Consensual surrender of the assets to Dacian | Satisfaction of Obligations under loan agreement | Mar-25 |
| MCAG | 777 | Class action settlement recovery | Article 9 sale by senior lender | Public disposition, no cash proceeds to estate | May-25 |
| 777 Stream | 600 | Holdco for global sports streaming services | Article 9 strict foreclosure by an ACAP affiliate to acquire the equity interest of 777 Stream LLC | $23.2 million in full satisfaction of debt | May-25 |
| Fz Sports/Fanatiz | 600 | Global sports streaming service | Article 9 foreclosure by ACM, as collateral agent, of a warrant to purchase shares in Fanatiz | Public disposition, no cash proceeds to estate | May-25 |
| STX | 777 | Movie and television studio | Article 9 foreclosure by ACM, as collateral agent, of the equity interests of England Holdings 3, Inc. | $6.5 million in full satisfaction of debt | May-25 |
| CBC Holdings | 600 | Private mortgage notes | Sale to third party | $3.0 million of cash proceeds | Jun-25 |
| Nutmeg Acquisitions | 600 | International football clubs | Article 9 public disposition by an ACM, as agent, of the equity interest of Nutmeg Acquisition LLC | Satisfaction of $157 million of debt | Jun-25 |
| England Holdings 3 | 777 | Holdco for Independent film and television studio | Article 9 strict foreclosure and Article 9 public disposition by ACAP affiliate to acquire shares of England Holdings 3, Inc. | Along with equity interests in Chiller Island and Flair, and promissory notes of Flair and other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Chiller Island | 600 | Holder of residual notes | Article 9 public disposition by an ACAP affiliate of the equity interest of Chiller Island 1 LLC | Along with equity interests in Flair, and promissory notes of Flair and other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Flair | 777 | Canadian airline | Article 9 public disposition by an ACAP affiliate of a convertible promissory note issued by Flair Airlines LTD | Along with equity interests in Chiller Island and Flair, and promissory notes of other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Flair | 777 | Canadian airline | Article 9 public disposition whereby the preferred shares of Flair Airlines LTD were repurchased by Flair | Along with equity interests in Chiller Island, and promissory notes of Flair and other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Fz Sports | 600 | Global sports streaming service | Article 9 public disposition by an ACAP affiliate of a loan to 1190 Sports Peru | No consideration to estate – lender-controlled Article 9 foreclosure | Jul-25 |
| SOUNDWaves | 777 | Early stage "Green" investments | Article 9 public disposition by an ACAP affiliate of the equity interest of Sustainable Supplies LLC | Satisfaction of $1.0 million of debt | Aug-25 |
| GO7 / Flexflight | 777 | Aviation technology | Sale to third party | Assumption of ~$45.0 million of liabilities plus $1.0 million of cash | Sep-25 |
| Scout Law | 600 | Plaintiff's law | Sale to management | Assumption of debt; nominal cash consideration | Feb-26 |
| ACH | 777 | N/A | Consensual redemption of 777 Partners' equity interest in Advantage Capital Holdings | Satisfaction of $12.7 million of debt | Apr-26 |
| ILFM | 777 | Investment vehicle | Article 9 public disposition by an ACAP affiliate of the equity interest of ILFM LLC | Satisfaction of $2.5 million of debt | Apr-26 |
| 777 | 777 | N/A | Article 9 public disposition of a secured promissory note and mortgage | Satisfaction of $20.0 million of debt | May-26 |
| MLH | 777 | Medical lien receivables | Sale to third party | Cash proceeds of $32.0 million applied to reduction of senior debt | May-26 |
| 777 Re Ltd. | BIA | Bermuda-based reinsurance company | License revoked by Bermuda regulators; wind-down | N/A – regulatory license revocation / wind-down | Jun-26 |
| Sphinx Funding | 777 | Litigation funding | Subject to litigation | Ongoing litigation management | Ongoing |
| 347 Green Leasing | 777 | Aircraft leasing | Wind-down | N/A – wind-down, no sale | Ongoing |
| Signal AHF | 777 | Medical lien receivables | Wind-down | N/A – wind-down, no sale | Ongoing |
| Signal Funding | 777 | Pre-settlement legal funding | Wind-down | N/A – wind-down, no sale | Ongoing |

**<u>Exhibit C</u>**

**Evidentiary Support for First Day Motions[1]**

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the applicable First Day Motion.

