Jason S. Brookner (TX Bar No. 24033684)
Amber M. Carson (TX Bar No. 24075610)
Blake M. Bryan (TX Bar No. 24140152)
**GRAY REED**
1845 Woodall Rodgers Fwy
Suite 1300
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
acarson@grayreed.com
bbryan@grayreed.com

*Proposed Counsel to the*
*Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SIGNAL NATIONAL LLC, *et al.*,[1] | § | Case No. 26-90190 (ELM) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE AUTOMATIC STAY, (II) DETERMINING THAT THE BANKRUPTCY COURT HAS EXCLUSIVE JURISDICTION OVER PROPERTY OF THE ESTATE DETERMINATIONS, AND (III) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 12:00 P.M. ON AUGUST 25, 2026.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/SignalNational. The Debtors' address for service in these chapter 11 cases is 3500 Maple Ave, Suite 420, Dallas, Texas 75219.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

## Introduction

1. Scott Sidell, a former employee of 777 Partners LLC, filed suit against 777 Partners LLC and Steven Pasko in the Circuit Court of the 11th Judicial District in and for Miami-Dade County, Florida, Case No. 2025-006423-CA-01 (the "Florida Litigation"). The First Amended Complaint asserts claims for breach of the 777 Partners Deferred Cash Plan and Award Agreement, breach of an Employment Agreement, breach of 777's Operating Agreement, and breach of fiduciary duty against Pasko. An involuntary petition was filed in Florida against 777 Partners LLC ("777") on July 16, 2026, followed by the Debtors all filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court on August 9, 2026 (the "Petition Date"). The automatic stay took effect as against 777 immediately upon the filing of the involuntary petition on July 13, 2026, and for the rest of the Debtors upon the Petition Date. 11 U.S.C. § 362(a).

2. Despite the automatic stay, Sidell's counsel has refused to cease efforts to pursue discovery in the Florida Litigation against 777. On August 21, 2026, when the Debtors' Florida counsel sought to cancel the August 25, 2026 hearing on 777's own Motion to Quash a subpoena to its attorneys at Stearns Weaver Miller, Sidell's counsel refused to "agree" to the cancellation and instead sought an emergency order from the Florida court to force the hearing forward. The Florida court would not cancel the hearing and instructed the parties to raise their objections at the scheduled hearing time. The hearing is scheduled to take place at 2 pm ET (1:00 p.m. CT) tomorrow, despite the fact that both parties filed Suggestions of Bankruptcy with the Florida court on July 17, 2026.

3. The present dispute centers on a subpoena issued to Stearns Weaver Miller ("Stearns Weaver"), counsel to 777, seeking attorney-client privileged documents—specifically, legal memoranda and communications concerning the suspension of the 777 Partners Deferred Cash Plan. The extent to which these documents constitute property of the Debtors' bankruptcy estate is a matter within this Court's exclusive jurisdiction. Similarly, Sidell's efforts to compel production from 777 is a direct violation of the automatic stay.

4. The Debtors, therefore, file this Motion to enforce the automatic stay against Sidell's counsel and to obtain an order from this Court confirming that (a) discovery against the Debtors must proceed, if at all, in this Court and only after obtaining relief from the automatic stay, and (b) any determination of whether documents or other property held by Stearns Weaver constitute property of the Debtors' estates falls within this Court's exclusive jurisdiction under 28 U.S.C. § 1334(e)(1).

## Relief Requested

5. By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit G** (the "Proposed Order"): (i) enforcing the automatic stay under section 362 of the Bankruptcy Code; (ii) determining that the Bankruptcy Court has exclusive jurisdiction under 28 U.S.C. § 1334(e)(1) over whether property is or is not property of the Debtors' estates; (iii) directing Sidell and his counsel to immediately cease all proceedings in the Florida Litigation that implicate the Debtors or property of the Debtors' estates, including but not limited to the subpoena to Stearns Weaver Miller; and (iv) granting related relief.

## Jurisdiction and Venue

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this is a core matter pursuant to 28 U.S.C. § 157(b).

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The bases for the relief requested herein are sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code"), 28 U.S.C. § 1334(e)(1), and Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

9. A detailed description of the Debtors and their businesses is set forth in the Declaration of Mark Shapiro, Chief Operating Officer, in Support of Chapter 11 Petitions and First Day Motions at Docket No. 14 (the "First Day Declaration").

10. On the Petition Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. An official committee of unsecured creditors was appointed by the Office of the U.S. Trustee on August 21, 2026.

11. On June 23, 2025, Scott Sidell ("Sidell") filed his First Amended Complaint against 777 and Steven Pasko ("Pasko") in the Circuit Court of the 11th Judicial District in and for Miami-Dade County, Florida, Case No. 2025-006423-CA-01 (the "Florida Litigation"). The complaint alleges that 777 breached the 777 Partners Deferred Cash Plan (the "Plan") and related Award Agreement by suspending payment of Sidell's vested deferred compensation benefits. Sidell claims damages of approximately $2,079,000 in unpaid Plan benefits, $650,000 in unpaid bonuses, and $56,600 in unpaid indemnification-related legal fees. *See* **Exhibit A** (Sidell's First Amended Complaint) ¶¶ 1–5, 79–96.

12. On July 3, 2025, Defendants filed a Motion to Dismiss Count IV of the Amended Complaint and motions to strike certain damages, attorneys' fees, and punitive damages claims. *See* **Exhibit B** (Defendants' Motion to Dismiss Count IV of the Amended Complaint and Motion

to Strike).

13. On April 9, 2026, the Florida Court entered a Final Judgment in favor of Plaintiff and against 777 on Counts I and II of Plaintiff's Amended Complaint. On April 24, 2026, 777 timely filed its Motion for Rehearing and Reconsideration ("Motion for Rehearing"), which remains pending due to the applicability of the automatic stay.

14. During the Florida Litigation, Sidell issued a subpoena to Stearns Weaver Miller ("Stearns Weaver"), 777's counsel, seeking the production of (a) any memorandum, brief, or final work product prepared by Stearns Weaver and provided to 777 or its officers related to its opinion concerning the suspension of the Plan and/or Award Agreement, and (b) any email or document prepared by Stearns Weaver and provided to 777 or its officers related to that opinion. *See* **Exhibit C** (Defendants' Motion to Quash Subpoena to Stearns Weaver and Motion for Protective Order). On May 8, 2026, Defendants filed a Motion to Quash Subpoena to Stearns Weaver and Motion for Protective Order, asserting that the subpoena on its face sought documents protected by the attorney-client privilege. *See id.*

15. Sidell does not dispute that the documents were privileged nor does he assert that the privilege has been waived. *See* **Exhibit D** (August 21 Chirinos Emails with Court). Sidell's counsel also does not dispute that the automatic stay is in effect, given that he filed his own Suggestion of Bankruptcy, yet continues to press forward with the Florida Litigation and, specifically, discovery against 777. *See id.*; *see also* **Exhibit E** (August 21 Chirinos Emails with Debtors' Counsel).

16. On August 21, 2026, Sidell's counsel refused to agree to cancellation of the August 25 hearing on 777's Motion to Quash. *See id.* Sidell's counsel argued to the Florida court that the hearing should proceed because the remaining defendant, Pasko, was not in bankruptcy. *See id.*

However, the Motion to Quash was filed ***by 777*** because ***777's attorney-client privilege***—not Pasko's—***is at issue***. Any proceeding on 777's Motion to Quash or 777's pending Motion for Rehearing directly implicates 777, its rights, and its estate property, and therefore violates the automatic stay.

17. On August 21 and again on August 23, 2026, Debtors' counsel sent cease-and-desist communications to Sidell's counsel demanding that he "immediately cease and desist from pursuing this issue before the Florida court—in fact, before any court other than the US Bankruptcy Court for the Northern District of Texas, Fort Worth Division." *See* **Exhibit F** (Cease and Desist Communication to Chirinos). Counsel has refused to comply, necessitating this Court's immediate intervention. *See id.* ("[the proceedings on this matter in Florida] will not be [suspended/pulled down]. You may make your motion with the bankruptcy court. I also spoke with several attorneys who are on the unsecured committee and attorneys on both bankruptcy dockets. They do not agree with your conclusion as we do not.").

**Basis for Relief Requested**

**I. Discovery Against the Debtors Violates the Automatic Stay and Must Proceed, If at All, in the Bankruptcy Court.**

18. Section 362 of the Bankruptcy Code contains a self-executing injunction that provides a debtor with a "breathing spell" essential to the bankruptcy process. *Campbell v. Countrywide Home Loans, Inc. (In re Campbell)*, 545 F.3d 348, 354–55 (5th Cir. 2008); *Halo Wireless, Inc. v. Alenco Commc'ns, Inc. (In re Halo Wireless, Inc.)*, 684 F.3d 581, 586 (5th Cir. 2012); *see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986).

19. Section 362(a)(1) stays "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this

title." 11 U.S.C. § 362(a)(1). Section 362(a)(3) also stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

20. Discovery against a debtor in a prepetition state court action constitutes a "continuation" of that action and is stayed under section 362(a)(1). *See Kalb v. Feuerstein,* 308 U.S. 433, 439, (1940); *see also Howell v. Thompson,* 839 S.W.2d 92, 92 (Tex. 1992); *Continental Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex. 1988). A party may not conduct discovery against a debtor without first obtaining relief from the automatic stay from the bankruptcy court. *See Kalb*, 308 U.S. at 439; *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 114 (5th Cir. 1987) (because the automatic stay "freezes in place all proceedings against the debtor, and because only an order of the bankruptcy court can authorize any further progress in the stayed proceedings, it follows that the continuation of any proceeding can derive legitimacy only from the bankruptcy court order."); *Howell*, 839 S.W.2d at 92; *Continental Casing Corp.*, 751 S.W.2d at 501; *see also In re Manown*, 213 B.R. 411, 413–14 (Bankr. N.D. Ga. 1997) (holding that discovery from a debtor in a prepetition state court action is part of the continuation of the action and cannot proceed without stay relief); *Matter of United Imports Corp.*, 200 B.R. 234, 237 (Bankr. D. Neb. 1996) (holding that discovery obligations imposed in prepetition litigation against a chapter 11 debtor were stayed); *Scherer v. Carroll*, 150 B.R. 549, 552 (D. Vt. 1993) (holding that filing bankruptcy stays state court discovery).

21. Even with actual knowledge of the automatic stay, Sidell's counsel has made no attempt to obtain relief from the automatic stay from this Court before continuing to prosecute this discovery, instead barreling forward ***despite*** the automatic stay. This failure to seek Court approval, coupled with the continued prosecution of the subpoena in the Florida court despite the

Debtors' chapter 11 filing, constitutes a willful violation of the automatic stay. *See* 11 U.S.C. § 362(k)(1); *In re Chesnut*, 422 F.3d 298, 302 (5th Cir. 2005) (holding that a violation is willful when the creditor knew of the bankruptcy filing and intentionally performed the act that violated the stay).

22. Moreover, the subpoena issued to Stearns Weaver seeks attorney-client privileged documents. The attorney-client privilege belongs to the client—here, 777. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49 (1985). Upon the commencement of the bankruptcy case, control of the privilege passed to the debtor in possession. *Id.* at 358. Neither the Debtors' existing management nor any estate representative has waived the privilege.

23. The subpoena directly implicates 777's privileged communications and its estate property. Permitting a state court to adjudicate whether the attorney-client privilege applies, whether an exception to the privilege has been established, and whether the documents must be produced would allow the continuation of a judicial proceeding against the Debtor and the exercise of control over property of the estate in violation of sections 362(a)(1) and 362(a)(3). *See In re Royce Homes LP*, 466 B.R. 81, 495–96 (S.D. Tex. 2012) (quoting *Hoffenberg v. Cohen (In re Towers Fin. Corp.),* 164 B.R. 719, 720 (S.D.N.Y. 1994)) ("Courts have emphasized that '[q]uestions that arise during the course of a bankruptcy proceeding concerning the appropriate scope of discovery and that do not involve controlling questions of law are left to the sound discretion of the court that is fully familiar with the entire proceeding—the bankruptcy judge.'"); *see also In re Commercial Financial Services, Inc.*, 247 B.R. 828, 836–38 (Bankr. N.D. Okla. 2000) (holding that discovery issues concerning a debtor must be addressed in the bankruptcy court).

24. The legislative history of section 362 confirms that Congress intended the scope of

the automatic stay to be sweeping. *See* H.R. Rep. No. 95-595, at 340 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6296–97 ("The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions."). Sidell's continued prosecution of discovery against 777 in the Florida court is precisely the type of conduct the automatic stay is intended to, and does, prohibit.

25. Sidell's counsel has argued that the hearing on the Motion to Quash should proceed because the remaining defendant, Pasko, is not in bankruptcy. This argument ignores that the Motion to Quash was filed by 777 to protect 777's attorney-client privilege. The privilege belongs to 777, not to Pasko, as evidenced by the arguments made by Sidell in his opposition to the Motion to Quash. Any ruling on the privilege—including whether any exception to the privilege applies—directly adjudicates 777's rights in its own privileged communications and thus constitutes a proceeding against the Debtor and an exercise of control over estate property. 11 U.S.C. §§ 362(a)(1), (3); *Weintraub*, 471 U.S. at 348–49, 358.

## II. The Bankruptcy Court Has Exclusive Jurisdiction Over Whether Property Is or Is Not Property of the Estate.

26. The jurisdictional foundation for the relief sought rests on 28 U.S.C. § 1334(e)(1), which grants the district court in which a title 11 case is commenced "*exclusive* jurisdiction of all the property, *wherever located*, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1) (emphasis added). This is an *in rem* grant of exclusive jurisdiction that vests this Court with authority over the res of the bankruptcy estate, wherever that property may be located. *See Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 483–85 (5th Cir. 2024).

27. The Fifth Circuit has squarely held that this exclusive jurisdiction encompasses the

threshold determination of whether specific property constitutes property of the estate in the first place. *Porretto*, 113 F.4th at 484–85; *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374–75 (5th Cir. 2003); *see also State of Tex. v. Wellington Res. Corp.*, 706 F.2d 533, 536 (5th Cir. 1983). Texas bankruptcy courts have consistently applied this principle. *See In re Correra*, 589 B.R. 76, 82–83 (Bankr. N.D. Tex. 2018); *In re Duval Cnty. Ranch Co.*, 167 B.R. 848, 852 (Bankr. S.D. Tex. 1994) ("whenever there is a dispute as to whether property is property of the estate, exclusive jurisdiction over that determination is in this Court"); *In re Royce Homes*, 652 B.R. at 495–96 (holding that litigation concerning the nature and extent of estate property lies within exclusive bankruptcy jurisdiction).

28. The estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This definition is broadly construed to include attorney-client privileged communications belonging to the debtor. *See Weintraub*, 471 U.S. 343, 348–49 (1985) (recognizing that a corporation's attorney-client privilege passes to the bankruptcy estate's representative, confirming the estate's interest in controlling privileged communications).

29. Here, the central dispute in the Florida Litigation concerns whether privileged documents—legal memoranda and communications concerning the suspension of the Plan—are subject to production. This is a question about whether those documents, which are protected by 777's attorney-client privilege, constitute property of 777's bankruptcy estate. That determination lies exclusively within this Court's jurisdiction. 11 U.S.C. § 541(a)(1); 28 U.S.C. § 1334(e)(1); *Weintraub*, 471 U.S. at 348–49, 358.

30. Any attempt by the Florida court to rule on the subpoena, the privilege, or any exception to the privilege would necessarily require that court to make determinations about estate

property—determinations that 28 U.S.C. § 1334(e)(1) reserves exclusively for this Court. *See Porretto*, 113 F.4th at 484–85; *In re Royce Homes*, 652 B.R. at 495–96.

**III. This Court Should Exercise Its Authority Under Section 105(a) to Enforce the Automatic Stay.**

31. Section 105(a) of the Bankruptcy Code empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Court has authority to fashion appropriate remedies for violations of the automatic stay. *See* 11 U.S.C. §§ 105(a), 362(k); *In re All Trac. Transp., Inc.*, 310 B.R. 570, 573 (Bankr. N.D. Tex. 2004).

32. The relief requested herein is necessary to prevent ongoing violations of the automatic stay, to protect the Debtors' privileged communications and estate property, and to preserve this Court's exclusive jurisdiction over property-of-the-estate determinations. The Debtors reserve all rights, including the right to seek sanctions, attorneys' fees, and contempt relief for willful violations of the automatic stay under sections 105 and 362(k) of the Bankruptcy Code. *See* 11 U.S.C. §§ 105(a), 362(k); 28 U.S.C. § 1334(e)(1).

**Emergency Consideration**

33. The Debtors request emergency consideration of this Motion pursuant to section J of the Complex Case Procedures. The Florida court has set a hearing for Tuesday, August 25, 2026, at 2:00 p.m. ET (1:00 p.m. CT) on the Motion to Quash, and Sidell's counsel has refused to agree to a cancellation of that hearing. Absent immediate relief from this Court, the Florida court may proceed with a hearing that directly violates the automatic stay and encroaches upon this Court's exclusive jurisdiction. The Debtors therefore respectfully request that the Court approve the relief requested in this Motion on an emergency basis. *See* Complex Case Procedures § J; 11 U.S.C. §§ 362(a), 105(a); 28 U.S.C. § 1334(e)(1).

**<u>Notice</u>**

34. The Debtors will provide notice of this Motion to the following parties or their counsel: (a) the U.S. Trustee for the Northern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel for Sidell; (d) counsel for Defendants in the Florida Litigation; (e) counsel to members of the Committee (if known) and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is needed. Fed. R. Bankr. P. 2002.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted this 24th day of August, 2026.

**GRAY REED**

By: *<u>/s/ Jason S. Brookner</u>*
Jason S. Brookner
Texas Bar No. 24033684
Amber M. Carson
Texas Bar No. 24075610
Blake M. Bryan
Texas Bar No. 24140152
1845 Woodall Rodgers Fwy, Suite 1300
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
acarson@grayreed.com
bbryan@grayreed.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Service**

I certify that on August 24, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas, as well as via email on the parties listed below:

Tulio D. Chirinos
CHIRINOS LAW FIRM PLLC
20283 State Road 7
Boca Raton, FL 33498
Tel: (561) 299-6334
tchirinos@chirinoslawfirm.com
***Counsel to Plaintiff Scott Sidell***

Leonor M. Lagomasino
GORDON REES SCULLY MANSUKHANI, LLP
100 SE Second Street, Suite 3900
Miami, FL 33131
Tel: (305) 428-5330
llagomasino@grsm.com
***Counsel to State Court Defendants 777 and Steven Pasko***

Andrew K. Glenn
GLENN AGRE BERGMAN & FUENTES
1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
Tel: (212) 970-1601
aglenn@glennagre.com
***Counsel to the Vida Parties***

Matthew C. Ziegler
Michael H. Carpenter
MORGAN LEWIS
2222 Market Street
Philadelphia, PA 191103
Tel: (215) 963-5000
matthew.ziegler@morganlewis.com
michael.carpenter@morganlewis.com
***Counsel to ING***

Susan Hersh
Office of the U.S. Trustee
1100 Commerce St., Room 976
Dallas, TX 75242
Tel: (214) 767-8967
susan.hersh@usdoj.gov
***U.S. Trustee for the Northern District of Texas, Region 6***

*/s/ Jason S. Brookner*
Jason S. Brookner

# <u>Exhibit A</u>

## Sidell's First Amended Complaint

Filing # 225790991 E-Filed 06/23/2025 11:34:19 AM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL DISTRICT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

SCOTT SIDELL

*Plaintiff*,

vs.