**I.**     ***Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>").**

1.     I believe that the joint administration of these 23 chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many, if not all, of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Therefore, I believe that an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  I also believe that joint administration will allow the Office of the U.S. Trustee for the Northern District of Texas (the "<u>U.S. Trustee</u>") and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, because this motion seeks only administrative, not substantive, consolidation of the Debtors' estates, I do not believe that parties in interest will be harmed by the relief requested but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

**II.**    ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases, (IV) Establishing a Master Service List, and (V) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>").**

2.     Through the Creditor Matrix Motion, the Debtors request authority to file one consolidated Creditor Matrix for all the Debtors.  It is my understanding that a large number of creditors may be shared amongst the Debtors; thus, I believe that the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome. The Debtors also request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "<u>Top 30 List</u>").  Because a large number of creditors may be

shared amongst the Debtors, I believe that the Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

3. The Debtors also request authority to redact certain personal identification information. With potentially hundreds of creditors and other parties in interest, the Debtors cannot reasonably know with sufficient certainty whether a release of each creditor's personal information could potentially jeopardize their safety. I believe that it is appropriate to redact from any documents filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix, the home addresses of individuals, including those of the Debtors' creditors, employees, and former employees. I believe that the redaction of the home addresses and personally identifiable information of individuals in the creditor matrix is necessary to protect such individuals' privacy and from the undue risk of identity theft or injury.

4. Additionally, the Debtors request authority to establish notice procedures and a Master Service List. The Debtors anticipate there will be thousands of notice parties in these cases. The cost of photocopying and mailing routine pleadings to all potential creditors would be substantial and unduly burdensome, particularly given that not all creditors and parties in interest need to be apprised of routine matters that do not affect their rights. I believe that the proposed notice procedures will afford due and adequate notice to all parties in interest without burdening the Debtors' estates with substantial administrative costs.

III. ***Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, and Statements of Financial Affairs, and (II) Granting Related Relief* (the "<u>Schedules and Statements Extension Motion</u>").**

5. Through the Schedules and Statements Extension Motion, the Debtors seek an extension of the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired

leases, and statements of financial affairs under the Bankruptcy Code (collectively, the "Schedules and Statements") by an additional eighteen (18) days, for a total of thirty-three (33) days from the Petition Date, through and including September 11, 2026.   Completing the Schedules and Statements requires the Debtors and their advisors to spend considerable time and effort to collect, review, and assemble copious amounts of information in addition to attending to the daily demands of the chapter 11 process.  In the days leading up to the Petition Date, the Debtors focused primarily on preparing for these chapter 11 cases, including negotiating with certain creditor constituencies, and thus the Debtors' management and professionals could not complete the Schedules and Statements as of the Petition Date.  Postpetition, the substantial amount of work entailed in completing the Schedules and Statements will be directly competing with the demands upon the Debtors' personnel to address critical operational matters during the initial postpetition period.  I believe that the Debtors' requested extension is in the best interests of the Debtors' estates and parties in interest, as focusing the attention of key personnel and advisors on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will facilitate the Debtors' smooth transition into chapter 11 and will ensure the Debtors' personnel has sufficient time to complete the Schedules and Statements.

IV.    ***Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date*** (the "**Claims Agent Retention Application**")

6.      The Debtors request authority to employ Epiq Corporate Restructuring, LLC ("Epiq") as their claims, noticing, and solicitation agent (the "Claims and Noticing Agent") in their chapter 11 cases, effective as of the Petition Date, in accordance with the terms and conditions of the Standard Services Agreement entered into by and between the Debtors and Epiq.  Epiq is a chapter 11 administrator comprised of leading industry professionals with significant experience

3

in both the legal and administrative aspects of large, complex chapter 11 cases. I believe that Epiq's employment is in the best interest of the estates because Epiq's rates are competitive and reasonable given its quality of services and expertise. Although the Debtors have not yet filed their schedules of assets and liabilities, the Debtors anticipate that there will be thousands of persons and entities to be noticed and that many of these parties will file claims. Given the anticipated number of claimants and the complexity of the Debtors' businesses, I believe that appointing Epiq as Claims and Noticing Agent will provide the most effective means of noticing, administering claims-related tasks, and soliciting and tabulating votes on a chapter 11 plan, while relieving the administrative burden on the Debtors and the Office of the Clerk of the Bankruptcy Court. Accordingly, I believe that the appointment of Epiq as the Claims and Noticing Agent is in the best interests of both the Debtors' estates and their stakeholders.