CIVIL DIVISION
CASE NO.: 2025-006423-CA-01

777 PARTNERS LLC, and STEVEN PASKO,

*Defendants*.
________________________________________/

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Scott Sidell ("Plaintiff" or "Mr. Sidell"), by and through undersigned counsel, hereby files this civil action complaint against Defendants, 777 Partners LLC ("777") and Steven Pasko ("Pasko") (collectively, "Defendants"), and requests a jury trial of all issues so triable, and in support thereof, avers as follows:

1. This is an action for the breach of employment and indemnification agreements that entitled Mr. Sidell to benefits and compensation for years of dedicated service to his employer, 777. Instead of honoring these agreements, 777 has refused to pay Mr. Sidell his earned benefits and compensation. He is now forced to retain counsel and bring this complaint to receive what he rightfully earned. For the following reasons, Defendants are liable to Mr. Sidell for the full amount of benefits and compensation he is owed.

2. *First*, under a deferred compensation plan and award agreement entered into between 777 and Mr. Sidell, Mr. Sidell was awarded $2,310,000 in deferred compensation in exchange for remaining an employee at 777 through August

2021. Mr. Sidell met this obligation under the agreement and became fully vested in his award on August 10, 2021, which required 777 to pay out the award over the next five years. 777 paid Mr. Sidell his 2022 payment but failed to pay his 2023 and 2024 award payments. 777 informed Ms. Sidell in April 2024 that it would not pay his outstanding award and that the deferred compensation plan was "suspended" indefinitely for future payments and retroactively for all payments back to 2023. 777's purported suspension of the same deferred compensation plan has been found to be invalid as it violates the terms of the plan and agreements by an arbitrator in an American Arbitration Association ("AAA") proceeding, which has been confirmed in Florida state court (the "Arbitration Award").[1] As detailed below and in the Arbitration Award, 777's conduct constitutes a breach of contract entitling Mr. Sidell to the full amount of his outstanding compensation due under the deferred compensation plan and award agreement.[2]

3. *Second,* Pasko, as the deferred compensation plan's administrator and 777's managing member, breached his fiduciary duty to Mr. Sidell when (1) he suspended the plan with full knowledge that the plan could not be modified to

---

[1] *Juan Arciniegas et al. vs 777 Partners LLC*, 2025-001159-CA-01, Dkts. 36-38 (Fla. Cir. Ct. April 24, 2025) (denying 777's motion to vacate, granting plaintiffs' motion to confirm arbitration award, and awarding all outstanding payments due under the plan as they come due).

[2] Mr. Sidell has alleged that 777's principal lender, Advantage Capital Holdings Inc. ("A-CAP"), and its Chairman and CEO, Kenneth King ("King"), forced 777 to suspend the deferred compensation plan and award agreements and have sought to hold A-CAP and King accountable in federal court for tortious interference with a contract. *Sidell v. King et al.*, 1:24-cv-25101-JAL, Dkt. 1 (S.D. Fla. Dec. 27, 2024). If discovery in that case or this case shows that A-CAP and King actually took control of 777 in May 2023, as alleged in another federal litigation in the Southern District of New York, Mr. Sidell reserves the right to add a claim for breach of the deferred compensation plan and award agreement's change in control provision.

withhold vested benefits absent consent of the participant, and (2) surrendered his authority as plan administrator to allow third parties A-CAP and King to force Pasko to suspend the plan and harm plan participants.

4. *Third,* Mr. Sidell's employment agreement entitled him to annual compensation bonuses to be paid at the same time other 777 employees received their bonuses. Mr. Sidell received his annual bonuses from 2017 through 2021 as required under his employment agreement. However, 777 failed to pay Mr. Sidell his 2022 bonus of $325,000 and 2023 bonus of $325,000 despite other employees being paid 2022 and 2023 bonuses. As such, 777 breached the employment agreement and Mr. Sidell is entitled to $650,000 in outstanding bonus payments.

5. *Lastly*, under its operating agreement, 777 is required to indemnify officers for any legal fees and costs associated with participating in legal matters for work done on behalf of 777. 777 is under investigation by both the United States Department of Justice ("DOJ") and United States Securities and Exchange Commission ("SEC"). Through no fault of his own, Mr. Sidell has been required to participate in the DOJ and SEC investigations. As a former officer of 777, 777 is required to pay for any and all legal fees and cost he incurred related to the DOJ and SEC investigations. 777 has acknowledged this requirement and paid $7,430.00 directly to Mr. Sidell's counsel, but has since failed to pay $6,600.00, which is past due. Additionally, Mr. Sidell's attorney requires a deposit of $50,000 to continue to represent Mr. Sidell in the DOJ and SEC investigations. Pursuant to the indemnity agreement, 777 is required to immediately pay the past due amount and continue to

pay any new legal fees and costs associated with the DOJ and SEC investigations as they become due.

6. Mr. Sidell brings this demand to remedy these wrongs and enforce his employment agreements.

**THE PARTIES, JURISDICTION AND VENUE**

7. Plaintiff Scott Sidell is an individual domiciled in and a citizen of the State of Connecticut. He is over the age of 18 and was employed by 777 Partners LLC from August 12, 2017, until December 20, 2024.

8. Defendant 777 Partners LLC is a limited liability company organized under the laws of the State of Delaware. 777's principal place of business is located at 100 SE 2nd Street, Suite 2000, Miami, Florida 33131.

9. Defendant Steven W. Pasko is an individual domiciled in and a citizen of the State of Florida. He is over the age of 18. At all relevant times, Pasko was a managing member of 777 Partners LLC and a member of its Board of Managers. As a member of 777's Board of Managers, Pasko was a Plan Administrator of the 777 Partners Deferred Cash Plan during the relevant period.

10. This Court has jurisdiction under Section 26.012(2) of the Florida Statutes.

11. Venue is proper in this Court under Sections 47.011 and 47.051 of the Florida Statutes because a substantial part of the events giving rise to the underlying

cause of action occurred in Miami-Dade County, Florida and Plaintiff was employed by 777 at its Miami, Florida headquarters.[3]

## FACTUAL ALLEGATIONS

### PLAINTIFF'S EMPLOYMENT AND RELEVANT CONTRACTS

12. On August 12, 2017, Plaintiff began working as Principal and Head of Alternative Energy and Infrastructure under the 777 Investment Team.

13. On December 21, 2018, Plaintiff entered into an employment agreement with 777 (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

14. Pursuant to the Employment Agreement, Plaintiff was employed for a term of three years; on the third anniversary of his start date (and on each subsequent anniversary), Plaintiff's Employment Agreement would be automatically renewed for an additional 12-month term unless 777 or Plaintiff delivered a written notice of intent not to renew the agreement at least thirty days before the end of the applicable term. Ex. A at § 1.

15. Plaintiff's compensation package included an annual salary, eligibility for annual bonuses, equity incentive participation, as well as other benefit plans.

[3] Plaintiff's employment agreement contains an arbitration clause requiring all employment related disputes to be litigated through AAA arbitration. However, due to 777's withdrawal from at least one other unrelated arbitration, counsel for Plaintiff, on four separate occasions over the course of two weeks, requested that Defendants' counsel confirm whether Defendants intended to enforce the arbitration provision and provided a deadline to receive those assurance or Plaintiff would file this claim in federal court. Defendants' counsel acknowledged the request and deadline but never expressed their intent to enforce the arbitration clause. Plaintiff filed a complaint in federal court on January 30, 2025, which was later voluntarily dismissed based on lack of diversity. Defendants did not express their intent to enforce the arbitration clause at any point in that litigation.

16. On April 9, 2021, Plaintiff entered into the 777 Partners Deferred Cash Plan Award Agreement (the "Award Agreement") with 777. A true and correct copy of the Award Agreement is attached hereto as Exhibit B.

17. The Award Agreement incorporated the terms and provisions of the 777 Partners Deferred Cash Plan (the "Plan") and provides that any awards granted under the Award Agreement are "subject to all of the terms and conditions of the Plan." A true and correct copy of the Plan is attached hereto as Exhibit C.

18. 777's operating agreement (the "Operating Agreement"), which Mr. Sidell does not have in his possession but will seek through discovery, requires 777 to pay its officers and directors legal fees, including those associated with litigation and government investigations that are brought against 777.

19. On April 11, 2024, 777 provided Mr. Sidell with written notice of its intent not to renew the Employment Agreement. As a result, Mr. Sidell's term of employment with 777 ended on December 20, 2024.

**THE PLAN AND THE AWARD AGREEMENT'S RELEVANT DEFINITIONS AND PROVISIONS**

20. At the time of its creation, the Plan's Administrator was the Board of Managers of 777, which included Pasko. Ex. C at § 1.1.

21. The Plan's Administrator has the authority to grant Award Agreements, which are agreements entered into between each Plan participant and 777 and were not required to be "the same with respect to each Participant." Ex. C at §§ 1.3, 3.1.

22. The Award Agreements granted specific awards to the individual participant that was subject to the unique agreement. For example, Plaintiff's Award

Agreement defined "Award" to mean the $2,310,000 he was granted in his Award Agreement. Ex. B at preamble (777 "hereby grants an award of the amount specified above the (the 'Award') to the individual named above (the 'Participant')." (emphasis in original).

23. An Award granted under an Award Agreement was initially fully unvested and was merely issued and outstanding to a participant. Over time, the Award would have both "vested" and "unvested" portions until it became fully vested. Ex. B at § 3.

24. After an Award was granted, a participant would "become vested in the Participant's Award" on the fourth anniversary of the Base Date. Ex. B at §§ 2-3. The fully vested benefits would then be paid out over the next five years. Ex. B at § 5.

25. The Plan's Administrator has the authority to amend, suspend, or terminate the Plan and Award under certain limited circumstances. Ex. C at §§ 3.1, 4.2. However, the Plan and Award Agreement set clear and firm boundaries that limited the Plan's Administrator's ability to adversely affect participant's entitlement to benefits under the agreements, including, but not limited to:

a. The Plan Administrator could **only** amend an "Award Agreement provided that the rights and obligations of the Participant of the Award that is the subject of any such Award Agreement are **not affected adversely**." Ex. C at § 3.1 (emphasis added).

b. A vested Award could only be forfeited by a participant if he was terminated for cause or if he breached the Restricted Covenant Agreement. Otherwise, "upon the Participant's Termination of Service for any reason, the Participant shall forfeit any portion of the Award with respect to which the Participant **has not yet become vested**." Ex. B at § 4 (emphasis added).



Sidell - Pasko - 00001

c. "[N]o amendment (taken as a whole with any other amendment adopted at such time), suspension, or termination, **without the consent** of the affected Participant, **shall materially adversely and disproportionately affect** any then -**issued and -outstanding Awards**." Ex. C at § 4.2 (emphasis added).

d. "Subject to the provisions of the Plan, the provisions of this Agreement may not be amended, modified, supplemented or terminated, and waivers or consents to departures from the provisions hereof **may not be given, without the written consent of each of the parties hereto**." Ex. B at § 12 (emphasis added).

26. The Plan insulates the Plan's Administrator, including Pasko, from individual liability related to the Plan *only* if their actions are "made in good faith with respect to the Plan or Awards." Ex. C at § 3.2.

27. The Plan and Award Agreement are governed by the laws of the State of Delaware. Ex. B at § 16; Ex. C at § 4.7.

**PLAINTIFF'S AWARD UNDER THE AWARD AGREEMENT**

28. Per the Award Agreement, 777 awarded Plaintiff $2,310,000 (the "Award"), which vested "in four (4) equal annual installments, on each anniversary of the Base Date." Ex. B at preamble, § 3.

29. As indicated in the Award Agreement, the Base Date was August 2017, and therefore the Award became fully vested as of August 2021. Ex. B at preamble, § 3.

30. Once vested, the Award was to be paid out in five installments on each anniversary of the Base Date illustrated by the following:

| Anniversary of Base Date | Payment Date | Percentage of Award | Dollar Amount |
|---|---|---|---|
| 5-Year Anniversary | Aug. 10, 2022 | 10% | $231,000 |
| 6-Year Anniversary | Aug. 10, 2023 | 15% | $346,500 |
| 7-Year Anniversary | Aug. 10, 2024 | 20% | $462,000 |
| 8-Year Anniversary | Aug. 10, 2025 | 25% | $577,500 |
| 9-Year Anniversary | Aug. 10, 2026 | 30% | $693,000 |

Ex. B at § 5.

31. Each of the five payments owed under the Award Agreement was to be made within ten (10) days following the applicable payment date, *i.e.*, no later than August 10th of each applicable year. *Id.*

**777 BREACHES THE PLAN AND AWARD AGREEMENT**

32. 777 did not pay Plaintiff his first installment on August 10, 2022 in one lump sum as was required under the Award Agreement. Instead, Plaintiff was paid $231,000 over the course of several years, receiving his last payment on April 5, 2024.

33. Plaintiff did not receive any amount of his August 10, 2023 payment of $346,500, which was due before the alleged suspension of the Plan, under the Award Agreement.

34. On or around April 15, 2024, Pasko informed Plaintiff that 777 was going to temporarily stop payments under the Plan.

35. Upon information and belief, in or around April 2024, a resolution was passed by the Plan Administrators purportedly suspending the Plan prospectively and retroactively to March 2023.

36. Neither Pasko nor any other employee of 777 ever sought Mr. Sidell's consent to suspend the Plan as is required since the suspension adversely affected his right to his $2,079,000 in remaining vested benefits (after subtracting the August 10, 2022 payment) under the Award Agreement. *See* Ex. B at § 12; Ex. C at § 3.1.

37. Following the unilateral and unauthorized suspension, Plaintiff did not receive his August 10, 2024 payment of $462,000.

38. 777 had no authority under the Plan to suspend the Plan or payment of vested benefits to Plaintiff. The Plan Administrator only had the right to suspend the Plan and withhold certain issued and outstanding unvested Awards, for which it also required participant consent. Ex. C at § 4.2.

39. Therefore, 777's suspension of the Plan and withholding of Plaintiff's August 2023 and August 2024 vested benefits payments and intent to withhold Plaintiff's August 2025 and August 2026 vested benefits constitutes a material breach and anticipatory breach of the Plan and Award Agreement.

40. In a recent AAA arbitration, the same purported suspension by 777 of the same Plan was ruled invalid as it breached the terms of the Plan and the Award Agreement. Specifically, the arbitrator ruled that "[t]he suspension of the Plan and Award Agreements constituted a breach of contract and 777's financial condition does not justify its failing to pay vested benefits," and as a result, the claimants were "entitled to the full amount of their remaining Awards, to be paid as they become due consistent with the Plan, plus prejudgment interest at the applicable statutory rate, from Respondent 777." The claimants in the matter petitioned to confirm the

arbitration award. *See Juan Arciniegas et al. vs 777 Partners LLC*, 2025-001159-CA-01, Dkt. 2 (Fla. Cir. Ct. Jan. 23, 2025). Judge Jason Emilio Dimitris subsequently confirmed the awards and ordered 777 to pay plaintiffs all outstanding payments due under the same Plan plus interest and all future payments due under the same Plan as they become due. *Id*. at Dkts. 36-38.

**PASKO BREACHES FIDUCIARY DUTY TO PLAINTIFF**

41. Pasko, as a Manager Member of the LLC, Board member, and the Plan Administer, owed a fiduciary duty to Mr. Sidell (and all other Plan participants) to act in their best interest and the Plan and Award agreement only immunized Pasko as Plan Administrator so long as he acted in good-faith.

42. Pasko breached his fiduciary duty by acting in bad faith when he: (1) refused to pay Plaintiff's vested benefits, knowing the benefits were due, and could not be withheld without consent from Plaintiff; and (2) allowed A-CAP and King, both non-Plan Administrators and third-parties, to allegedly force the suspension of Plan and Award Agreements in violation of the terms of the Plan. See Ex. C at § 3.2.

43. Pasko's disloyal and conflicted acquiescence to A-CAP and King in general is well documented. In a federal case in the Southern District of New York, Plaintiffs have alleged that as of the summer of 2023 that "as a result of the agreement between 777 Partners and A-CAP, King and A-CAP must approve every material decision that 777 Partners makes . . . ." *See Leadenhall Capital Partners LLP et. al. v. Josh Wander et. al*, 1:24-cv-03453, Dkt. 1 at ¶¶11-20 (S.D.N.Y. May 3, 2024).

44. A-CAP and King have all but conceded Pasko's disloyal, conflicted, and bad faith conduct towards Plaintiff and Plan participants in federal court in the Southern District of Florida by arguing that they were "entitled" as a lender, not a Plan administrator, to direct 777 and Pasko to not pay benefits due under the Plan and Award Agreement. *Sidell v. Advantage Capital Holdings LLC and Kenneth King*, 1:24-cv-25101-JAL, Dkt. 11 at 5-7 (S.D. Fla. Mar. 7, 2025).

45. Pasko's breach of fiduciary duty damaged Plaintiff by the amount of vested benefits he was owed under the Plan and Award Agreement.

**THE EMPLOYMENT AGREEMENT AND PLAINTIFF'S AWARD THEREUNDER**

46. Pursuant to Section 4 of the Employment Agreement, Mr. Sidell was "eligible for an annual incentive bonus award determined by the Company in respect of each calendar year during Employee's employment ('Discretionary Bonus')." Ex. A at § 4(b).

47. The Employment Agreement provided that any bonus "shall be paid to [Mr. Sidell] at the same time as annual bonuses are generally payable to other senior employees of the Company . . . but in no event later than 60 calendar days following the conclusion of the calendar year for which the bonus is attributable." *Id*.

48. The Employment Agreement also provides that Mr. Sidell is entitled to any earned bonus even if he is no longer employed as long as he continued his employment through the bonus "payment date" (*i.e.*, the date other employees received their bonus but no later than 60 days following the calendar year for which

the bonus was attributable). *Id.*

49. The Employment Agreement is governed by the laws of the State of Florida. *Id.* at § 15(h).

**777 BREACHES THE EMPLOYMENT AGREEMENT**

50. Plaintiff earned an annual bonus for calendar year 2020 in an amount equal to his annual salary for calendar year 2020. 777 paid Plaintiff his 2020 annual bonus in full.