**V.**    ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "<u>Wages Motion</u>").**

7.    Through the Wages Motion, the Debtors seek to pay prepetition wages, salaries, other compensation, including (a) paying standard wage compensation and paid time off, (b) maintaining reimbursement programs, and (c) maintaining certain benefits on account of their Workforce Programs.

8.    The payment of the Workforce Obligations is vital to the Debtors' ability to effectuate these chapter 11 cases and preserve their estates for the benefit of all stakeholders. As of the Petition Date, the Debtors employ approximately 15 employees and 3 independent contractors. The Debtors' employees are employed on a full-time or part-time basis either by 777 Partners LLC, Suttonpark Capital LLC, or Sutton Park Servicing LLC. Of these Employees, approximately 3 employees are paid hourly (the "<u>Hourly Employees</u>") and approximately 12

4

employees are salaried (the "Salaried Employees" and together with the Hourly Employees, the "Employees").

9.      The Employees perform a wide variety of functions critical to the Debtors' business enterprise, to say nothing of the administration of these chapter 11 cases. The Employees are skilled personnel intimately familiar with the Debtors' business enterprise. Without the continued, uninterrupted services of the Employees, the Debtors' business and the administration of the estate will be materially impaired.

10.      Additionally, the Employees rely on compensation and benefits to pay their daily living expenses and other necessities. These individuals could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits. As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Workforce Programs is approximately $97,106.15 (the "Workforce Obligations"). The Workforce Obligations consist of the following:

| Workforce Obligations | Estimated Prepetition Amount Outstanding |
|---|---|
| Compensation Obligations | |
| Unpaid Wages | $0.00 |
| PTO Obligations (accrued but unpaid for active Employees) | $97,106.15 |
| Withholding Taxes and Obligations (i.e., Deductions) | $0.00 |
| ADP Payroll Processing Fees | $0.00 |
| Total | $97,106.15 |
| | |
| Workforce Obligations | Estimated Prepetition Amount Outstanding |
| Benefit Obligations | |
| Health Insurance (Medical, Vision, Dental Insurance) | $0.00 |
| Other Benefits (Life, AD&D, accident/critical illness, disability benefits) | $0.00 |
| Miscellaneous Employee Programs | $0.00 |
| Workers Compensation Obligations | $0.00 |
| Total Benefits Obligations | $0.00 |
| Total | $97,106.15 |

**I.      Compensation and Deductions.**

**A.      Wage Obligations.**

11.      Full time Employees are paid current bi-weekly, while part time Employees are paid bi-weekly in arrears.  The Debtors also employ 3 independent contractors (the "Independent Contractors").  The payroll for the Employees and the Independent Contractors is funded and paid at the same time on a bi-weekly basis.  Because certain of the Employees are paid in arrears, they often have wages and other compensation that has accrued, but is unpaid, at any given point in time.  As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of accrued but unpaid wages to the Employees.

12.      The Independent Contractors are paid bi-weekly in arrears.  The Debtors do not believe that they owe any amounts on account of accrued but unpaid wages to the Independent Contractors as of the Petition Date.  However, the Debtors seek authority to pay any prepetition amounts owed to the Independent Contractors and to continue honoring their obligations to the Independent Contractors in the ordinary course of business.  The Debtors' payroll processing functions for Employees are managed by ADP.  The Debtors believe they will not owe any prepetition amounts to ADP for its payroll processing services.

**B.      Paid Time Off, Vacation, and Sick Days.**

13.      The Employees are entitled to paid time off, sick leave, and vacation time ("PTO"). The Employees receive 15 days of PTO per year, and Employees may carry over a maximum of 5 days to the next fiscal year.  The Debtors estimate that, as of the Petition Date, no amounts will be due and owing on account of accrued and unpaid PTO for the Employees.  However, the total amount of PTO for the Employees that the Debtors seek to roll over postpetition is $97,106.15. The Debtors request authority, but not direction, to allow the Employees to use their accrued PTO

6

amounts in the ordinary course of business. The Debtors do not seek authority to pay cash in satisfaction of any PTO obligations accrued before the Petition Date.