51. Plaintiff earned an annual bonus for calendar year 2021 in an amount equal to his annual salary for calendar year 2021. 777 paid Plaintiff his 2021 annual bonus in full.

52. In or around April 2023, Joshua Wander, another member of 777's Board of Directors, led a meeting with the Investment Team, including Mr. Sidell, during which he informed the attendees that they had earned annual bonuses for calendar year 2022. Mr. Wander stated that 777 would pay the bonuses by the end of April 2023.

53. Upon information and belief, 777 paid all but a handful of those employees their annual bonuses for calendar year 2022.

54. Based on Mr. Sidell's 2020 and 2021 annual bonuses, he expected to receive $325,000 for his 2022 annual bonus, which was the amount of his annual salary for calendar year 2022.

55. 777 did not pay Plaintiff his 2022 annual bonus on the bonus payment date, by the end of April 2023, or at any time thereafter. In fact, over a year later, on May 8, 2024, Mr. Wander acknowledged that Mr. Sidell earned his 2022 annual

bonus and expressed surprise that he had not been paid. In the same conversation, Mr. Wander informed Plaintiff that he was only aware of one other managing director that had not yet received their bonus for the 2022 calendar year.

56. Upon information and belief, in early 2024, 777 paid certain members of the Investment Team their annual bonuses for calendar year 2023, triggering the bonus payment date for all other Investment Team members.

57. 777 did not pay Plaintiff his 2023 annual bonus on the bonus payment date.

58. Based on Mr. Sidell's 2020 and 2021 annual bonuses, he expected to receive $325,000 for his 2023 annual bonus, which was the amount of his annual salary for calendar year 2023.

59. Plaintiff's term of employment ended on December 20, 2024. He has still not received any amount of his $325,000 2022 annual bonus or $325,000 2023 annual bonus.

60. Therefore, 777 breached the Employment Agreement and Mr. Sidell is entitled to payment in full of his 2022 and 2023 Annual Bonuses, totaling $650,000, with interest.

**777 BREACHES THE 777 OPERATING AGREEMENT**

61. Pursuant to 777's Operating Agreement, 777 is required to indemnify officers and directors for any legal fees and cost associated with participating in legal matters for work done on behalf 777.

62. In 2024, the DOJ and SEC launched investigations into 777.

63. Mr. Sidell was compelled by the DOJ and SEC to participate in the investigations. Mr. Sidell retained Max Nicolas of Max Nicolas LLC to represent him in the investigations.

64. As required by the Operating Agreement, 777 paid $7,430.00 directly to Mr. Sidell's counsel for his representation of Mr. Sidell in the investigations through August 31.

65. On or about October 31, 2024, 777 failed to pay $6,600.00 due to Mr. Sidell's counsel for his representation related to the investigations. The amount is now past due.

66. Mr. Sidell's counsel withdrew from the matter because of 777's failure to pay the outstanding amount and Mr. Sidell is currently participating in the investigations without counsel.

67. Given the severity of the allegations against 777 and the complexity of the investigation, Mr. Sidell's former counsel requires a $50,000 retainer to represent Mr. Sidell going forward in the investigations.

68. Therefore, 777 has breached the Operating Agreement and Mr. Sidell is entitled to the $6,600 in the past due legal fees and the $50,000 retainer for future representation associated with the DOJ and SEC investigations.

**COUNT I**
**Breach and Anticipatory Breach of Contract – Failure to Pay Benefits Due Under the Plan and Award Agreement**
**(Against 777)**

69. Plaintiff restates and incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 68 above.

70. Under the Award Agreement, 777 issued Plaintiff an Award in the amount of $2,310,000, which vested in August 2021 and was to be paid out in five annual installments, beginning in August 2022.

71. The Award Agreement required that 777 make a payment to Plaintiff on August 10, 2023, in the amount of $346,500, which represents 15% of the Award. The payment was not made on August 10, 2023.

72. The Award Agreement required that 777 make a payment to Plaintiff on August 10, 2024, in the amount of $462,000, which represents 20% of the Award. The payment was not made on August 10, 2024.

73. The Award Agreement required that 777 make a payment to Plaintiff on August 10, 2025, in the amount of $577,500, which represents 25% of the Award.

74. The Award Agreement required that 777 make a payment to Plaintiff on August 10, 2026, in the amount of $693,000, which represents 30% of the Award.

75. 777 committed a breach of the Award Agreement by failing to make the August 10, 2023 and August 10, 2024 payments.

76. 777 also committed an anticipatory breach of the Award Agreement by purportedly suspending the Plan and the August 2025 and August 2026 payments under the Award Agreement, even though it had no right to do so under the Plan, at the apparent direction of A-CAP and King, in or around April 2024. *See Skyways Motor Lodge Corp. v. Del. River & Bay Auth.*, 2019 Del. Ch. LEXIS 206, at *29 (Del. Ch. Feb. 21, 2019) (finding that a statement by a party that it would not comply with the terms of a contract constituted a repudiation of the contract and stating

that a repudiation happens when a party's actions amount to a "significant and substantial alteration of both the present and the reasonably anticipated future relations created by [the] agreement") (quoting *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,* 857 A.2d 998, 1014 (Del. Ch. 2004)).

77. Defendants continue to breach the Award Agreement.

78. As a direct result, Plaintiff has suffered damages of $2,079,000, being the $346,500 payment that was not made on August 10, 2023, the $462,000 payment that became due but was not made on August 10, 2024, the $577,500 payment that would have been due on August 10, 2025, and the $693,000 payment that would have been due on August 10, 2026, pre- and post-award interest, as well as his incurred costs and reasonable attorneys' fees. *See Schlosser & Dennis, LLC v. Traders Alley, LLC*, 2017 Del. Super. LEXIS 331, at *16 (Del. Super. Ct. July 6, 2017) (explaining that under Delaware law and the "general principles of contract law, an anticipatory repudiation gives rise to an immediate claim for total breach of contract damages against the repudiating party").

**COUNT II**
**Breach of Contract – Failure to Pay Benefits Under the Employment Agreement (Against 777)**

79. Plaintiff restates and incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 68 above.

80. Under the Employment Agreement, Plaintiff earned a $325,000 annual bonus for 2022, and a $325,000 annual bonus for 2023.

81. 777 failed to pay Plaintiff any amount of his earned annual bonuses for calendar years 2022 or 2023.

82. 777 breached the Employment Agreement by failing to pay Plaintiff the amount of $325,000 by the 2022 bonus payment date and $325,000 by the 2023 bonus payment date.

83. As a direct result, Plaintiff has suffered damages, being no less than $650,000, pre- and post-award interest from the respective bonus payment dates, as well as his incurred costs and reasonable attorneys' fees.

**COUNT III**
**Breach of Contract – Failure to Indemnify Under Operating Agreement (Against 777)**

84. Plaintiff restates and incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 68 above.

85. Under 777's Operating Agreement, Plaintiff is entitled to payment of all legal fees and costs associated with litigation and/or government investigations into 777.

86. 777 failed to pay Plaintiff's outstanding legal fees and cost of $6,600 associated with the DOJ and SEC investigations into 777.

87. 777 also has not agreed to pay Plaintiff's future legal fees for his representations in the DOJ and SEC investigations, which require a retainer of $50,000 to Plaintiff's counsel.

88. As a direct result, 777 has breached the Operating Agreement and Plaintiff has suffered damages, being no less than $6,600, pre- and post-award

interest, as well as his incurred costs and reasonable attorneys' fees, and the $50,000 retainer Plaintiff must pay to continue to be represented in the DOJ and SEC investigations.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Against Pasko)**

89. Plaintiff restates and incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 68 above.

90. Pasko's role at 777 during the relevant time period was Manager Member/Director. He was also the Plan Administrator.

91. As such, Pasko owes fiduciary duties to 777, its employees, and Plan participants. *Largo Legacy Grp., Ltd. Liab. Co. v. Charles*, 2021 Del. Ch. LEXIS 140, at *29-30 (Ch. June 30, 2021) ("[T]o have any fiduciary duties to an entity, the affiliate must exert control over the assets of that entity. In keeping with that principle, Delaware law presumes that managers of limited liability companies owe fiduciary duties unless explicitly disclaimed. Given the primacy of freedom of contract, Delaware's limited liability company jurisprudence begins with the basic premise that, unless limited by the operating agreement, the manager has a fiduciary duty to manage the entity in its interest and in the interests of its members. Without language in an [operating] agreement to the contrary, the managers of a Delaware LLC owe traditional fiduciary duties of care and loyalty.").

92. Pasko, while acting as Managing Member/Director of 777 and Plan Administrator, breached his duty fiduciary duty.

93. "To state a claim for breach of fiduciary duty, a party must show (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Osios LLC v. Tiptree, Inc.*, 2024 Del. Ch. LEXIS 219, at *15 (Ch. June 12, 2024).

94. Under Florida law, the elements for breach of fiduciary are virtually the same: "(1) existence of a fiduciary duty, (2) breach of that duty, and (3) damages flowing from the breach." *Columbia Bank v. Turbeville*, 143 So. 3d 964, 970 (Fla. 1st DCA 2014) (citing *Cassedy v. Alland Invs. Corp.*, 128 So. 3d 976, 978 (Fla. 1st DCA 2014)).

95. Pasko, as Managing Member/Director of 777 and Plan Administrator of the Plan, is personally liable for the breach of fiduciary duty for acting in bad faith by suspending the Plan and payments under the Award Agreement even though he knew the benefits could not be withheld and by allowing third parties A-CAP and King to suspend the Plan despite their lack of authority under the Plan.

96. As a result of Pasko's conduct, Plaintiff has suffered damages of $2,079,000, being the $346,500 payment that was not made on August 10, 2023, the $462,000 payment that became due but was not made on August 10, 2024, the $577,500 payment that would have been due on August 10, 2025, and the $693,000 payment that would have been due on August 10, 2026, pre- and post-award interest, as well as his incurred costs and reasonable attorneys' fees, compensatory damages, and punitive damages.

**WHEREFORE**, Plaintiff respectfully prays for judgment as follows:

a. For an award of the **$2,079,000** due under the Award Agreement plus prejudgment interest under Delaware law against 777 under Count I;

b. For an award of the **$650,000** due under the Employment Agreement plus prejudgment interest under Delaware law against 777 under Count II;

c. For an award of **$6,600** due under the Operating Agreement for past due legal fees, plus prejudgment interest under Delaware law against 777 under Count III;

d. For punitive damages against Pasko for breach of fiduciary duty under Count IV pursuant to Delaware law;

e. For compensatory damages against Pasko for breach of fiduciary duty under Count IV pursuant to Delaware law;

f. For an award of reasonable attorney's fees and costs for all Counts, as determined by the Court and associated with seeking this judgment against all parties pursuant to Delaware law;

g. For post-judgment interest for all Counts;

h. For such other and further relief as may be just and proper.

Respectfully submitted this 23rd day of June, 2025.

By: *<u>/s/ Tulio D. Chirinos</u>*

Tulio D. Chirinos, Esq.
Florida Bar No. 1022468
tchirinos@chirinoslawfirm.com
Chirinos Law Firm PLLC
370 Camino Gardens Blvd., Suite 106
Boca Raton, FL 33432
Tel.: (561) 299-6334

*Counsel for Plaintiff Scott Sidell*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 23, 2025, I caused a true copy of the foregoing was electronically served via the Florida Portal filing system, which will serve a copy to all attorneys on the service list.

*/s/ Tulio D. Chirinos*
Tulio D. Chirinos, Esq.

# EXHIBIT A

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is made as of this 21st day of December, 2018, by and between Scott Sidell (the "Employee") and 777 Partners LLC (the "Company").

**W I T N E S S E T H:**

**WHEREAS**, the Company desires to employ Employee and to enter into this Agreement embodying the terms of such employment, and Employee desires to enter into this Agreement and to accept such employment, subject to the terms and provisions of this Agreement.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the parties, intending to be legally bound, agree as follows:

1. **Employment and Acceptance**. The Company shall employ Employee, and Employee shall accept such employment, subject to the terms and conditions of this Agreement, commencing on the date hereof (the "Start Date") and terminating on the 3rd anniversary of the Start Date, unless this Agreement and Employee's employment is terminated earlier in accordance with the terms of this Agreement or renewed as provided in the immediately following sentence. On the third anniversary of the start date and each anniversary thereafter, this Agreement shall be automatically renewed for additional term of twelve (12) months unless the Company or Employee delivers a written notice to the other of its intent not to renew this Agreement at the end of the then applicable term, which written notice shall be delivered no later than thirty (30) days prior to the end of such term.

2. **Duties and Title**. Employee shall serve as Principal and Head of Alternative Energy and Infrastructure Investments for the Company, and in such capacity, shall have the duties, responsibilities, functions and authority that are normally associated with such position. Employee shall devote his best efforts and substantially all of his business time, skill and attention to all facets of the business of the Company and will faithfully perform his duties, responsibilities and functions hereunder to his ability in a diligent and professional manner. Employee shall not engage in any activity that (x) conflicts with the interests of the Company or any of its subsidiaries, parents or affiliates (collectively, the "Company Group"), (y) interferes with the proper and efficient performance of Employee's duties for the Company, or (z) interferes with Employee's exercise of judgment in the Company's best interests. Employee agrees to serve as an officer and/or director of such other companies constituting part of the Company Group as the Company may direct, in each case, without additional compensation.

3. **Location**. Employee shall perform his duties in the New York metropolitan area; provided that, Employee will be required to travel to the Company's offices in Miami, Florida to perform his duties as reasonably necessary or requested by the Company.

4. **Compensation**.

(a) **Base Salary**. Employee shall be entitled to an annualized base salary of $250,000 per year ("Base Salary"), payable in accordance with the regular payroll practices of the Company.

(b) **Discretionary Bonus**. Employee shall be eligible for an annual incentive bonus award determined by the Company in respect of each calendar year during Employee's employment (the "Discretionary Bonus"). The target Discretionary Bonus for each calendar year shall be targeted to be $100,000, with the actual Discretionary Bonus payable being based upon the level of achievement of annual Company performance objectives and annual individual performance objectives for such calendar year. Subject to Section 4(c) below, the Discretionary Bonus shall be paid to Employee at the same time as annual bonuses are generally payable to other senior employees of the Company, subject to Employee's continuous employment through the payment date and not having given notice of resignation, but in no event later than 60 calendar days following the conclusion of the calendar year for which the bonus is attributable. Employee's receipt of a Discretionary Bonus at any time will not be construed as creating any expectation of or entitlement to any future bonus.

(c) **Advances Against the Discretionary Bonus**. To the extent that third parties engage the Company to perform certain services and such third parties pay a retainer to the Company, then seventy-five percent (75%) of all such retainers, up to an aggregate of $100,000, shall be paid to Employee as an advance against the Discretionary Bonus, which payment shall be made within ten (10) days after the Company is paid such retainer in immediately available funds that are not subject to any refund or claw back by a third party. Employee's Discretionary Bonus for any year shall be at least equal to the amounts advanced to Employee pursuant to this Section 4(c) during such year. To the extent that Employee's Discretionary Bonus for any year is greater than the amounts advanced to Employee pursuant to this Section 4(c) during such year then such excess shall be paid in accordance with Section 4(b).

(d) **Net Profit Bonus.** Employee will be eligible to receive a bonus in an amount equal to 20% of all fees, commissions, and trading profits, net of related expenses, related allocated overhead and related costs (including but not limited to cost of capital), and related taxes ("Net Profit Bonus"), that result from any transactions which are principally the result of Employee's efforts or the efforts of employees of the Company (or affiliates of the Company assigned to work for the Company) working under the direct supervision of Employee.

(e) **Company Bonus Program**. Employee shall be eligible to participate in the bonus program of the Company, as soon as practicable after it is launched, pursuant to which employees of the Company and its affiliates are entitled to receive bonuses based on amounts distributable by the Company to its members.

(f) **Benefits**. Employee shall be eligible to participate in any and all employee benefit plans made available to other similarly-situated employees of the Company. Employee shall also be entitled to the same number of holidays, vacation days, and sick days, as well as any other benefits, in each case as are generally allowed to similarly-situated employees of the Company in accordance with the Company policy as in effect from time to time. The Company may alter, modify, add to or delete any employee benefit maintained for the Company's employees generally at any time.

(g) **Travel Expenses.** The Company shall reimburse Executive for all reasonable, customary, and necessary expenses, including travel (including travel to and from the Company's principal office) and entertainment expenses, incurred in the performance of

Executive's duties for the Company. Executive shall first account for such expenses in accordance with the policies and procedures set by the Company from time to time for reimbursement of such expenses. The amount, nature, and extent of such expense reimbursement shall always be subject to the control, supervision, and direction of the Company.

5. **Termination**.

(a) General. The Employee's employment with the Company's may be terminated by the Employee or by the Company at any time, for any reason (the effective date such termination of employment, the "Separation Date"). Upon any termination of Employee's employment for any reason, except as may otherwise be requested by the Company in writing and agreed upon in writing by Employee, Employee shall resign from any and all directorships, committee memberships, and any other positions Employee holds with the Company and any member of the Company Group. The payment (or commencement of a series of payments) hereunder of any "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) upon a termination of employment shall be delayed until such time as Employee has also undergone a "separation from service" as defined in Treas. Reg. 1.409A-1(h), at which time such nonqualified deferred compensation (calculated as of the date of Employee's termination of employment hereunder) shall be paid (or commence to be paid) to Employee on the schedule set forth in this Section 5 as if Employee had undergone such termination of employment (under the same circumstances) on the date of Employee's ultimate "separation from service." Notwithstanding any provisions to the contrary in this subsection, any Net Profit Bonus that would have become due and owing to Employees within 60 days of Separation Date, by virtue of an actual financial closing or an applicable transaction within 60 days of said Separation Date, will result in payment by Company to Employee of the respective Net Profit Bonus ("Separation Net Profit Bonus").

(b) Termination Due to Death or Disability. Employee's employment shall terminate automatically upon Employee's death. The Company may terminate Employee's employment immediately upon the occurrence of a Disability, such termination to be effective upon Employee's receipt of written notice of such termination. "Disability" shall mean any physical or mental disability or infirmity of Employee that prevents the performance of Employee's duties for a period of (i) 90 consecutive days or (ii) 120 non-consecutive days during any 12-month period. Upon Employee's death or in the event that Employee's employment is terminated due to Employee's Disability, Employee or Employee's estate or Employee's beneficiaries, as the case may be, shall be entitled to:

(i) all accrued but unpaid Base Salary, Net Profit Bonus, and Separation Net Profit Bonus through the Employee's Separation Date;

(ii) any unpaid or unreimbursed business expenses incurred in accordance with the Company's business expense policy;

(iii) any benefits provided under the Company's employee benefit plans upon a termination of employment, in accordance with the terms contained therein ((i), (ii) and (iii), collectively, the "Accrued Obligations"); and

(iv) any earned but unpaid Discretionary Bonus in respect of any completed calendar year that has ended prior to the Separation Date, which amount shall be paid at such time discretionary bonuses are paid to other employees of the Company, but in no event later than the date that is two and one-half months following the later of the last day of the fiscal year in which the Separation Date occurred or the calendar year in which the Separation Date occurred (the "Unpaid Discretionary Bonus").