### C. Deductions.

14. In the ordinary course of business, ADP processes deductions from Employees' payroll in respect of federal, state, and local income taxes, FICA, court-ordered garnishments, child support, and other pretax deductions payable pursuant to certain of the health, welfare, and retirement savings programs detailed herein (collectively, the "Deductions"), and forwards those amounts to the various third-party entities on whose behalf the Deductions were made. As of the Petition Date, the Debtors believe that there are no Deductions that have been taken but not yet paid to the appropriate recipient.

## II. Insurance, Disability, and other Benefits.

15. Prior to the Petition Date, Employees were offered various standard employee benefits, including, without limitation, (a) medical, dental, and vision insurance, (b) life insurance, (c) disability insurance, and (d) employee assistance programs provided to the workforce in the ordinary course of business (collectively, the "Benefits").

### A. Medical, Dental, and Vision Insurance.

16. The Debtors offer health, vision, and dental insurance through Cigna, EyeMed Vision Care, and MetLife (the "Health Insurance"). The premiums are paid by the Debtors on a monthly basis, and Employees share in the cost of their Health Insurance. The total approximate annual amount paid by the Debtors for Health Insurance in 2026 is approximately $215,000.00. As of the Petition Date, the Debtors believe that they do not owe any prepetition amounts on account of the Health Insurance.

**B.      Life, Accidental Death and Dismemberment, and Disability Insurance.**

17.     The Debtors provide voluntary, basic life insurance, accidental death and dismemberment, employee assistance program, voluntary critical illness, voluntary accident, and disability insurance to the Employees through MetLife (the "Other Benefits").  MetLife is paid monthly.  The approximate annual cost to the Debtors for these Other Benefits is approximately $17,000.00.  As of the Petition Date, the Debtors believe that they do not owe any amounts on account of the Other Benefits.

**C.      Workers Compensation.**

18.     In each state in which the Debtors operate, they maintain workers' compensation insurance for Employees at the statutorily required levels for claims arising from or related to their employment with the Debtors through Zurich (collectively, the "Workers' Compensation Program," and any obligations thereto, the "Workers' Compensation Obligations").  The total cost of the current Workers' Compensation Program for the current policy period is $3,560.00.  The Debtors pay the Workers Compensation Obligations on a monthly basis.  As of the Petition Date, the Debtors estimate that there is no amount owed in accrued but unpaid prepetition amounts in respect of the Workers' Compensation Program.

19.     The Debtors request authority to pay prepetition amounts owing with respect to the Workers' Compensation Obligations, and to continue honoring their obligations with respect to the Workers' Compensation Program in the ordinary course of business.  It is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would

8

most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to penalties.

20. I believe that it is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to penalties.

**D. Other Miscellaneous Employee Programs.**

21. The Debtors also offer Employees a number of miscellaneous benefits (the "Miscellaneous Employee Programs") through health savings accounts and flexible savings accounts. The approximate annual cost to the Debtors for these Miscellaneous benefits is $42,000.00. As of the Petition Date, the Debtors believe they do not owe any prepetition amounts for the Employees' Miscellaneous Employee Programs.

22. I believe that payment of the Workforce Obligations represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, without payment of the Workforce Obligations, the Employees may seek alternative employment opportunities while their services are needed to carry out an orderly administration of these chapter 11 cases. This would deplete the Debtors' workforce, hindering the Debtors' ability to operate their business and maximize value of their estates. Such loss and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on administering their estates.

23.     The majority of Debtors' workforce rely exclusively on the compensation and benefits to satisfy their daily living expenses.  Many members of the workforce expect and require their wages to arrive on a timely basis.  Consequently, the workforce would be exposed to financial difficulties if the Debtors are not permitted to honor obligations for unpaid Workforce Obligations.  Continuing ordinary course benefits will help maintain workforce morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

**VI.     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>").**

24.     Through the Cash Management Motion, the Debtors seek authorization to continue to operate their Cash Management System and Bank Accounts in the ordinary course of business.  In the ordinary course of business, the Debtors utilize a Cash Management System in operating the Company's remaining businesses as a going concern, to manage the cash of the Debtors in a cost-effective, efficient manner, account for intercompany transactions, and hold funds for the benefit of non-Debtor third parties.  The Cash Management System allows the Debtors to monitor cash flow and to centralize payments for general administrative and operating expenses and enable the Debtors to facilitate cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of their bank accounts.