Following Employee's death or a termination of Employee's employment by reason of a Disability, except as set forth in this Section 5(b), Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(c) Termination by the Company with Cause. The Company may terminate Employee's employment at any time with Cause, effective upon Employee's receipt of written notice of such termination. "Cause" shall mean the Employee's: (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of this Agreement or the Limited Liability Company Agreement of the Business Entity; (4) misconduct, including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or detrimental to the reputation or business affairs of the Company; (5) violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or *nolo contendere* to, a felony or a misdemeanor requiring jail time; (7) failure to cooperate with, or any attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company*; provided that* with respect to clauses (3)–(5) above, such breach or failure is not cured after written notice from the Company and a 10 day cure period, provided that such breach is capable of cure; *provided however* any instances of discrimination or harassment will not be capable of cure. Following such termination of Employee's employment with Cause, Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(d) Termination by the Company without Cause. The Company may terminate Employee's employment at any time without Cause, effective upon Employee's receipt of written notice of such termination. In the event that Employee's employment is terminated by the Company without Cause (other than due to death or Disability), Employee shall be entitled to:

(i) The Accrued Obligations;

(ii) the Unpaid Discretionary Bonus; and

(iii) the Employee's then-Base Salary for a period of twelve (12) months.

Notwithstanding the foregoing, the payments and benefits described in clauses (ii) and (iii) above shall immediately terminate, and the Company shall have no further obligations to Employee with respect thereto, in the event that Employee breaches any of Employee's continuing obligations under this Agreement. Following such termination of Employee's employment by the Company without Cause, except as set forth in this Section 5(d), Employee shall have no further rights to

any compensation or any other benefits under this Agreement. For the avoidance of doubt, Employee's sole and exclusive remedy upon a termination of employment by the Company without Cause shall be receipt of the Severance Benefits (as defined below).

(e) Termination by Employee. Employee may terminate Employee's employment for any reason by providing the Company with 20 days' advance written notice of such termination. In the event of a termination of employment by Employee under this Section 5(e), Employee shall be entitled only to the Accrued Obligations. In the event of termination of Employee's employment under this Section 5(e), the Company may, in its sole and absolute discretion, by written notice accelerate such date of termination. Following such termination of Employee's employment by Employee, except as set forth in this Section 5(e), Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(f) Release. Notwithstanding any provision herein to the contrary, the payment of any amount or provision of any benefit pursuant to 5(b) or 5(d) other than Accrued Obligations (collectively, the "Severance Benefits") shall be conditioned upon Employee's execution, delivery to the Company, and non-revocation of a release of claims (and the expiration of any revocation period contained in such release of claims) in a form acceptable to the Company in its sole discretion (a "Release of Claims"), within 60 days following the Separation Date. If Employee fails to execute a Release of Claims in such a timely manner so as to permit any revocation period to expire prior to the end of such 60-day period, or timely revokes Employee's acceptance of such Release of Claims following its execution, Employee shall not be entitled to any of the Severance Benefits. Further, (i) to the extent that any of the Severance Benefits constitutes "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur prior to the 60th day following the Separation Date, but for the condition on executing a Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following such 60th day and (ii) to the extent that any of the Severance Benefits do not constitute "nonqualified deferred compensation" for purposes of Section 409A of the Code, any payment of any amount or provision of any benefit otherwise scheduled to occur following the Separation Date, but for the condition on executing the Release of Claims as set forth herein, shall not be made until the first regularly scheduled payroll date following the date the Release of Claims is timely executed and the applicable revocation period has ended, after which, in each case, any remaining Severance Benefits shall thereafter be provided to Employee according to the applicable schedule set forth herein. For the avoidance of doubt, in the event of a termination due to Employee's death or Disability, Employee's obligations herein to execute and not revoke the Release of Claims may be satisfied on Employee's behalf by Employee's estate or a person having legal power of attorney over Employee's affairs.

6. **Confidential Information**. The Company and Employee agree that Employee will have access to, Confidential Information in the course of his employment with the Company. During Employee's employment and thereafter, Employee shall not, directly or indirectly, use for Employee's own purpose or for the benefit of any person or entity other than the Company, disclose, provide access to, or publish any Confidential Information to any individual or entity, unless such disclosure has been authorized in writing by the Company's Board of Managers or is otherwise required by law. For purposes of this Agreement, the term "Confidential Information" means non-public confidential, proprietary or trade secret information

concerning the Company or its business operations of which Employee has knowledge, including, without limitation: (a) information regarding customers and prospective customers of the Company Group and information concerning the transactions or relations of any customer or prospective customer of the Company Group, (b) information concerning any product of, or technology or procedure employed by, the Company Group but not generally known to its customers, prospective customers, vendors or competitors, or any product under development by or being tested by the Company Group but not at the time offered generally to customers or vendors, (c) information relating to the Company Group's computer software, computer systems, pricing or marketing methods, sales margins, cost of goods, cost of material, capital structure, operating results, borrowing arrangements, or business plans, (d) any information which is generally regarded as confidential or proprietary in any line of business engaged in by the Company Group, (f) inventions, innovations or improvements covered by Section 7 below, (g) plans or strategies related to the acquisition or disposition of any business or portion of any business of the Company, or strategic ventures considered or anticipated to be entered into by the Company Group, (h) financial information relating to the Company Group, its financial condition or financial statements, (i) information related to the compensation of Employees, consultants, agents or representatives of the Company Group, other than Employee's own compensation, (j) all written, graphic and other material relating to any of the foregoing, and (k) any information provided to Employee by the Company Group which was indicated by the Company Group to be Confidential Information, or any information which a reasonable person would expect to be considered Confidential Information. In the event that Employee is required by law to disclose any Confidential Information, Employee will promptly notify the Company in writing so that the Company may seek a protective order and/or file any other motion to prevent the production or disclosure of Confidential Information. If such motion has been denied, then Employee may disclose only such portion of the Confidential Information which is required by law to be disclosed or the Company consent, in writing, to having disclosed, provided that, Employee will use reasonable efforts to preserve the confidentiality of the remainder of the Confidential Information.

7. **Inventions, Patents and Other Intellectual Property**. All inventions, innovations or improvements in the Company's method of conducting its business (including policies, procedures, products, improvements, software, ideas, discoveries and other intellectual property, whether patentable or copyrightable or not) conceived or made by Employee, either alone or jointly with others ("Work Product"), during Employee's employment belong to the Company. "Work Product" shall not include any Work Product that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information, except for such Work Product that either (i) relates, at the time of conception or reduction to practice of such Work Product, to the Company's business, or actual or demonstrably anticipated research or development of the Company, or (ii) results from any work performed by Employee for the Company. Employee will promptly disclose in writing such Work Product to the Company and perform all actions reasonably requested by the Company to establish and confirm such ownership by the Company, including, but not limited to, cooperating with and assisting the Company at the Company's expense in obtaining patents for the Company in the United States and in foreign countries. Any patent application filed by Employee during the six months period following the Separation Date will be presumed to relate to an invention which was made during Employee's employment and thereafter unless Employee can provide evidence to the contrary.

8. **Cooperation**. During Employee's employment and thereafter, Employee shall cooperate fully with any litigation, investigation or inquiry by the Company or any governmental or regulatory agency or body, that relates to the Company or any member of the Company Group.

9. **Non-Competition**.

(a) Employee acknowledges that (i) the Company Business is national in scope, (ii) the Company would not have entered into this Agreement but for the covenants and agreements set forth in this Section 9, and (iii) the covenants set forth in this Section 9 are reasonable and necessary to protect the legitimate business interests of the Company, including the Confidential Information obtained by Employee during the course of Employee's employment with the Company and the Company's goodwill. For purposes of this Agreement, "Company Business" shall mean the business of medical lien funding and any other business activities in which any member of the Company Group is engaged (or has committed plans to engage) during the Employee's employment.

(b) Notwithstanding anything herein to the contrary, during Employee's employment and for a period of time ending twelve (12) months after the Separation Date (the "Restricted Period"), Employee shall not, directly or indirectly, engage in a Competing Business, or in any other business in which the Company Group is engaged, except as an Employee or agent of the Company, and shall not, directly or indirectly, as owner, partner, joint venture, Employee, broker, agent, corporate officer, principal, licensor, shareholder (unless as owner of no more than two percent of the issued and outstanding securities of the Company with a class of securities registered under the Securities Exchange Act of 1934, as amended) or in any other capacity whatsoever, engage in or have any connection with any business which is a Competing Business, and which operates anywhere in the United States. "Competing Business" shall mean any business which, directly or indirectly, competes with the Company Business or any business engaged in by the Company or its present and then-existing affiliates as of or prior to the Separation Date.

10. **Non-Solicitation**. At all times during the Restricted Period, Employee shall not, other than on behalf of the Company, directly or indirectly (i) attempt to employ or retain or enter into any contractual or business arrangement with any current or former employee of the Company Group, (ii) employ or hire any such person, unless such person was not employed by the Company Group in the one (1) year period prior to the Separation Date, (iii) induce, influence, combine or conspire with, or attempt to induce, influence, combine or conspire with, any of the officers, employees, customers or suppliers of the Company Group to terminate or modify its employment or other relationship with the Company Group or to compete with the Company Group, and/or (iv) solicit, or attempt to solicit, any customer of the Company Group or any customer who was a customer of the Company Group at any time in the one year period prior to the Separation Date.

11. **Company Property**. Employee acknowledges and agrees that all computers, equipment, software, records, plans, manuals, guides, memoranda, lists, correspondence with customers or representatives, reports, records, charts, advertising materials, and any data and other property delivered to or acquired by Employee by or on behalf of the Company Group (including, but not limited to, any such customers obtained by Employee), and

all records compiled by Employee which pertain to the business of the Company Group shall be and remain the property of the Company Group, and be subject at all times to the discretion and control of the Company Group shall be delivered promptly to the Company by Employee upon the termination of Employee's employment or upon demand during Employee's employment.

12. **Non-Disparagement**. Employee agrees that he will not, at any time during Employee's employment and thereafter, publish or communicate to any person or entity any Disparaging (as defined below) remarks, comments or statements concerning the Company Group, and their respective parents, subsidiaries, or their respective present and former members, partners, directors, officers, shareholders, employees, agents, attorneys, successors and assigns. "Disparaging" remarks, comments or statements are those that impugn the character, honesty, integrity or morality or business acumen or abilities in connection with any aspect of the operation of business of the individual or entity being disparaged. Notwithstanding the foregoing, nothing in this Agreement shall be construed to preclude truthful disclosures in response to lawful process as required by applicable law, regulation, or order or directive of a court, governmental agency or regulatory organization.

13. **Remedies; Specific Performance**. The Company and Employee acknowledge and agree that Employee's breach or threatened breach of any of the restrictions set forth in Sections 6 through 12 may result in irreparable and continuing damage to the Company for which there may be no adequate remedy at law. Each party shall be entitled to seek equitable relief, including specific performance and injunctive relief as remedies for any breach or threatened or attempted breach of Sections 6 through 12, without requiring the posting of a bond. The parties agree that such remedies shall be in addition to any and all remedies, including damages, available to the parties for such breaches or threatened or attempted breaches.

14. **Notice of Rights and Exceptions.** Employee understands that this Agreement does not limit his ability to communicate with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("Government Agencies"), including to report possible violations of federal law or regulation or making other disclosures that are protected under the whistleblower provisions of federal law or regulation, or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company. Employee will not be criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

15. **Miscellaneous**.

(a) **Representations and Warranties**. Employee represents and warrants that he is not a party to or subject to any restrictive covenants, legal restrictions or other agreements in favor of any entity or person which would in any way preclude, inhibit, impair, or limit Employee's ability to enter into this Agreement or to perform his obligations under this

Agreement, including, but not limited to, non-competition agreements, non-solicitation agreements or confidentiality agreements and Employee's employment with the Company will not violate the terms of any agreement or other obligations to which Employee is subject. In connection with Employee's employment with the Company, Employee shall not use any confidential or proprietary information Employee may have obtained in connection with employment with any prior employer.

(b) **Notices**. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be considered given when delivered personally, one business day after being sent by a major overnight courier for next business day delivery, or five days after being mailed by certified mail, return receipt requested, postage prepaid, to the parties at their respective addresses first set forth above, or such other persons or such other addresses as may be designated in writing by a party to the other party in the manner provided herein for giving notice.

(c) **Taxes**. All payments made pursuant to this Agreement will be subject to applicable withholdings for federal, state and local taxes. This Agreement is intended to comply with the requirements of Section 409A of the Code and, to the extent applicable, shall be interpreted in accordance with Section 409A of the Code to avoid any taxes thereunder. Any right to a series of installment payments pursuant to this Agreement shall be treated as a right to a series of separate payments. Any separate payment or benefit under this Agreement or otherwise shall not be deemed "nonqualified deferred compensation" subject to Section 409A of the Code to the extent provided in the exceptions in Treasury Regulation Section 1.409A-1(b)(4), Section 1.409A-1(b)(9) or any other applicable exception or provision of Section 409A of the Code. To the extent that any payments or reimbursements provided to Employee under this Agreement are deemed to constitute compensation to Employee to which Treasury Regulation Section 1.409A-3(i)(1)(iv) would apply, such amounts shall be paid or reimbursed reasonably promptly, but not later than December 31 of the year following the year in which the expense was incurred. The amount of any such payments eligible for reimbursement in one year shall not affect the payments or expenses that are eligible for payment or reimbursement in any other taxable year, and Employee's right to such payments or reimbursement of any such expenses shall not be subject to liquidation or exchange for any other benefit.

(d) **Entire Agreement**. This Agreement contains the complete, final, and exclusive agreement of the parties with respect to the subject matter contained herein, and supersedes, terminates, and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(e) **Amendments; Waivers**. This Agreement cannot be amended, modified, or supplemented unless the Company and Employee consent, in writing, to such amendment, modification, or supplement. No term, covenant or condition of this Agreement or any breach thereof shall be deemed waived, except with the written consent of the party against whom the wavier is claimed, and any waiver or any such term, covenant, condition or breach shall not be deemed to be a waiver of any preceding or succeeding breach of the same or any other term, covenant, condition or breach.

(f) **Survival**. Sections 6 through 15 shall survive the termination of Employee's employment in accordance with their respective terms.

(g) **Headings**. The headings set forth in this Agreement are for convenience of reference only and shall not be used in interpreting this Agreement. The parties acknowledge that each party and its counsel has reviewed and revised, or had an opportunity to review and revise, this Agreement, and the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(h) **Governing Law**. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the State of Florida, without giving effect to the conflict of laws rules thereof to the extent that the application of the law of another jurisdiction would be required thereby.

(i) **Severability**. If any one or more of the provisions of this Agreement shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(j) **Arbitration**. The parties agree that any dispute, controversy or claim between the Company and Employee arising out of, relating to or concerning Employee's employment or termination thereof, other than claims that cannot be subject to mandatory arbitration as a matter of law, shall be finally settled by arbitration in the State of Florida, before and in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association before a single arbitrator, provided that the parties may seek equitable relief from a court of competent jurisdiction pursuant to Section 13 of this Agreement; and provided further, that in the event there are claims that cannot be subject to mandatory arbitration as a matter of law, the parties agree to submit such claims to the exclusive jurisdiction of the state courts of Florida or the U.S. District Court for the Southern District of Florida and AGREE TO WAIVE THEIR RIGHT TO A JURY TRIAL. The arbitration proceedings shall be confidential. The arbitrator's award shall be final and binding upon all parties and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States. For purposes of any actions or proceedings ancillary to the arbitration referenced above (including, but not limited to, proceedings seeking injunctive or other interim relief pursuant to Section 13 of this Agreement or to enforce an arbitration award), the parties agree to submit to the exclusive jurisdiction of the state and federal courts of the State of Florida and AGREE TO WAIVE THEIR RIGHT TO A JURY TRIAL. Notwithstanding the forgoing, if Joshua Wander and Steven W. Pasko, directly or indirectly, do not own in the aggregate at least fifty percent (50%) of the Company, then any dispute, controversy or claim between the Company and Employee shall not be subject to the arbitration provisions described herein, and instead shall be resolved in a court of competent jurisdiction in the state courts of Florida or the U.S. District Court for the Southern District of Florida, with the losing party bearing the attorneys' fees and legal costs for the prevailing party.

(k) **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which counterparts shall together constitute a single agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

777 PARTNERS LLC

By: Steven W. Pasko
Title: Co-Managing Partner

SCOTT SIDELL

# EXHIBIT B

# 777 PARTNERS DEFERRED CASH PLAN
# AWARD AGREEMENT

| | |
|---|---|
| **Participant:** | Scott Sidell |
| **Grant Date:** | December 31, 2020 |
| **Award:** | $2,310,000 |
| **Base Date:** | August 2017 |

777 Partners LLC, a Delaware limited liability company (the "Company"), pursuant to the 777 Partners Deferred Cash Plan (the "Plan"), hereby grants an award of the amount specified above the (the "Award") to the individual named above (the "Participant").

1. **Definitions**. Capitalized terms used but not otherwise defined in this Award Agreement (this "Agreement") shall have the respective meanings ascribed to such terms in the Plan.

2. **Grant**. Subject to the conditions set forth in the Plan and this Agreement, the Company grants to the Participant an Award in the amount specified above.

3. **Vesting**. The Participant shall become vested in the Participant's Award, in four (4) equal annual installments, on each anniversary of the Base Date prior to the Participant's Termination of Service, provided that, if a Change in Control should occur prior to the Participant's Termination of Service, then subject to Section 4, the Participant shall become vested in the unvested portion of the Award.

4. **Forfeiture**.

(a) Except as otherwise set forth herein, upon the Participant's Termination of Service for any reason, the Participant shall forfeit any portion of the Award with respect to which the Participant has not yet become vested.

(b) If, prior to the one (1) year anniversary of the Grant Date, the Participant's Termination of Service occurs for any reason other than due to the Participant's death or Disability, the Participant shall forfeit automatically, without consideration, the entire Award, including any portion of the Award in which the Participant had previously become vested.

(c) Upon a Participant's Termination of Service due to the Participant's death or Disability, the Participant shall become vested in the portion of the Award that would have vested on the next anniversary of the Base Date.