25.     The Cash Management System includes a total of 10 Bank Accounts.  The Bank Accounts are held at Axos Bank, City National Bank of Florida, Customers Bank, and East West Bank (collectively, the "<u>Cash Management Banks</u>").  As of the Petition Date, the Debtors have approximately $10.3 million total cash in the Bank Accounts, of which approximately $9.1 million is held for the benefit of non-Debtor third parties or is subject to reconciliation, and approximately

$1.2 million is available for operations and expenses.  The Bank Accounts are described in more

detail below:[1]

| Bank Account | Bank Account Description |
|---|---|
| **Suttonpark Capital LLC**<br>Axos Bank<br>Account ending -2943 | **Lockbox Account:** No activity account for a lockbox that receives and forwards checks received on behalf of SuttonPark Servicing, LLC to a third-party servicer taking over the servicing of structured settlements and similar assets. |
| **Suttonpark Capital LLC**<br>Axos Bank<br>Account ending -2950 | **Operating Account:** Operating account previously used to collect funds owed to Suttonpark Capital, LLC from the Suspense Account and third parties to transfer to Suttonpark Servicing LLC operating account ending in 2976 to cover expenses as necessary. |
| **Suttonpark Capital LLC**<br>Axos Bank<br>Account ending -6597 | **Settlement Proceeds Account:** Collects settlement payments pursuant to repurchase agreement with broker. Rights to settlement payments were assigned to a non-debtor third party, and the Debtors hold funds in this account for the benefit of such non-debtor third party. |
| **Suttonpark Servicing LLC**<br>Axos Bank<br>Account ending -2976 | **Operating Account:** Primary operating account used to pay operational expenses, payroll for Suttonpark Servicing, LLC, and professional fees associated with transitioning the servicing of structured settlements and related assets of various portfolios.<br><br>Funds in this account are primarily from: (1) funds from the Suspense account, once verified to belong to Sutton Park Servicing, LLC transferred through the operating account ending in 2950; and (2) National Founders LP a third party secured creditor of a non-Debtor affiliate.<br><br>Prepetition, National Founders LP provided funds through protective advances under a loan facility with a non-Debtor affiliate for the purpose of paying the expenses associated with transitioning servicing portfolios financed under such loan facility to new servicer(s). That non-Debtor affiliate has no employees, and the employees and other professionals of Suttonpark Servicing LLC, who have the institutional knowledge and skills necessary to transition all of the companies' (including certain non-Debtor affiliates') structured settlement servicing streams, are paid through these protective advances. |
| **Suttonpark Servicing LLC**<br>Axos Bank<br>Account ending -9869 | **Suspense Account:** Holds miscellaneous deposits from cash streams flowing from the company's various servicing portfolios, which are still subject to reconciliation and are pending application or disbursement to appropriate parties, whether Debtor or non-Debtor. When Debtors identify where the funds belong, they transfer such funds accordingly. |
| **Suttonpark Servicing LLC**<br>Axos Bank<br>Bank account ending -3795 | **Passthrough Account:** Holds funds belonging to third parties in connection with historical servicing operations. |
| **777 Asset Management LLC**<br>City National Bank of Florida<br>Account ending -6857 | **Operating Account:** Former operating account used for ad hoc operational expenses and healthcare benefit administration. |
| **777 Partners LLC**<br>Customers Bank<br>Account ending -6725 | **Operating Account:** Former operating account for payroll and accounts payable; activity currently suspended due to garnishment. |

---

[1] These descriptions of Bank Account types are for illustrative purposes only and are not exhaustive.  A single Bank Account may fall into more than one of the categories described herein.

11

| Bank Account | Bank Account Description |
|---|---|
| **Signal National LLC**<br>East West Bank<br>Account ending -6398 | **General Operating Account:** Primary account for general operating expenses for all Debtors and DIP credit facility deposits. Used to pay the Debtors' Credit Card. Suttonpark Debtors reimburse account for operating expenses on behalf of Suttonpark Debtors. |
| **Signal National LLC**<br>East West Bank<br>Account ending -6405 | **Payroll Account:** Primary operating account for payroll processing for all Debtors and receives payroll reimbursements. Suttonpark Debtors reimburse account for payroll expenses on behalf of Suttonpark Debtors. |

26.     The Debtors pay fees incurred in connection with the Bank Accounts (the "Bank Fees") to the Cash Management Banks on a monthly basis in arrears.  The Bank Fees vary but are approximately $4,500.00 per month.  As of the Petition Date, the Debtors believe they will owe approximately $4,500.00 in Bank Fees.  The Debtors seek the authority, but not direction, to pay the prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historic practice.