(d) Upon the Participant's Termination of Service for by the Company for Cause or in the event of a Participant's Restrictive Covenant Breach, the Participant shall forfeit automatically, without consideration, the Award, including any portion of the Award in which the Participant had previously become vested.

5. **Award Settlement**. Subject to Sections 4 and 7, the Award shall be paid to the Participant, in cash, in five installments on each anniversary of the Base Date in accordance with the table below:

| **Payment Date (Anniversary of Base Date)** | **Percentage of Award** |
|---|---|
| 5-Year Anniversary | 10% |
| 6-Year Anniversary | 15% |
| 7-Year Anniversary | 20% |
| 8-Year Anniversary | 25% |
| 9-Year Anniversary | 30% |

Each payment shall be made within ten (10) days following the applicable Payment Date; provided that, in the event of the Participant's death, any unpaid portion of the Award shall be paid to the Participant's estate in a single cash lump sum within ninety (90) days following the Participant's death; provided further that, upon a Change in Control, any unpaid portion of the Award shall be paid in its entirety within ninety (90) days following such Change in Control.

6. **Transferability**. The Award shall not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant other than by will or by the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO.

7. **Withholdings**. The Company or any of its subsidiaries shall have the authority and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy federal, state, local and foreign taxes (including the Participant's Federal Insurance Contributions Act obligation) required by law to be withheld with respect to any taxable event concerning the Participant arising as a result of this Agreement.

8. **Incorporation by Reference**. The terms and provisions of the Plan are incorporated herein by reference, and the Participant hereby acknowledges receiving a copy of the Plan and represents that the Participant is familiar with the terms and provisions thereof. The Participant accepts this Award subject to all of the terms and conditions of the Plan. In the event of a conflict or inconsistency between the terms of the Plan and the terms of this Agreement, the Plan shall govern and control.

9. **Captions**. The captions in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of terms contained herein.

10. **Entire Agreement**. This Agreement together with the Plan, as either of the foregoing may be amended or supplemented in accordance with their terms, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and therein, and supersedes all prior communications, representations and negotiations in respect thereto.

11. **Successors and Assigns**. The terms of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors and permitted assigns. The Participant may not assign any of the rights or obligations under this Agreement without the

prior written consent of the Company. The Company may assign its rights and obligations to another entity which will succeed to all or substantially all of the assets and business of the Company.

12. **Amendments and Waivers**. Subject to the provisions of the Plan, the provisions of this Agreement may not be amended, modified, supplemented or terminated, and waivers or consents to departures from the provisions hereof may not be given, without the written consent of each of the parties hereto.

13. **Severability**. In the event that any provision of this Agreement shall be held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts of this Agreement, and this Agreement shall be construed and enforced as if the illegal or invalid provision had not been included.

14. **Signature in Counterparts**. This Agreement may be signed in counterparts, each which shall constitute an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

15. **Notices**. Any notice required to be given or delivered to the Company under the terms of the Plan or this Agreement shall be in writing and addressed to the General Counsel and the Secretary of the Company at its principal corporate offices. Any notice required to be given or delivered to the Participant shall be in writing and addressed to the Participant at the address listed in the Company's personnel files or to such other address as the Participant may designate in writing from time to time to the Company. All notices shall be deemed to have been given or delivered upon: personal delivery, three days after deposit in the United States mail by certified or registered mail (return receipt requested), one business day after deposit with any return receipt express courier (prepaid), or one business day after transmission by facsimile.

16. **Governing Law**. This Agreement shall be administered, interpreted and enforced under the internal laws of the State of Delaware without regard to conflicts of law thereof.

17. **Waiver of Jury Trial**. THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, INTERPRETATION OR ENFORCEMENT HEREOF. THE PARTIES HERETO AGREE THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND WOULD NOT ENTER INTO THIS AGREEMENT IF THIS SECTION WERE NOT PART OF THIS AGREEMENT.

18. **No Employment Rights**. The Participant understands and agrees that this Agreement does not impact in any way the right of the Company or its subsidiaries to terminate or change the terms of the employment of the Participant at any time for any reason whatsoever, with or without cause, nor confer upon any right to continue in the employ of the Company or any of its subsidiaries.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the first date set forth above.

**777 PARTNERS LLC**

By: Steven W. Pasko
Name: Steven Pasko
Title: Managing Partner

**PARTICIPANT:**

Scott Sidell
Name: Scott Sidell

# EXHIBIT C

# 777 PARTNERS DEFERRED CASH PLAN

## ARTICLE I.

## DEFINITIONS

Wherever the following terms are used in the Plan they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

1.1. "Administrator" means the Board of Managers of the Company or committee thereof.

1.2. "Award" means a specified cash amount representing a pro-rata of the increase in the fair market value of the Company.

1.3. "Award Agreement" means any written notice, agreement, terms and conditions, contract or other instrument or document evidencing an Award, including through electronic medium, which shall contain such terms and conditions with respect to an Award as the Administrator shall determine consistent with the Plan.

1.4. "Cause" shall have the same meaning as in an employment agreement (or other arrangement, including, but not limited to, any severance arrangement) between a Participant and the Company or any of its affiliates, or, if no such employment agreement (or other arrangement, including, but not limited to, any severance arrangement) exists or "Cause" is not defined therein, "Cause" shall mean: (i) the Participant's indictment, conviction of, or plea of guilty or nolo contendere to, an act constituting a felony under the laws of the United States or any state or political subdivision thereof; (ii) the Participant's commission of an act constituting a breach of a duty of care or duty of loyalty, gross negligence or willful misconduct in connection with the Participant's material duties to the Company; (iii) the Participant's commission of an act of fraud, self-dealing, or a conflict of interest in connection with the Participant's employment; (iv) the Participant's breach of any applicable restrictive covenant obligations; (v) the Participant's commission of an act which would make the Participant subject to being enjoined, suspended, barred or otherwise disciplined for violation of any U.S. federal or state or foreign securities laws, rules or regulations, including a statutory disqualification; (vi) if the Participant is covered by an employment agreement with the Company, the Participant's material breach, non-performance, or non-observance of any provision of the employment agreement; (vii) the Participant's conduct tending to bring the Company or its affiliates into public disgrace or disrepute; (viii) material insubordination or failure by the Participant to follow the lawful instructions or directions from the Administrator or its designee; or (ix) the Participant's failure to comply with a material Company policy. If the condition triggering "Cause" is reasonably curable, the Participant will have five (5) days to cure the condition (but only with respect to the first time it occurs) to the reasonable satisfaction of the Administrator. If the condition is cured to the reasonable satisfaction of the Administrator, Cause will not be deemed to exist.

1.5. "Change in Control" means (i) any transfer (including by way of merger, consolidation or other reorganization) in one transaction or a series of related transactions by the

Company of the equity of the Company if the members of the Company immediately prior to such transaction or series of related transactions own less than fifty percent (50%) of the Company's voting power immediately after such transaction or series of related transactions, or (ii) a sale of all or substantially all of the assets of the Company or its subsidiaries to an independent party who is not an affiliate of any member; provided that, in each case, any such event results in net proceeds (after underwriting discounts and commissions) to the Company of at least $100,000,000. Notwithstanding the foregoing, for purposes of the Plan a "Change in Control" shall not be deemed to occur unless it constitutes a "Change in Control Event" within the meaning of Section 409A of the Code.

1.6. "Code" means the Internal Revenue Code of 1986, as amended from time to time. Any reference to any section of the Code shall also be a reference to any successor provision and any Treasury Regulation promulgated thereunder.

1.7. "Company" means 777 Partners LLC, a Delaware limited liability company.

1.8. "Disability" means, with respect to a Participant as determined by the Administrator, that the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

1.9. "DRO" means any judgment, decree or order which relates to marital property rights of a spouse or former spouse and is made pursuant to applicable domestic relations law (including community property law).

1.10. "Eligible Individual" means a Person who is an officer, employee, consultant, advisor or director of the Company or any of its affiliates.

1.11. "Participant" means an Eligible Individual who has been granted an Award.

1.12. "Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, incorporated organization, governmental or regulatory or other entity.

1.13. "Plan" means this 777 Partners Deferred Cash Plan, as amended or amended and restated from time to time.

1.14. "Restrictive Covenant Breach" means a Participant's breach of any restrictive covenants, including without limitation, any affirmative contractual obligations to Company or any of its affiliates and any non-competition, non-solicitation or non-disparagement restrictions, between the Participant and the Company or any of its affiliates.

1.15. "Termination of Service" means with respect to a Participant, a termination of such Participant's (a) employment with the Company or any of its affiliates or (b) relationship with the Company or any of its affiliates as a consultant, advisor or director. For purposes of the Plan, a "Termination of Service," with respect to any Participant, shall be deemed to occur in the

event that a subsidiary of the Company to which the Participant provides services ceases to remain a subsidiary of the Company for any reason.

## ARTICLE II.

## GRANTING OF AWARDS

2.1. Award Agreement. Each Award shall be evidenced by an Award Agreement.

2.2. Plan and Awards Not to Confer Rights with Respect to Continuance of Employment or Relationship. Neither this Plan, the grant of an Award, nor any other action taken hereunder shall be construed as giving any Participant any right to continue such Participant's relationship with the Company or any of its affiliates, nor shall it give any Participant the right to be retained by the Company or any of its affiliates, or interfere in any way with the right of the Company or any of its affiliates to terminate any Participant's employment or relationship, as the case may be, at any time, for any reason.

## ARTICLE III.

## ADMINISTRATION

3.1. Duties and Powers of Administrator. It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with its provisions. The Administrator shall have the power to interpret the Plan and the Award Agreements, and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith, to interpret, amend or revoke any such rules, to delegate authority in accordance with Section 3.3 and to amend any Award Agreement provided that the rights or obligations of the Participant of the Award that is the subject of any such Award Agreement are not affected adversely. Any such grant or award under the Plan need not be the same with respect to each Participant.

3.2. Administrator Liability; Good Faith Actions. All expenses and liabilities which members of the Administrator incur in connection with the administration of the Plan shall be borne by the Company. All actions taken and all interpretations and determinations made by the Administrator in good faith shall be final and binding upon all Participants, the Company and all other interested persons. No members of the Administrator shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or Awards, and all members of the Administrator shall be fully protected by the Company in respect of any such action, determination or interpretation.

3.3. Delegation of Authority. The Administrator may, in its sole discretion, designate employees of the Company and professional advisors to assist the Administrator in the administration of the Plan, including with respect to the execution of Award Agreements or other documents, and, to the extent permitted by applicable law, delegate from time to time some or all of its authority to grant Awards under the Plan to a committee or committees consisting of one or more members of the Administrator and/or one or more officers of the Company.

## ARTICLE IV.

## MISCELLANEOUS PROVISIONS

4.1. Transferability of Awards. No Award under the Plan may be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO, unless and until the shares underlying such Award have been issued, and all restrictions applicable to such shares have lapsed. No Award or interest or right therein shall be liable for the debts, contracts or engagements of the Participant or Participant's successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, hypothecation, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence.

4.2. Amendment, Suspension or Termination of the Plan and Awards. The Administrator may, with prospective or retroactive effect, amend, suspend or terminate this Plan or any portion thereof at any time and for any reason; provided, however, that no amendment (taken as a whole with any other amendment adopted at such time), suspension, or termination, without the consent of the affected Participant, shall materially adversely and disproportionately affect any then -issued and -outstanding Awards.

4.3. Tax Withholding. The Company or any of its subsidiaries shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy federal, state, local and foreign taxes (including the Participant's Federal Insurance Contributions Act obligation) required by law to be withheld with respect to any taxable event concerning a Participant arising as a result of this Plan.

4.4. Effect of Plan upon Other Compensation Plans. Nothing in this Plan shall be construed to limit the right of the Company or any of its affiliates to establish other plans or to pay compensation to its employees, in cash or property, in a manner that is not expressly authorized under this Plan. Except as may otherwise be specifically and unequivocally stated under any employee benefit plan, policy or program, no amount payable in respect of any Award shall be treated as compensation for purposes of calculating a Participant's rights under any such plan, policy or program. The selection of a Participant shall neither entitle such Participant to, nor disqualify such Participant from, participation in any other award or incentive plan.

4.5. Compliance with Laws. The Plan, the granting and vesting of Awards under the Plan and the payment of money under the Plan or under Awards granted or awarded hereunder are subject to compliance with all applicable federal, state, local and foreign laws, rules and regulations (including but not limited to federal, state and foreign securities law and margin requirements) and to such approvals by any listing, regulatory or governmental authority as may, in the advice of counsel for the Company, be necessary or advisable in connection therewith. Any securities delivered under the Plan shall be subject to such restrictions, and the Person acquiring such securities shall, if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure

compliance with all applicable legal requirements. To the extent permitted by applicable law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such laws, rules and regulations.

4.6. Titles. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of the Plan.

4.7. Governing Law. This Plan and all rights thereunder shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to conflict of laws principles thereof.

4.8. Section 409A. Each Award is intended to comply with Section 409A of the Code and, to the extent applicable, the Plan and Award Agreements shall be limited, construed and interpreted in accordance with Section 409A of the Code. Neither the Company, nor any of its subsidiaries, shall be liable for any additional tax, interest or penalties that may be imposed on a Participant by Section 409A of the Code or any damages for failing to comply with Section 409A of the Code or this Section 4.8. Notwithstanding anything in the Plan or in an Award to the contrary, the following provisions shall apply to Awards:

(a) A Termination of Service shall not be deemed to have occurred for purposes of any provision of an Award providing for payment upon or following a Participant's Termination of Service unless such Termination of Service is also a "Separation from Service" within the meaning of Section 409A of the Code.

(b) Whenever a payment under an Award specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

(c) If under the Award an amount is to be paid in two or more installments, each installment shall be treated as a separate payment for purposes of Section 409A of the Code.

Notwithstanding any provision of the Plan to the contrary, the Administrator may adopt such amendments to the Plan and outstanding Award Agreements or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate to comply with the requirements of Section 409A of the Code.

4.9. ERISA. The Plan and each Award Agreement is intended to constitute a "bonus plan" that is exempt from the requirements of the Employee Retirement Income Security Act of 1974, as amended.

4.10. No Rights to Awards. No Eligible Individual, or any other Person, shall at any time have the right to be selected as a Participant in this Plan nor, having been selected as a Participant and granted an Award or have any right to be granted any additional Awards pursuant to this Plan. The terms and conditions of the Awards are subject to the Administrator's determinations and interpretations with respect thereto and need not be the same with respect to each Participant (whether or not such Participants are similarly situated).

4.11. Unfunded Status. Neither the Plan nor any Award shall be construed to require the Company to fund any of the Awards payable under the Plan or to set aside or earmark any monies or other assets specifically for payments under the Plan. The Plan is "unfunded," and all payments shall be paid by the Company solely out of its general assets. Participants shall not have any interest in any specific asset of the Company as a result of the Plan. Nothing contained in the Plan and no action taken pursuant to the provisions of the Plan shall create or be construed to create a trust of any kind, or a fiduciary relationship amongst the Company and the Participants or any other Person. To the extent that any Person acquires a right to receive payments from the Company under the Plan, such right shall be no greater than the right of any unsecured general creditor of the Company.

4.12. Severability. In the event that any provision of this Plan shall be held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts of this Plan, and this Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

# **Exhibit B**

**Defendants' Motion to Dismiss Count IV
of the Amended Complaint and Motion to Strike**

Filing # 226628500 E-Filed 07/03/2025 11:55:50 PM

**IN THE CIRCUIT COURT OF THE 11TH JUDICIAL DISTRICT**

**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

SCOTT SIDELL

Plaintiff,

and

777 PARTNERS LLC,
STEVEN PASKO,

Defendants.

CASE NO.: 2025-006423-CA-01

**DEFENDANTS' MOTION TO DISMISS COUNT IV OF AMENDED COMPLAINT; MOTION TO STRIKE CLAIM FOR DAMAGES UNDER COUNT II; MOTION TO STRIKE CLAIM FOR ATTORNEY'S FEES UNDER ALL COUNTS; AND MOTION TO STRIKE CLAIM FOR PUNITIVE DAMAGES UNDER COUNT IV**

Defendants, 777 Partners, LLC ("777") and Steven Pasko ("Pasko), through their undersigned counsel, move to dismiss Count IV of the Amended Complaint; move to strike the claim for damages under Count II; move to strike the claim for attorney's fees under all Counts; and move to strike the claim for punitive damages under Count IV. In support of these Motions, Defendants state as follows:

1. In Counts I through III of his Amended Complaint, Plaintiff sued 777, his former employer, alleging 777 breached three employment-related agreements. Specifically, Plaintiff alleges 777 breached (1) the Cash Deferred Plan ("Plan") and related Award Agreement [Count I]; (b) the Employment Agreement [Count II]; and (c) and the Operating Agreement [Count III.]

2. In Count IV, Plaintiff sued Defendant Steven Pasko, a former managing member of 777, for breach of fiduciary duty. Plaintiff seeks compensatory damages, prejudgment interest, punitive damages, and attorney's fees pursuant to Delaware law for that alleged breach. Defendants move to dismiss the Count IV on the grounds the Amended Complaint fails to allege sufficient facts which would give rise to Pasko's individual liability under a theory of breach of fiduciary duty.

3. As to each Count, Plaintiff seeks to recover compensatory damages, prejudgment interest, and attorney's fees under Delaware Law. These claims for damages must be stricken because (1) the Employment Agreement (Count II) is governed by Florida law, such that the measure of compensatory damages and entitlement to prejudgment interest and attorney's fees are not governed by Delaware law; and (2) under Delaware law, Plaintiff is not entitled to recover either or attorney's fees or punitive damages under the theories plead.

4. For the reasons set forth herein, Defendants seek an Order dismissing Count IV of the Amended Complaint; striking Plaintiff's claims for damages under Count II; striking Plaintiff's claims for attorney's fees; and striking Plaintiff's claims for punitive damages under Count IV.

**MOTION TO DISMISS COUNT IV OF THE AMENDED COMPLAINT**

Count IV of the Amended Complaint must be dismissed because it fails to allege facts sufficient to give rise to a fiduciary duty owed by Pasko, individually, to Plaintiff arising from the alleged suspension of the Plan and his resulting claim for damages for non-payment of the Award under the Plan.

First, it is crucial to note that the Plan at issue is not governed by ERISA. *See, Plan, Para. 4.9.* This distinction is critical because Plaintiff intentionally conflates the terms "plan

administrator" as used in the Plan at issue with the obligations of a "Plan Administrator" under an ERISA-governed plan. Plaintiff obfuscates the two terms and would have this Court improperly apply the highly technical obligations giving rise to a fiduciary duty imposed upon "Plan Administrators", a defined term under ERISA, 29 U.S.C. Sect. 1009(16)(A) and ERISA-governed plans, to the administators of the Plan at issue here. The highly regulated rights and duties of a "Plan Administrator" under ERISA are entirely unrelated to the rights and duties of the "administrator" of the non-ERISA Plan at issue here. The rights and duties at issue here are governed and limited by the contractual terms of the Plan itself which are not pre-empted by ERISA's strict statutory framework.