27.     In the ordinary course of business, the Debtors provide corporate credit card access to certain of their senior-level employees through Ramp Visa (collectively, the "Corporate Credit Card").  These employees may use the Corporate Credit Card for a variety of necessary and reasonable corporate and operational expenses incurred within the scope of the employee's job duties.  The Corporate Credit Card has a total limit of $30,000.00.  As of the Petition Date, approximately four (4) employees have access to the Corporate Credit Card.  As of the Petition Date, the Debtors believe that approximately $17,000.00 is owed on the Corporate Credit Card. The Debtors seek the authority, but not direction, to pay any amounts owed on the Corporate Credit Card and to continue paying the Corporate Credit Card in the ordinary course on a postpetition basis, consistent with historic practice.

28.     I believe that requiring the Debtors to adopt a new cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the

12

ability to quickly track and report the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through monitoring the collection and movement of funds. Any disruption of the Cash Management System would have a negative effect on the Debtors' restructuring efforts. Indeed, absent the relief requested herein, requiring the Debtors to adopt a new cash management system could cause the Debtors' operations to grind to a halt, severely damaging the Debtors' business. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Maintaining the current Cash Management System will also allow the Debtors' accounting employees to focus on their daily responsibilities.

29. I believe that parties in interest will not be harmed by the Debtors' continued use of the present Cash Management System, including maintenance of the Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations. Specifically, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of Debtors' personnel. The Debtors will continue to work closely with the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored without the Court's approval.

30. Additionally, the Debtors' funds move through the Cash Management System as described in the Cash Management Motion, and at any given time, there may be prepetition amounts outstanding on account of the Cash Management System. Any non-payment of prepetition amounts owed could cause disruptions to the Debtors' operations. The Debtors' continued use of the Cash Management System, including payment of Bank Fees and amounts

13

owing on the Corporate Credit Card, will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition amounts due. Accordingly, I believe that the Debtors have shown that a sound business purpose exists to continue use of the Cash Management System in the ordinary course postpetition and to authorize payment of prepetition amounts due in connection with the Cash Management System, including Bank Fees and the Corporate Credit Card.

**VII.** ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and (C) Pay Premiums Thereunder, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").***

31. By the Motion, the Debtors seek authority to continue insurance coverage entered into prepetition and satisfy obligations related thereto, renew, supplement, or purchase insurance coverage as needed postpetition, and pay premiums thereunder. In the ordinary course of business, the Debtors maintain approximately four (4) insurance policies, including one expired director and officer liability policy that has remaining policy limits during the policy period, plus additional expired excess policies that amend such director and officer policy, (collectively, the "<u>Insurance Polices</u>"). The Insurance Policies are administered collectively as part of a program by various third-party insurance carriers and provide coverage for, among other things, commercial general liability (CGL), employee benefits liability, and director and officer liability. The Insurance Policies are essential to the ongoing operation of the Debtors' business enterprise. The aggregate annual premium for the current Insurance Policies is approximately $103,800.00.

32. The Insurance Policies are generally one year in length and typically renew in November every year. The insurance premiums for the policies are paid annually in advance pursuant to the payment terms set forth in each applicable Insurance Policy. As of the Petition

14

Date, the Debtors do not believe there are any prepetition amounts due or outstanding on account of insurance premiums.

33. I believe the continuation of the Insurance Program, maintenance of the Insurance Policies, and entry into new insurance policies is essential to the preservation of the value of the Debtors' business enterprise. Moreover, in many instances, insurance coverage is required by the regulations, laws, credit agreements, and contracts that govern the Debtors' commercial activities, including the requirement by the U.S. Trustee for the Northern District of Texas that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, I believe the Debtor should be authorized to maintain and/or modify its existing Insurance Policies, honor obligations related thereto and enter into new insurance policies in the ordinary course of business and consistent with prepetition practices.