Indeed, under ERISA's own terms, a deferred compensation plan such as this, referred to sometime as a "top hat" plan, does not impose a fiduciary duty on the plan's administrators. 29 U.S.C Sect. 1101(a)(1). *See also, Holloman v. Mail-Well Corp.,* 443 F.3d 832, 842 (11th Cir. 2006) ("ERISA explicitly states that top hat plans are not subject to the ERISA's fiduciary requirements. Further, it is well established in the caselaw that there is no cause of action for breach of fiduciary duty involving a top hat plan.") citing *Reliable Home Health Care, Inc., v. Union Cent. Ins. Co.,* 295 F.3d 505, 512, 516 (5th Cir.2002) (finding that the plaintiff could not recover from a plan provider for breach of fiduciary duty because the plan was a top hat plan); *Garratt v. Knowles*, 245 F.3d 941, 949 (7th Cir.2001).

Instead, under the contractually binding provision of the Plan, the "Administrator" of the Plan is defined "as the Board of Managers of [777] of committee thereof." *See Plan, Para. 1.1* This definition does not include the members themselves in an individual capacity.

Moreover, the Plan sets forth the rights and duties of the Administrator. As shown in the following fully excerpted Article III of the Plan governing the administration of the Plan, the

Administrator (1) does not owe participants of the Plan a fiduciary duty; (2) has no individual liability under the Plan; and (3) is permitted to delegate its duties:

> **ARTICLE III.**
>
> **ADMINISTRATION**
>
> 3.1. Duties and Powers of Administrator. It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with its provisions. The Administrator shall have the power to interpret the Plan and the Award Agreements, and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith, to interpret, amend or revoke any such rules, to delegate authority in accordance with Section 3.3 and to amend any Award Agreement provided that the rights or obligations of the Participant of the Award that is the subject of any such Award Agreement are not affected adversely. Any such grant or award under the Plan need not be the same with respect to each Participant.
>
> 3.2. Administrator Liability; Good Faith Actions. All expenses and liabilities which members of the Administrator incur in connection with the administration of the Plan shall be borne by the Company. All actions taken and all interpretations and determinations made by the Administrator in good faith shall be final and binding upon all Participants, the Company and all other interested persons. No members of the Administrator shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or Awards, and all members of the Administrator shall be fully protected by the Company in respect of any such action, determination or interpretation.
>
> 3.3. Delegation of Authority. The Administrator may, in its sole discretion, designate employees of the Company and professional advisors to assist the Administrator in the administration of the Plan, including with respect to the execution of Award Agreements or other documents, and, to the extent permitted by applicable law, delegate from time to time some or all of its authority to grant Awards under the Plan to a committee or committees consisting of one or more members of the Administrator and/or one or more officers of the Company.

These provisions prove fatal to Plaintiff's claims, requiring dismissal of Count IV for the following reasons:

***First***, these provisions do not impose a fiduciary duty on the Administrator.

***Second***, because the Plan at issue is a nonqualified deferred compensation plan and not governed by ERISA, 777 is not required to hold the assets to fund the Plan in trust, as they would be under an ERISA-governed plan where the funds are not subject to the employer's creditors In contrast, under the Plan at issue, the Administrator of the Plan has no obligation to hold 777 assets in trust and those assets are subject to creditors. Because there is no duty to preserve the assets in trust, there is no resulting fiduciary obligation. *See, In re IT Group, Inc.,* 448 F.3d 661, 671 (3d Cir. 2006), as amended (July 10, 2006). In *It Group, supra,* the Third Circuit Court of Appeal Court rejected the participants argument that the plan administrator under a non-ERISA governed deferred compensation plan had a duty to fund payment under the Plan despite the threat of insolvency. The Court held that although it recognized that discretion to plan administrators are subject to the implied duty of good faith, the implied duty of good faith is merely an "interpretive tool to determine the parties' justifiable expectations" and it may not be used to add new terms to an agreement or to override express contractual terms. Because the plan at issue did not impose such a requirement on the administrators of that plan, no fiduciary duty existed. Similarly, in this case, Pasko owes no fiduciary duty to Plaintiff.

***Third,*** the Plan allows the Administrator to delegate authority. Thus, even assuming as true the allegations in the Amended Complaint that Pasko allowed third parties to suspend payment under the Plan, *Complaint, Para. 95,* such delegation is expressly authorized under the Plan and cannot form the grounds for a claim for breach of fiduciary duty.

***Fourth,*** the Plan does not subject a member of the Board of Managers to individual liability. Even if Pasko were to have acted in bad faith as alleged, Pasko is not a party to the Plan or to the Award Agreement in his individual capacity and cannot therefore be individually liable.

He did not sign the Award Agreement in his individual capacity and only signed the Award Agreement in his capacity as "Managing Partner", as shown here:

**777 PARTNERS LLC**

By: Steven W. Pasko
Name: Steven Pasko
Title: Managing Partner

**PARTICIPANT:**

Scott Sidell
Name: Scott Sidell

Delaware law, which governs the Award Agreement and the Plan, follows black letter law which holds that officers of an entity are not liable for the obligations of that entity unless they have expressly bound themselves to those obligations. *See, Ruggiero v. FuturaGene, plc.,* 948 A.2d 1124, 1132 (Del. Ch. 2008) ("Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually.") (internal citations omitted.)

Thus, based on the four corners of the Complaint, Pasko never bound himself to the terms of the Award Agreement or the Plan because he signed the Award Agreement, which incorporated the terms of the Plan, in his representative capacity as a Managing Member of 777. The documents attached to the Complaint evidence unequivocally that Pasko was never a party to those agreements and he never signed those agreements in his individual capacity.

***Finally***, no doubt aware of these fatal flaws to his claim, Plaintiff attempts to create a catch-all duty of fiduciary duty owed by Pasko to Plaintiff by extending the source of the duty beyond the terms of the Plan (which are non-existent) to the terms of the 777 Operating Agreement. This vaguely-alleged theory of liability must be seen for what it is and rejected wholesale. Plaintiff has

not attached the Operating Agreemetn nor cited any provision of the Operating Agreement which would give rise to a fiduciary duty owed by Pasko individually to Plaintiff in connection with payment of the Award under the Plan. Absent such a provision – which does not exist – Plaintiff's claim against Pasko individually must fail.

In short, Pasko cannot be held personally liable for any of the obligations under the Plan and Count IV must be dismissed.

**MOTION TO STRIKE CLAIM FOR ALL DAMAGES UNDER COUNT II**

Count II seeks compensatory damages and an award of prejudgment interest and attorney's fees under Delaware law for the alleged breach of the Employment Agreement entered into between 777 and Plaintiff. The Employment Agreement, however, is governed by Florida law and not Delaware law. *See Employment Agreement, Para. 15(h).* Plaintiff must plead entitlement to damages under Florida and not Delaware law and the claim for damages under Delaware law must be stricken.

**MOTION TO STRIKE CLAIM FOR ATTORNEY'S FEES**

Plaintiff seeks an award of attorney's fees as to all Counts under Delaware law. Because Delaware follows the American Rule and does not allow for the recovery of attorney's fees absent a contractual or statutory provision, Plaintiff's claim for attorney's fees must be stricken. *See, In re Delaware Pub. Sch. Litig.,* 312 A.3d 703, 715 (Del. 2024) (Delaware follows the "American Rule" in awarding attorneys' fees, which provides that " 'a litigant must, himself, defray the cost of being represented by counsel.' ") (internal citations omitted.)

Plaintiff seeks an award of punitive damages under Delaware law against Pasko under Count IV of the Amended Complaint. Even if Plaintiff could state a cause of action against Pasko – which he cannot – Plaintiff's claim for punitive damages must be stricken. Under Delaware law, punitive damages are not awardable for breach of contract, regardless of how reprehensible the party's conduct. In *E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 445 (Del. 1996), after analyzing the rationale for imposing punitive damages in contractual relationships, the Court declined to extend the law to allow for punitive damages in the context of employment related claims, as it was extended in the insurance context. In a thorough and well-reasoned opinion, the *Pressman* Court affirmed the long- held principle that "punitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort." (internal citations omitted.) "Unless the bad faith rises to the level of an independent tort, which itself would support an award of punitive damages, mere bad faith on the part of a party to a contract will not give rise to punitive damages." *Id. Citing* Anderson, *Damages Under the Uniform Commercial Code* § 11:35 (1992 & Supp.1995).

WHEREFORE, 777 respecfully requests an Order (1) dismissing the Count IV of the Anended Complaint; (2) striking the claim for damages under Count I; (3) striking the claims for attorney's fees under all Counts; and (4) striking the claim punitive damages under Count IV, and such other and further relief as this Court deems just and proper.

Dated July 3, 2025

____________________________
Leonor M. Lagomasino, Esq.
Florida Bar No. 750018
llagomasino@grsm.com
**GORDON REES SCULLY MANSUKHANI, LLP**
100 SE Second Street, Suite 3900
Miami, FL 33131

Telephone: (305) 428-5330
***Counsel for Defendants 777 and Steven Pasko***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 3, 2025, I caused a true copy of the foregoing was electronically served via the Florida Portal filing system, which will serve a copy to all attorneys on the service list.

***/s/ Leonor M. Lagomasino***
Leonor M. Lagomasino

**Service List**

**Tulio D. Chirinos, Esq.**
Chirinos Law Firm PLLC
370 Camino Gardens Blvd., Ste 106
Boca Raton, FL 33432
Tel: 561-299-6334
tchirinos@chirinoslawfirm.com

***Counsel for Petitioners***

….

# Exhibit C

## Defendants' Motion to Quash Subpoena to Stearns Weaver and Motion for Protective Order

**IN THE CIRCUIT COURT OF THE 11TH JUDICIAL DISTRICT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

SCOTT SIDELL,

Plaintiff,

vs.

777 PARTNERS LLC, and STEVEN PASKO,

Defendants.

CASE NO. 2025-006423-CA-01

**DEFENDANTS' MOTION TO QUASH SUBPOENA TO STEARNS WEAVER AND MOTION FOR PROTECTIVE ORDER**

Defendants, 777 Partners LLC ("777") and Steven Pasko ("Pasko"), through their counsel, move to quash the Subpoena to its attorneys at the law firm of Stearns Weaver Miller ("Stearns Weaver") which seeks documents protected by the attorney-client privilege. Defendants also seek the issuance of a protective order prohibiting the disclosure by Stearns Weaver of those attorney-client privileged documents. In support of these Motions, Defendants state as follows:

1. Defendants move to quash the Subpoena issued to counsel for Defendants, Stearns Weaver, and move for protective order as to the disclosure of the documents sought in that Subpoena. The Subpoena on its face reveals it seeks the production of documents which are protected by the attorney-client privilege (the "Privileged Communications".) Defendants have unequivocally communicated to Plaintiff that they have not and do not waive the attorney-client privilege as to those Privileged Communications.

2. Instead, on May 6, 2026, Plaintiff advised the Court it will issue the Subpoena because Defendants did not object to the Notice of Intent to serve the Subpoena by May 4, 2026, in accordance with Rule 1.351.

3. Inexcusably, however, Plaintiff's counsel failed to disclose to this Court that, when

she served the Notice of Intent, she also stated that the Subpoena was being held ***"in abeyance",*** such that the ten-day period to object to the Notice of Intent never began to run. Plaintiff's counsel also never advised Defendants that she would no longer hold the Subpoena in abeyance such that the ten-day response period would begin to run.

4. Accordingly, in reliance on Plaintiff's counsel's representation that the Subpoena would be held in abeyance, Defendants did not serve their objections to the Notice of Intent.

5. Defendants therefore seek an Order quashing the Subpoena because Plaintiff is estopped from changing its position and seeking an issuance of the Subpoena.

6. Alternatively, even if this Court allows the issuance of the Subpoena on procedural grounds, Defendants hereby move to quash the subpoena and move for protective order on substantive grounds because the Subpoena seeks documents which are protected by the attorney-client privilege, as evidenced on the face of the Subpoena.

7. Within the hour after Plaintiff filed its Notice, the parties met and conferred as to the relief sought herein and Plaintiff insists on moving forward with the issuance of the Subpoena.

## MEMORANDUM OF FACT AND LAW

### I. FACTS

#### A. THE SUBPOENA ON ITS FACE SEEKS ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS.

The Subpoena seeks production from Stearns Weaver, 777's legal counsel, of the following attorney-client privilege documents, referenced above as the "Privileged Communications":

**DOCUMENTS TO BE PRODUCED**

**REQUEST NO. 1:**

The memorandum, brief, or final work product prepared by You and provided to 777 or any of its officers, employees, shareholders, or members including Defendant Steven Pasko, related to Your opinion with respect to the suspension of the Cash Plan and/or related Award Agreement.

**REQUEST NO. 2:**

Any email or document prepared by You and provided to 777 or any of its officers, employees, shareholders, or members including Defendant Steven Pasko, related to Your opinion with respect to the suspension of the Cash Plan and/or related Award Agreement.

*See, Subpoena.*

The Subpoena includes a request for any memorandum, brief, or final work product related to Stearns Weaver's opinion with respect to the suspension of the777 Deferred Cash Plan and/or related Award Agreement. The Subpoena further asks for documentation evidencing the transmittal of that opinion to Defendants. The scope of the Subpoena seeks the production of only attorney-client privileged documents pertaining to legal advice given by Stearns Weaver in connection with the suspension of the 777 Deferred Cash Plan and does not include a request for any non-privileged documents.

The topic of the requested Privileged Communications pertains to the legality of the suspension of the 777 Cash Deferred Plan. In this case, Plaintiff sued 777 for breach of the 777 Cash Deferred plan and sued Pasko for breach of fiduciary duty related to the suspension of that Plan, challenging the legality of the suspension. Plaintiff therefore seeks documents memorializing the opinions of 777 lawyers as to the very legal issue in this lawsuit, reaching the core of the attorney-client privilege.

Plaintiff does not dispute these documents are otherwise privileged nor does Plaintiff

dispute that Defendants did not waive the privilege. Instead, based on conversations with Plaintiff's counsel, Plaintiff intends to challenge the assertion of the privilege based upon a narrow exception to the privilege -- which Defendants deny applies. The applicability of the purported exception has not been brought before the Court, while the applicability of the attorney-client privilege remains sacrosanct.

In short, the attorney-client privilege applies in this case and Defendants are entitled to an order quashing the Subpoena and a protective order as to the documents which are the subject of the Subpoena.

### B. THE NOTICE OF INTENT TO SERVE THE SUBPOENA WAS HELD IN ABEYANCE.

On April 24, 2026, Plaintiff served its Notice of Intent to serve the Subpoena, but also stated the Subpoena was held **"in abeyance"** pending our client's agreement to mediate. The April 24 email attaching the Notice of Intent is set forth below as follows in its entirety:

> Leo,
>
> Please find attached a notice of intent to serve subpoena duces tecum without deposition directed to Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., a/k/a Stearns Weaver Miller, in the above referenced litigation.
>
> ***We will hold the subpoena in abeyance*** if your clients want to mediate now that they have insurance coverage for this litigation.
>
> Thank you,
>
> [Nicole Cvercko]

(Emphasis added.)

The common understanding of the words ***"in abeyance"*** mean *"**a state of not happening or being used at present**."* *See, Cambridge Advanced Learner's Dictionary &*

*Thesaurus © Cambridge University Press.* Thus, the Notice of Intent was not in effect and not being used when it was served. ***As such, the ten-day deadline to object to the Notice of Intent never began to run.***

Defendants reasonably relied on Plaintiff's counsel's statement that the Subpoena would be held in abeyance pending an agreement to mediate or not mediate. The parties had not discussed mediation as of May 4, 2026 or thereafter, and for that reason Defendants did not file an objection to the Notice of Intent.

Indeed, within a few days after service of the Notice of Intent, Plaintiff requested a meet and confer to discuss Defendants' responses to discovery related to the Privileged Communications. On May 5, 2026, undersigned and Plaintiff's counsel, Nicole Cvercko, met via zoom to discuss the Privileged Communications. During that call, ndersigned in no uncertain terms expressed that Defendants were objecting to producing the Privileged Communications, which Plaintiff does not dispute.

During that call, Ms. Cvercko did not raise the topic of mediation nor did she indicate that Plaintiff would no longer hold the Subpoena in abeyance given there had been no agreement to mediate. Instead, the parties agreed that Defendants would amend their discovery responses and provide a privilege log to include the Privileged Communications. In Ms. Cvercko's subsequent confirming email regarding that meet and confer, she makes no mention of the Notice of Intent or mediation, and there is simply no other correspondence by Plaintiff's counsel indicating they would no longer hold the Subpoena in abeyance, thus triggering the ten day response time. Accordingly, Defendants were never on notice that Plaintiff was no longer holding the Subpoena in abeyance and thus did not file their objections to the Notice of Intent. Plaintiff is therefore estopped from seeking issuance of the subpoena and the subpoena must be quashed.

For these reasons, the Subpoena should be quashed.

Alternatively, if the Court does not quash the Subpoena on procedural grounds, Defendants move for protective order as to the documents sought therein under on the substantive grounds they are protected by the attorney-client privilege under *Fla. Stat. 90.502*. The privilege belongs to Defendants, and Defendants have standing to raise the objections to the Subpeona at this time. Defendants do so without waiving Stearns Weaver's ability to respond on behalf of Defendants in the event the Subpoena is not quashed or this Court otherwise denies this Motion.

## II. APPLICABLE LAW.

### A. THE SUBPOENA SHOULD BE QUASHED ON PROCEDURAL GROUNDS BECAUSE THE SUBPOENA WAS HELD IN ABEYANCE.

Defendants reasonably relied on Plaintiff's representation that it was holding the Subpoena in abeyance pending Defendants' agreement to mediate. The parties never discussed mediation – even during the May 5 meet and confer -- or that Plaintiff would no longer hold the Subpoena in abeyance. The Subpoena should therefore be quashed because Plaintiff should be estopped from maintaining that the ten-day period under Rule 1.351(b) expired.

### B. ALTERNATIVELY, ON SUBSTANTIVE GROUNDS, DEFENDANTS ARE ENTITLED TO AN ORDER QUASHING THE SUBPOENA AND FOR PROTECTIVE PURSUANT TO FLA.R.CIV.P. 1.280(D) OR, ALTERNATIVELY, FLA.R.CIV.P. 1.351(D).

#### 1. Florida Rule of Civil Procedure 1.280(d).

Defendants move to quash the Subpoena and for protective order under Fla.R.C.P. 1.280(d) which provides in relevant part as follows:

> **(d) Protective Orders.** On motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any

order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense that justice requires, including 1 or more of the following:

(1) that the discovery not be had; …

(4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; …

Here, good cause exists to quash the Subpoena and order that discovery not be had because of the irreparable harm which would result to Defendants if Stearns Weaver were compelled to produce the Privileged Communications.

"The attorney-client privilege is the oldest confidential communication at common law and ... is ***'traditionally deemed worthy of maximum legal protection***.' " *Nova Se. Univ., Inc. v. Jacobson,* 25 So. 3d 82, 86 (Fla. 4th DCA 2009), citing *BNP Paribas v. Wynne,* 967 So.2d 1065, 1067 (Fla. 4th DCA 2007) (emphasis added.)

The privilege is codified and protects confidential communications. *Fla. Stat. 90.502* codifies the privilege which provides in relevant part that "[a] client has a privilege to refuse to disclose, ***and to prevent any other person from disclosing***, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client." *Fla. Stat. 90.502(2).* (Emphasis added.) A communication between lawyer and client is 'confidential' if it is not intended to be disclosed to third persons other than those necessary for the rendition of legal services or the transmission of the communication. *Fla. Stat. 9*0.502(1)(c). The privilege may be asserted by the client (i.e., Defendants) or its lawyers (i.e. Stearns Weaver). *Fla Stat. 90.502(3)(a) and (e); Neu v. Miami Herald Pub. Co.,* 462 So.2d 821, 825 (Fla.1985).

If Stearns Weaver were required to produce the Privileged Communications, Defendants would be materially and irreparably harmed, thus mandating that the Subpoena be quashed and a

protective order be issued.

A trial court's order erroneously compelling discovery of information protected from discovery by the attorney-client privilege is reviewable by certiorari because of the material and irreparable harm which would be caused by such an order. *Bennett v. Berges*, 84 So. 3d 373, 374–75 (Fla. 4th DCA 2012), citing *S & I Invs. v. Payless Flea Market, Inc.,* 10 So.3d 699, 701 (Fla. 4th DCA 2009); *see also Allstate Ins. Co. v. Langston,* 655 So.2d 91, 94 (Fla.1995). "The basis for allowing certiorari review of certain discovery orders is that discovery of protected material could result in letting the 'cat out of the bag,' and injury could result if such information was disclosed." *Cape Canaveral Hosp., Inc. v. Leal,* 917 So.2d 336, 339 (Fla. 5th DCA 2005). When a party is required to turn over protected documents, they are beyond relief. " *Id. citing Langston,* 655 So.2d at 94 n. 2.

As shown above, this Court may take notice based on the face of the Subpoena that the documents Plaintiff seeks to be produced by Stearns Weaver are attorney-client protected documents which encompass Stearns Weaver's opinions as to the subject matter of this lawsuit. As Plaintiff acknowledged, no dispute exists Defendants have not and do not waive the privilege as to those Privileged Communications which are the subject of the Subpoena. While Plaintiff claimed it intends to contest the privilege based on a narrow exception, Plaintiff indicated it would do so after Defendants amended their responses to discovery. As such, there has been no ruling by this Court that the privilege does not apply. Defendants therefore seek an Order quashing the Subpoena and issuing a protective order as to the disclosure of the Privileged Communications pursuant to Fla.R.Civ.P. 1280(d).

**2. <u>Florida Rule of Civil Procedure 1.351(c).</u>**

Fla.R.Civ.P. 1.351(c) governs objections after issuance of a subpoena which provides in part that "[i]f the person upon whom the subpoena is served objects at any time before the production of the documents or things, the documents or things shall not be produced under this rule, and relief may be obtained pursuant to rule 1.310." Fla.R.Civ.P. 1.310 governs depositions under oath. Here, because the privilege belongs to Defendants, Defendants in addition to Stearns Weaver have standing to object to the Subpoena in addition to Stearns Weaver.[1]

This Court, however, is not required to wait to rule on the privilege objections until they are raised at a deposition of Stearns Weaver pursuant to Rule 1.310 and must rule on these objections at this time. The amendment to Fla.R.Civ.P. 1.351, which no longer triggered a deposition upon an objection to a third-party subpoena, did not dispose of the trial court's obligation to treat privilege objections differently than it would have the objection been made at a deposition of the non-party records custodian. *Lyons v. Lyons*, 162 So. 3d 212, 215 (Fla. 4th DCA 2015). ***"Any claim of privilege must be ruled on*** and *in camera* inspection conducted ***prior to production of such documents***." *Lyons v. Lyons*, 162 So. 3d 212, 215 (Fla. 4th DCA 2015), *Id.,* citing *Bennett v. Berges,* 84 So.3d 373, 374–75 (Fla. 4th DCA 2012) (emphasis added); *accord Patrowicz,* 110 So.3d at 974. As noted by the *Lyons* Court, "in both *Patrowicz* and *Russell,* the courts granted the petition for certiorari seeking to quash the Rule 1.351 subpoena, not because of the 'self-executing' objection of Rule 1.351, but because the court had not conducted an *in camera* review for privilege." *Id.*

Here, based on the requests on the face of the subpoena, the documents sought invade the

---

[1] Defendants will produce a privilege log as to the Stearns Weaver opinion in its possession but cannot provide one as to the documents in Stearns Weaver's possession. This Motion nonetheless extends to all documents in Stearns Weaver's possession which are responsive to the Subpoena.

attorney-client privilege and seek the opinions of Defendants' attorneys with respect to the issues in this suit. No *in camera* inspection is required, although a ruling by this Court on these objections *is* required prior at this time. Until such ruling has been made, Stearns Weaver is not required to produce the Privileged Communications and, for the reasons set forth herein, Stearns Weaver should never be required to disclose the Privileged Communications.

The Subpoena should therefore be quashed and a protective order issued as to the production of the Privileged Communications.

WHEREFORE, Defendants 777 Partners LLC and Steven Pasko respectfully request an Order Quashing the Subpoena and issuing a protective order as to the Privileged Communications.

Dated: May 8, 2026.

Respectfully submitted,

***s/ Leonor M. Lagomasino***

Leonor M. Lagomasino, Esq.
Florida Bar No. 750018
llagomasino@grsm.com
**GORDON REES SCULLY MANSUKHANI, LLP**
100 SE Second Street, Suite 3900
Miami, FL 33131
Telephone: (305) 428-5330
***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 8, 2026, I caused a true copy of the foregoing was electronically served via the Florida Portal filing system, which will serve a copy to all attorneys on the service list.

***/s/ Leonor M. Lagomasino***
Leonor M. Lagomasino

**<u>Service List</u>**

**Tulio D. Chirinos, Esq.**
Chirinos Law Firm PLLC
370 Camino Gardens Blvd., Ste 106
Boca Raton, FL 33432
Tel: 561-299-6334
tchirinos@chirinoslawfirm.com

**Nicole Cvercko, Esq.**
Chirinos Law Firm PLLC
11 Broadway Ste. 615
New York, NY 10004-1490
Tel: 646-559-9952
ncvercko@ChirinosLawFirm.com

***Counsel for Plaintiff***

# Exhibit D

## August 21 Chirinos Emails with Court

**From:** Tulio Chirinos
**To:** Rubio, Nicole; Leonor Lagomasino
**Cc:** Nicole Cvercko
**Subject:** Re: 2025-006423-CA-01 - Request for Emergency Order Requiring August 25 Hearing Move Forward
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png
Outlook-aaongq21.png
img-43317d2e-7eae-42ba-99a6-b7382cd517fd.png
img-37ab12a8-6e8f-4fac-a055-b90ced8a34b6.png
img-015d1d58-3932-4baf-8de4-dc28d927de12.png
img-c2731907-1af8-4a83-b9bf-30d13b9aac10.png
img-a0102f97-70d3-44fe-9764-6116472323eb.png
img-d791cb0f-1565-4c4b-af00-1b782e73447a.png

---

Thank you, Ms. Rubio.

photo-logo

**Tulio D. Chirinos**
**Managing Partner**
**Chirinos Law Firm PLLC**
Admitted in Florida and Louisiana
561-299-6334 | www.chirinoslawfirm.com
| tchirinos@chirinoslawfirm.com
20283 State Road 7
Boca Raton, FL 33498

Follow us

*****************************************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*****************************************************************************************

---

**From:** Rubio, Nicole <nrubio@jud11.flcourts.org>
**Date:** Friday, August 21, 2026 at 11:24 AM
**To:** Leonor Lagomasino <llagomasino@grsm.com>; Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Cc:** Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** Re: 2025-006423-CA-01 - Request for Emergency Order Requiring August 25 Hearing Move Forward

Good morning,

The hearing on August 25th remains set. It is improper to argue substantive matters over email. Please appear on the 25th, and the Court will address any objections at that time.

Thank you.

Best,

***Nicole Rubio***
Judicial Assistant to the Honorable Judge Mavel Ruiz
Circuit Civil Court
Osvaldo N. Soto Miami-Dade Justice Center
20 N.W. 1st Avenue
Miami, Florida 33128
(305) 349-7101
nrubio@jud11.flcourts.org

**Please note** the allotted time is very important. Kindly request sufficient time, as we will not be able to extend the hearing beyond what is scheduled.

****Proposed dates may have been given for more than one case. Dates are not being held unless clearly stated otherwise.****

---

**From:** Leonor Lagomasino <llagomasino@grsm.com>
**Sent:** Friday, August 21, 2026 7:21 AM
**To:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>; Rubio, Nicole <nrubio@jud11.flcourts.org>
**Cc:** Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** RE: 2025-006423-CA-01 - Request for Emergency Order Requiring August 25 Hearing Move Forward

**EXTERNAL EMAIL:** Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Dear Ms. Rubio,

It was inappropriate for Mr. Chirinos to litigate this matter by email to you, but a few issues need correction which I feel compelled to do here in the event the Court reviews this email in responding to Plaintiff's Request for an Emergency Order. The hearing at issue was noticed by Defendant 777 Partners ("777") on its Motion to Quash Plaintiff's Subpoena to Stearns Weaver.

777 is currently in bankruptcy which stays all proceedings against it. On July 17, 2026, both parties filed a Suggestion of Bankruptcy as to 777. The Suggestion which Plaintiff filed requests that, in light of the automatic stay, "[n]o further orders, rulings or other proceedings be entered or conducted as to Defendant 777 Partners LLC while the automatic stay remains in effect, including any rulings on matters currently pending before the Court as to that Defendant." The Motion at issue was filed by 777 before it was placed in involuntary bankruptcy.

While Plaintiff claims he intends to use the documents he seeks to subpoena in his pending claim against Mr. Pasko, the fact is the pending Motion was filed by 777 because it is 777's attorney-client privilege at issue – not Mr. Pasko's. Any proceedings at this time on 777's Motion to Quash or 777's

Motion for Reconsideration would violate the automatic stay. The Motion will also be argued by 777's counsel which requires a comfort order from the bankruptcy court to allow it to continue.

For this reason, 777 must cancel the hearing on the pending Motion to Quash.

We thank you and the Court for your consideration of this matter.

Leo Lagomasino

---

**LEONOR M. LAGOMASINO**
Partner

**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE LAW FIRM™**
**D:** 305.428.5302 | **M:** 305.632.7684
**E:** llagomasino@grsm.com | grsm.com
Miami Tower, 100 SE Second Street, Suite 3900, Miami, FL 33131
vCard

---

**From:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Sent:** Friday, August 21, 2026 6:22 AM
**To:** Rubio, Nicole <nrubio@jud11.flcourts.org>
**Cc:** Leonor Lagomasino <llagomasino@grsm.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** 2025-006423-CA-01 - Request for Emergency Order Requiring August 25 Hearing Move Forward

Good morning Ms. Rubio,

We received the attached email at 5:26 a.m. this morning from Defense counsel unilaterally cancelling the August 25, 2026 hearing on grounds that are inappropriate to cancel the hearing. Specifically, because a former party to the lawsuit is in bankruptcy. The remaining defendant and the subject of the August 25 hearing is not in bankruptcy, and no stay applies to him (an individual).

We respectfully request that Judge Ruiz order that the hearing take place as scheduled months in advance. If at that time defense counsel would like to argue that the court should not hear the motion because of the bankruptcy it can.

Please let us know how to proceed. If Judge Ruiz would like us to file an emergency motion please let us know and we will do that as well.

Thank you.

**Tulio D. Chirinos**
**Managing Partner**
**Chirinos Law Firm PLLC**
Admitted in Florida and Louisiana
561-299-6334 | www.chirinoslawfirm.com

photo-logo

| tchirinos@chirinoslawfirm.com
20283 State Road 7
Boca Raton, FL 33498

Follow us

*********************************************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*********************************************************************************************

---

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

# **Exhibit E**

**August 21 Chirinos Emails with Debtors' Counsel**

**From:** Tulio Chirinos
**To:** Leonor Lagomasino
**Cc:** Nicole Cvercko
**Subject:** Re: Sidell - we are canceling next week

---

You do not get to unilaterally cancel hearings. We will take action today with the court.

Sent from my iPhone

> On Aug 21, 2026, at 5:26 AM, Leonor Lagomasino <llagomasino@grsm.com> wrote:
>
> Good morning.
>
> We need to cancel next week's hearing in light of 777's bankruptcy. This motion should be stayed because it is bringing 777 back in the case and we are also going to be seeking a comfort order from the court to be able to continue representing 777.
>
> Please let me know if you have any questions.
>
> Leo
>
> ---
>
> This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.
>
> **GORDON REES SCULLY MANSUKHANI, LLP**
> **YOUR 50 STATE LAW FIRM™**
> www.grsm.com

# <u>Exhibit F</u>

## Debtors' Cease and Desist Communication to Chirinos

**From:** Tulio Chirinos
**To:** Jason S. Brookner
**Cc:** Leonor Lagomasino; Elizabeth Janczak; Amber M. Carson; Patricia Ann Redmond; Nicole Cvercko
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")
**Date:** Sunday, August 23, 2026 8:02:14 PM

Understood. We look forward to briefing the issue.

Sent from my iPhone

On Aug 23, 2026, at 8:54 PM, Jason S. Brookner <jbrookner@grayreed.com> wrote:

I don't care what anyone else thinks.

We will proceed accordingly.

**Jason S. Brookner**
**Partner**
Tel 469.320.6132 | Cell 214.563.7313 | Fax 469.320.6894 | jbrookner@grayreed.com
Dallas Office: 1845 Woodall Rodgers Fwy., Suite 1300 | Dallas, TX 75201
Houston Office: 1300 Post Oak Blvd., Suite 2000 | Houston, TX 77056
grayreed.com | Connect with me on LinkedIn

<logo_9ea511f8-dec2-4040-b931-331f2278988a.jpg>

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is
intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please
contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

---

**From:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Sent:** Sunday, August 23, 2026 7:37 PM
**To:** Jason S. Brookner <jbrookner@grayreed.com>
**Cc:** Leonor Lagomasino <llagomasino@grsm.com>; Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District

Action 2025-006423 (the "State Court Action")

They will not be. You may make your motion with the bankruptcy court. I also spoke with several attorneys who are on the unsecured committee and attorneys on both bankruptcy dockets. They do not agree with your conclusion as we do not.

Thank you.

Sent from my iPhone

> On Aug 23, 2026, at 5:58 PM, Jason S. Brookner <jbrookner@grayreed.com> wrote:
>
> Tulio, after further review, it is apparent to me that the Florida proceeding scheduled for Tuesday is subject to the automatic stay.
>
> Starting with first principles, you can't really dispute that the attorney-client privilege belongs to the client (here, 777), not the lawyer. Thus, only the client can waive the privilege. As the Supreme Court recognized in Commodity Futures Trading Commission v. Weintraub, the entity has the privilege, which can then be exercised by the trustee upon conversion to chapter 7 (put another way, loosely, it's the estate representative who has the right to waive the privilege – either the debtor in possession itself if no trustee is appointed, or the trustee if appointed). Here, there is no trustee in place, and so existing management (Mark Shapiro the interim COO and Anna Phillips, the independent director), have the final say, and since neither of them have agreed to anything, the privilege has not been waived.
>
> Next, there's no question that any "property" belonging to the Debtor, whether tangible or intangible, and wherever located and by whomever held, is property of the estate and subject to the automatic stay. I'm sure you're aware of this given that it's the same as saying "the sky is blue."
>
> Looking at the pleadings in Florida—which you were not willing to send for some reason, but which Leo provided—it's pretty clear to me that you're seeking a privileged memo.
> Starting with the subpoena, it seeks the following information:

<image002.png>

The motion to quash filed by Defendants on May 8, 2026 (attached) discussed this issue and addresses why the docs in question are privileged.

The Motion to Quash further states that Plaintiffs do not dispute the privileged nature of the documents and do not dispute that the privilege has not been waived, but instead contend that the docs in question are subject to an EXCEPTION to the privilege.

The contrary argument in the opposition appears to rely on the fact 777 is allegedly a nominal defendant "in name only". As we know, however, an entity's privilege does not depend upon its status as a litigation party; the privilege exists regardless of litigation. And, I am informed that a motion for reconsideration on two counts against 777 remains pending. Consequently and in any event, 777 remains a named defendant and any actions against 777 are therefore stayed.

The opposition then continues – implicitly acknowledging the existence of the privilege – contending that despite the privilege, the fiduciary exception applies and/or the doctrine of necessity and/or the crime fraud exception applies.

The memo then effectively says that plaintiffs aren't even exactly sure if the privilege even applies, and requests an amended privilege log because, among other things, "[t]he first and amended privilege logs provided by Defendants are insufficient to answer key questions that remain outstanding. We therefore seek an order compelling Defendants to provide a supplemental privilege log and sworn factual information concerning the document, including who specifically requisitioned the memorandum from 777 . . . . Further, this Court requires basic predicate facts such as the documents purpose, participants, transmission , and payment, to properly evaluate the privilege assertion, including whether the beneficiary exception to attorney client privilege applies."

Whether discovery may proceed against a debtor is a question for the bankruptcy court and may not proceed absent relief from the automatic stay. *See generally, eg*, In re Com. Fin. Servs., Inc., 247 B.R. 828 (Bankr. N.D. Okla. 2000). Allowing this issue to proceed in

state court is a direct violation of the automatic stay.

We understand that G&R tried to pull down the motion, but you refused and insisted that the matter proceed, despite the automatic stay.

And so, in the interests of avoiding litigation and following on my initial email to you from Friday night, we demand that you immediately cease and desist from pursuing this issue before the Florida court—in fact, before any court other than the US Bankruptcy Court for the Northern District of Texas, Forth Worth Division (the court in which the 777 chapter 11 proceedings are pending).

Please advise no later than Noon ET (11 CT tomorrow) that the proceedings on this matter in Florida are suspended/pulled down and will not proceed, or we will seek appropriate recourse before Judge Morris, which may include, among other things, an award of legal fees and issuance of a contempt order for violating the automatic stay.

Needless to say, all rights are reserved.

---

**From:** Leonor Lagomasino <llagomasino@grsm.com>
**Sent:** Friday, August 21, 2026 7:18 PM
**To:** Jason S. Brookner <jbrookner@grayreed.com>; Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Cc:** Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

Jason,

I can assure you that most Florida lawyers I have dealt with are nowhere as discourteous and unprofessional as Mr. Chirinos. I am sorry you were dealing with this.

As soon as I get back this evening, I will send you the documents you are requesting.

Thank you for your efforts in trying to resolve what should be a fairly straight forward outcome in a bankruptcy-related matter.

Leo

---

**From:** Jason S. Brookner <jbrookner@grayreed.com>
**Sent:** Friday, 21 August 2026 19:48:13
**To:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Cc:** Leonor Lagomasino <llagomasino@grsm.com>; Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

You don't often get email from jbrookner@grayreed.com. Learn why this is important

I'm not a Florida lawyer and don't have docket nos or access to the state court docket. And so if you could provide the relevant pleadings that would be appreciated, as my understanding is that the memo in question was prepared for 777 and the issue is the privilege relative to that memo.

Perhaps I'm reading the wrong documents — thus my request for you to please provide.

---

**From:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Sent:** Friday, 21 August 2026 18:44:08
**To:** Jason S. Brookner <jbrookner@grayreed.com>
**Cc:** llagomasino@grsm.com <llagomasino@grsm.com>; Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

You have the docket number you can pull. If you'd like to speak

on Monday we can. Just let me know.

I'm cc'ing my colleague Nicole please make sure she is included in emails on this matter.

Sent from my iPhone

On Aug 21, 2026, at 7:36 PM, Jason S. Brookner <jbrookner@grayreed.com> wrote:

Thank you for the response.

Please provide the motions and responses at your convenience.

My understanding is that you are seeking privileged information under some exception/doctrine – is that not correct?

If there is a question over whether the relevant information is the Debtors' or someone else's – and hence whether it's property of the estate or not – that is an issue that is exclusively within Judge Morris' jurisdiction.

Thanks.

**Jason S. Brookner**
**Partner**
Tel 469.320.6132 | Cell 214.563.7313 | Fax 469.320.6894 | jbrookner@grayreed.com
Dallas Office: 1845 Woodall Rodgers Fwy., Suite 1300 | Dallas, TX 75201
Houston Office: 1300 Post Oak Blvd., Suite 2000 | Houston, TX 77056
grayreed.com | Connect with me on LinkedIn

<image001.jpg>

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is
intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please
contact the sender immediately. Any disclosure, copying, distribution or the taking of any

action concerning the contents of
this communication by anyone other than the named recipient(s) is strictly prohibited.

---

**From:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Sent:** Friday, August 21, 2026 6:29 PM
**To:** Jason S. Brookner <jbrookner@grayreed.com>
**Cc:** llagomasino@grsm.com; Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

Thanks, Jason. We shall govern ourselves accordingly.

The information is not 777 Partners. It belongs to the plan members. You may review our motions and attend the hearing on August 25 and make any arguments you have to Judge Ruiz. Ms. Lagomasino can give the the dial in information.

Thanks

Sent from my iPhone

> On Aug 21, 2026, at 6:34 PM, Jason S. Brookner <jbrookner@grayreed.com> wrote:
>
> Mr. Chirinos, re-sending my email as I mis-typed your email the first time – please see below.
>
> ---
>
> **From:** Jason S. Brookner
> **Sent:** Friday, August 21, 2026 5:31 PM
> **To:** 'chirinos@chirinoslawfirm.com'

<chirinos@chirinoslawfirm.com>
**Cc:** 'llagomasino@grsm.com' <llagomasino@grsm.com>; Janczak, Elizabeth <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond (predmond@stearnsweaver.com) <predmond@stearnsweaver.com>
**Subject:** Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

Mr. Chirinos, good evening.

This firm represents 777 Partners and multiple affiliates in their chapter 11 cases pending in the Northern District of Texas, Forth Worth Division, under Case No. 26-90190, before the Honorable E. Lee Morris.

It has come to our attention that your firm has served a subpoena on the Stearns Weaver law firm seeking what I am told is privileged information belonging to 777 Partners, which has resulted in a motion to quash by Gordon Rees, one of the Debtors' law firms defending the State Court Action.

As you may know, any of the Debtors' property or information, no matter where it may be located in the Universe (which includes any of the Debtors' property held by held by Stearns Weaver) is property of the Debtors' estate under section 541 of the Bankruptcy Code.  Andy attempt obtain or exercise control over the same is prohibited by section 362(a)(3) of the Bankruptcy Code (among potentially other applicable subsections of section 362).

The Debtors demand that you immediately cease and desist from taking or continuing any further action or proceeding to obtain any property of the Debtor, including the

Debtors' privileged information.

A failure or refusal to immediately cease and desist in the State Court Action will be deemed an intentional and continuing violation of the automatic stay, and the Debtors will seek all appropriate relief before Judge Morris.

If you have any questions, please feel free to contact me at the number listed below.

Of course, the Debtors reserve all rights.

Govern yourself accordingly.

**Jason S. Brookner**
**Partner**
Tel 469.320.6132 | Cell 214.563.7313 | Fax 469.320.6894 | jbrookner@grayreed.com
Dallas Office: 1845 Woodall Rodgers Fwy., Suite 1300 | Dallas, TX 75201
Houston Office: 1300 Post Oak Blvd., Suite 2000 | Houston, TX 77056
grayreed.com | Connect with me on LinkedIn

<image001.jpg>

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

<logo_9ea511f8-dec2-4040-b931-331f2278988a.jpg>

---

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If

you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

<2026-05-08 SIDELL DEFS MOTION TO QUASH SUBPOENA TO STEARNS WEAVER AND MOTION FOR PROTECTIVE ORDER(117194102.1).pdf>
<2026-05-30 Pf's Corrected Response in Opposition to Df's Motion to Quash Subpoena(118214550.1).pdf>
<2025-06-23 First Amended Complaint(103472985.1).pdf>

**From:** Jason S. Brookner
**To:** Tulio Chirinos; Leonor Lagomasino
**Cc:** Elizabeth Janczak; Amber M. Carson; Patricia Ann Redmond; Nicole Cvercko
**Subject:** RE: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")
**Date:** Sunday, August 23, 2026 4:57:52 PM
**Attachments:** 2026-05-08 SIDELL DEFS MOTION TO QUASH SUBPOENA TO STEARNS WEAVER AND MOTION FOR PROTECTIVE ORDER(117194102.1).pdf
image002.png
2026-05-30 Pf"s Corrected Response in Opposition to Df"s Motion to Quash Subpoena(118214550.1).pdf
2025-06-23 First Amended Complaint(103472985.1).pdf

---

Tulio, after further review, it is apparent to me that the Florida proceeding scheduled for Tuesday is subject to the automatic stay.

Starting with first principles, you can't really dispute that the attorney-client privilege belongs to the client (here, 777), not the lawyer. Thus, only the client can waive the privilege. As the Supreme Court recognized in Commodity Futures Trading Commission v. Weintraub, the entity has the privilege, which can then be exercised by the trustee upon conversion to chapter 7 (put another way, loosely, it's the estate representative who has the right to waive the privilege – either the debtor in possession itself if no trustee is appointed, or the trustee if appointed). Here, there is no trustee in place, and so existing management (Mark Shapiro the interim COO and Anna Phillips, the independent director), have the final say, and since neither of them have agreed to anything, the privilege has not been waived.

Next, there's no question that any "property" belonging to the Debtor, whether tangible or intangible, and wherever located and by whomever held, is property of the estate and subject to the automatic stay. I'm sure you're aware of this given that it's the same as saying "the sky is blue."

Looking at the pleadings in Florida—which you were not willing to send for some reason, but which Leo provided—it's pretty clear to me that you're seeking a privileged memo.
Starting with the subpoena, it seeks the following information:



The motion to quash filed by Defendants on May 8, 2026 (attached) discussed this issue and addresses why the docs in question are privileged.

The Motion to Quash further states that Plaintiffs do not dispute the privileged nature of the documents and do not dispute that the privilege has not been waived, but instead contend that the docs in question are subject to an EXCEPTION to the privilege.

The contrary argument in the opposition appears to rely on the fact 777 is allegedly a nominal defendant "in name only". As we know, however, an entity's privilege does not depend upon its status as a litigation party; the privilege exists regardless of litigation. And, I am informed that a motion for reconsideration on two counts against 777 remains pending. Consequently and in any event, 777 remains a named defendant and any actions against 777 are therefore stayed.

The opposition then continues – implicitly acknowledging the existence of the privilege – contending that despite the privilege, the fiduciary exception applies and/or the doctrine of necessity and/or the crime fraud exception applies.

The memo then effectively says that plaintiffs aren't even exactly sure if the privilege even applies, and requests an amended privilege log because, among other things, "[t]he first and amended privilege logs provided by Defendants are insufficient to answer key questions that remain outstanding. We therefore seek an order compelling Defendants to provide a supplemental privilege log and sworn factual information concerning the document, including who specifically requisitioned the memorandum from 777 . . . . Further, this Court requires basic predicate facts such as the documents purpose, participants, transmission , and payment, to properly evaluate the privilege assertion, including whether the beneficiary exception to attorney client privilege applies."

Whether discovery may proceed against a debtor is a question for the bankruptcy court and may not proceed absent relief from the automatic stay. *See generally, eg*, In re Com. Fin. Servs., Inc., 247 B.R. 828 (Bankr. N.D. Okla. 2000). Allowing this issue to proceed in state court is a direct violation of the automatic stay.

We understand that G&R tried to pull down the motion, but you refused and insisted that the matter proceed, despite the automatic stay.

And so, in the interests of avoiding litigation and following on my initial email to you from Friday night, we demand that you immediately cease and desist from pursuing this issue before the Florida court—in fact, before any court other than the US Bankruptcy Court for the Northern District of Texas, Forth Worth Division (the court in which the 777 chapter 11 proceedings are pending).

Please advise no later than Noon ET (11 CT tomorrow) that the proceedings on this matter in

Florida are suspended/pulled down and will not proceed, or we will seek appropriate recourse before Judge Morris, which may include, among other things, an award of legal fees and issuance of a contempt order for violating the automatic stay.

Needless to say, all rights are reserved.

---

**From:** Leonor Lagomasino <llagomasino@grsm.com>
**Sent:** Friday, August 21, 2026 7:18 PM
**To:** Jason S. Brookner <jbrookner@grayreed.com>; Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Cc:** Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

Jason,

I can assure you that most Florida lawyers I have dealt with are nowhere as discourteous and unprofessional as Mr. Chirinos. I am sorry you were dealing with this.

As soon as I get back this evening, I will send you the documents you are requesting.

Thank you for your efforts in trying to resolve what should be a fairly straight forward outcome in a bankruptcy-related matter.

Leo

---

**From:** Jason S. Brookner <jbrookner@grayreed.com>
**Sent:** Friday, 21 August 2026 19:48:13
**To:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Cc:** Leonor Lagomasino <llagomasino@grsm.com>; Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

You don't often get email from jbrookner@grayreed.com. Learn why this is important

I’m not a Florida lawyer and don’t have docket nos or access to the state court docket. And so if you could provide the relevant pleadings that would be appreciated, as my understanding is that the memo in question was prepared for 777 and the issue is the privilege relative to that memo.

Perhaps I’m reading the wrong documents — thus my request for you to please provide.

---

**From:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Sent:** Friday, 21 August 2026 18:44:08
**To:** Jason S. Brookner <jbrookner@grayreed.com>
**Cc:** llagomasino@grsm.com <llagomasino@grsm.com>; Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>; Nicole Cvercko <ncvercko@ChirinosLawFirm.com>
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

You have the docket number you can pull. If you’d like to speak on Monday we can. Just let me know.

I’m cc’ing my colleague Nicole please make sure she is included in emails on this matter.

Sent from my iPhone

> On Aug 21, 2026, at 7:36 PM, Jason S. Brookner <jbrookner@grayreed.com> wrote:
>
> Thank you for the response.
>
> Please provide the motions and responses at your convenience.
>
> My understanding is that you are seeking privileged information under some exception/doctrine – is that not correct?
>
> If there is a question over whether the relevant information is the Debtors’ or someone else’s – and hence whether it’s property of the estate or not – that is an issue that is exclusively within Judge Morris’ jurisdiction.
>
> Thanks.

**Jason S. Brookner**
**Partner**
Tel 469.320.6132 | Cell 214.563.7313 | Fax 469.320.6894 | jbrookner@grayreed.com
Dallas Office: 1845 Woodall Rodgers Fwy., Suite 1300 | Dallas, TX 75201
Houston Office: 1300 Post Oak Blvd., Suite 2000 | Houston, TX 77056
grayreed.com | Connect with me on LinkedIn

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

---

**From:** Tulio Chirinos <TChirinos@ChirinosLawFirm.com>
**Sent:** Friday, August 21, 2026 6:29 PM
**To:** Jason S. Brookner <jbrookner@grayreed.com>
**Cc:** llagomasino@grsm.com; Elizabeth Janczak <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond <predmond@stearnsweaver.com>
**Subject:** [EXTERNAL] Re: Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

Thanks, Jason. We shall govern ourselves accordingly.

The information is not 777 Partners. It belongs to the plan members. You may review our motions and attend the hearing on August 25 and make any arguments you have to Judge Ruiz. Ms. Lagomasino can give the the dial in information.

Thanks

Sent from my iPhone

> On Aug 21, 2026, at 6:34 PM, Jason S. Brookner <jbrookner@grayreed.com> wrote:
>
> Mr. Chirinos, re-sending my email as I mis-typed your email the first

time – please see below.

---

**From:** Jason S. Brookner
**Sent:** Friday, August 21, 2026 5:31 PM
**To:** 'chirinos@chirinoslawfirm.com' <chirinos@chirinoslawfirm.com>
**Cc:** 'llagomasino@grsm.com' <llagomasino@grsm.com>; Janczak, Elizabeth <ejanczak@sgrlaw.com>; Amber M. Carson <acarson@grayreed.com>; Patricia Ann Redmond (predmond@stearnsweaver.com) <predmond@stearnsweaver.com>
**Subject:** Sidell v. 777 Partner and Pasko, Miami Dade 11th District Action 2025-006423 (the "State Court Action")

Mr. Chirinos, good evening.

This firm represents 777 Partners and multiple affiliates in their chapter 11 cases pending in the Northern District of Texas, Forth Worth Division, under Case No. 26-90190, before the Honorable E. Lee Morris.

It has come to our attention that your firm has served a subpoena on the Stearns Weaver law firm seeking what I am told is privileged information belonging to 777 Partners, which has resulted in a motion to quash by Gordon Rees, one of the Debtors' law firms defending the State Court Action.

As you may know, any of the Debtors' property or information, no matter where it may be located in the Universe (which includes any of the Debtors' property held by held by Stearns Weaver) is property of the Debtors' estate under section 541 of the Bankruptcy Code. Andy attempt obtain or exercise control over the same is prohibited by section 362(a)(3) of the Bankruptcy Code (among potentially other applicable subsections of section 362).

The Debtors demand that you immediately cease and desist from taking or continuing any further action or proceeding to obtain any property of the Debtor, including the Debtors' privileged information.

A failure or refusal to immediately cease and desist in the State Court Action will be deemed an intentional and continuing violation of the automatic stay, and the Debtors will seek all appropriate relief before Judge Morris.

If you have any questions, please feel free to contact me at the number listed below.

Of course, the Debtors reserve all rights.

Govern yourself accordingly.

**Jason S. Brookner**
**Partner**
Tel 469.320.6132 | Cell 214.563.7313 | Fax 469.320.6894 | jbrookner@grayreed.com
Dallas Office: 1845 Woodall Rodgers Fwy., Suite 1300 | Dallas, TX 75201
Houston Office: 1300 Post Oak Blvd., Suite 2000 | Houston, TX 77056
grayreed.com | Connect with me on LinkedIn

<image001.jpg>

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is
intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please
contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of
this communication by anyone other than the named recipient(s) is strictly prohibited.

<logo_9ea511f8-dec2-4040-b931-331f2278988a.jpg>

---

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

# <u>Exhibit G</u>

## Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | §<br>§<br>§ | Chapter 11 |
| SIGNAL NATIONAL LLC., *et al.*,[1] | §<br>§ | Case No. 26-90190 (ELM) |
| Debtors. | §<br>§ | (Jointly Administered |
| | § | **Re: Docket No. ___** |

**ORDER (I) ENFORCING THE AUTOMATIC STAY,**
**(II) DETERMINING THAT THE BANKRUPTCY COURT HAS**
**EXCLUSIVE JURISDICTION OVER PROPERTY-OF-THE-ESTATE**
**DETERMINATIONS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (a) enforcing the automatic stay imposed by section 362(a) of the Bankruptcy Code, (b) determining that the Bankruptcy Court has exclusive jurisdiction over property-of-the-estate determinations pursuant to 28 U.S.C. §

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/SignalNational. The Debtors' address for service in these chapter 11 cases is 3500 Maple Ave, Suite 420, Dallas, TX 75219.

1334(e)(1), and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion and the record of the hearing on such Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. The automatic stay under 11 U.S.C. § 362(a) is in full force and effect with respect to the Debtors and property of the Debtors' estates.

3. Discovery against the Debtors in prepetition litigation, including the Florida Litigation (Case No. 2025-006423-CA-01, Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida), is stayed pursuant to 11 U.S.C. § 362(a)(1).

4. This Court has exclusive jurisdiction under 28 U.S.C. § 1334(e)(1) over all property of the Debtors and property of the Debtors' estates, including the threshold determination of whether specific property constitutes property of the estate.

5. Any determination of whether documents or other property constitute property of

the Debtors' estates, including determinations concerning the Debtors' attorney-client privilege, falls within this Court's exclusive jurisdiction.

6. Scott Sidell and his counsel are directed to immediately cease all proceedings in the Florida Litigation (Case No. 2025-006423-CA-01) that implicate the Debtors or property of the Debtors' estates, including but not limited to (a) the subpoena to Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., (b) any hearing on 777 Partners LLC's Motion to Quash, and (c) any other proceeding that would require adjudication of 777 Partners LLC's rights in its privileged communications.

7. The Debtors' rights are reserved, including the right to seek sanctions, attorneys' fees, and contempt relief for willful violations of the automatic stay under 11 U.S.C. § 362(k).

8. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

9. The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

10. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # # END OF ORDER # # #

<u>Submitted by:</u>

Jason S. Brookner (TX Bar No. 24033684)
Amber M. Carson (TX Bar No. 24075610)
Blake M. Bryan (TX Bar No. 24140152)
**GRAY REED**
1845 Woodall Rodgers Fwy, Suite 1300
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
acarson@grayreed.com
bbryan@grayreed.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*